IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
In re:                                          :
                                                :      **Chapter 11**
**APPLIED EXTRUSION TECHNOLOGIES,**             :      **Case No. 04-13388 (      )**
    **INC. and**                                :
                                                :
**APPLIED EXTRUSION TECHNOLOGIES,**             :
    **(CANADA), INC.**                           :      **(Joint Administration Pending)**
                                                :
               **Debtors.**        :
------------------------------------------------------------x

## DEBTORS' SOLICITATION AND DISCLOSURE STATEMENT
## FOR DEBTORS' PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**SHEARMAN & STERLING**
Douglas P. Bartner
Mona A. Touma
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

- and -

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Pauline K. Morgan (No. 3650)
Edward J. Kosmowski (No. 3849)
Alfred Villoch, III (No. 4341)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for Debtors and
Debtors in Possession

**THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT. IN THE EVENT THE COMPANIES LISTED BELOW FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE PLAN OF REORGANIZATION, THIS SOLICITATION AND DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.**

## SOLICITATION AND DISCLOSURE STATEMENT

# APPLIED EXTRUSION TECHNOLOGIES, INC.

### Solicitation of Votes with Respect to the
### Prepackaged Chapter 11 Plan of Reorganization of

### APPLIED EXTRUSION TECHNOLOGIES, INC.
### APPLIED EXTRUSION TECHNOLOGIES (CANADA), INC.

### From the Holders of:

### Applied Extrusion Technologies, Inc.'s 10¾% Series B Senior Notes due 2011

### THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
### 5:00 P.M., EASTERN STANDARD TIME, ON NOVEMBER 24, 2004, UNLESS EXTENDED

Applied Extrusion Technologies, Inc. ("AET") hereby solicits (this "Solicitation") from holders (collectively, "Noteholders") of its 10¾% Series B Senior Notes due 2011 (the "Notes" or "Senior Notes") votes to accept or reject the Plan of Reorganization (the "Plan") under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). The Notes are guaranteed by Applied Extrusion Technologies (Canada), Inc. ("AET Canada" and, together with AET, the "Company"). All capitalized terms used herein shall have the meanings ascribed to them in the Plan unless otherwise noted. A copy of the Plan is attached hereto as Exhibit A.

This Solicitation and Disclosure Statement is being provided to holders of the common stock of AET for information purposes only. **VOTES ARE NOT BEING SOLICITED FROM HOLDERS OF COMMON STOCK OF AET.**

**THE BOARDS OF DIRECTORS OF AET AND AET CANADA HAVE APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE BOARDS OF DIRECTORS OF AET AND AET CANADA RECOMMEND THAT ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SUBMIT BALLOTS TO ACCEPT THE PLAN.**

The date of this Solicitation and Disclosure Statement is November 1, 2004.

The Company has negotiated the terms of the Plan with the members of an ad hoc committee of Noteholders (the "Committee") certain other Noteholders (together with the members of the Committee and as defined in the Plan, the "Restructuring Agreement Noteholders"). The Restructuring Agreement Noteholders have entered into the Restructuring Agreement with the Company to support the Plan. A copy of the Restructuring Agreement is attached hereto as Exhibit B. The Restructuring Agreement Noteholders have informed the Company that they collectively hold or control over 70% of the outstanding principal amount of the Notes as of the date hereof.

**THE RESTRUCTURING AGREEMENT NOTEHOLDERS SUPPORT THE PROPOSED FINANCIAL RESTRUCTURING AND HAVE AGREED TO VOTE TO ACCEPT THE PLAN.**

If the Plan becomes effective, then, on the Effective Date, the Notes would be exchanged, in full satisfaction of all of AET and AET Canada's obligations under the Notes, for (1) with respect to Noteholders holding Claims (including without limitation guaranty claims) arising from ownership of the Notes that are equal to or in excess of $500,000 in principal amount (the "Holders of Allowed Large Note Claims"), a Ratable Portion of (a) $50 million 12% Senior Notes (the "New Notes"); (b) 100% of the issued and outstanding common stock on the Effective Date (the "Effective Date New Common Stock") of AET, as reorganized under chapter 11 of the Bankruptcy Code ("Reorganized AET"); and (c) the Large Noteholder Cash, as more fully described herein; and (2) with respect to Noteholders holding Claims (including without limitation guaranty claims) arising from ownership of the Notes that are less than $500,000 in principal amount (the "Holders of Allowed Small Note Claims"), (a) Cash equal to (A) the percentage of recovery of the Holders of Large Note Claims as disclosed in this Solicitation and Disclosure Statement multiplied by (B) the amount of such Holder's Claim, which Cash will be provided pursuant to the Plan Funding Commitment more fully described herein; and (b) a Ratable Portion of the Small Noteholder Cash, as more fully described herein. The Effective Date New Common Stock shall be subject to dilution by the Management Incentive Plan as more fully described herein and by any duly authorized issuance of capital stock of Reorganized AET after the Effective Date including any New Common Stock authorized for the New Securities Reserve. Subject to the conditions set forth herein, Holders of the Senior Notes that are in a Class or Classes that have voted to accept the Plan, shall be deemed to have instructed Reorganized AET to transfer the Noteholder Cash, in an amount of up to $2.5 million to the Indenture Trustee, on behalf of the Class or Classes of Senior Note Claims that have voted to accept the Plan. The Indenture Trustee will then be deemed to transfer the Noteholder Cash to Reorganized AET for distribution to the holders of AET's existing common stock, par value $0.01 per share (the "AET Common Stock," and the holders thereof, the "Stockholders"; provided that an official committee of equity security holders is not appointed, by a trustee or the Bankruptcy Court in the Chapter 11 Cases (as defined below) or other events, as described herein have not occurred. If the Plan becomes effective, then, on the Effective Date, the AET Common Stock and all other AET Equity Interests will be canceled.

It is contemplated that Reorganized AET will not be subject to reporting requirements under the Securities and Exchange Act of 1934, as amended (the "Exchange Act"). Accordingly, the New Notes and New Common Stock will be subject to substantial restrictions on transfer as more fully described in this Solicitation and Disclosure Statement. Directors, officers and employees of the Company may solicit exchanges from the Noteholders and will not receive any additional compensation for such solicitations.

The Company is not currently under the jurisdiction of a Bankruptcy Court or a debtor or debtor in possession under chapter 11 of the Bankruptcy Code. If the Company receives the requisite acceptances of the Plan in sufficient number and dollar amount to satisfy the requirements for acceptance of the Plan from the Holders of Allowed Large Note Claims in accordance with the Bankruptcy Code, the Company intends to file with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") and to seek, as promptly thereafter as practicable, confirmation of the Plan by the Bankruptcy Court. The confirmation of the Plan is subject to, among other things, judicial approval of the Solicitation and Disclosure Statement and the terms of the Plan. If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Noteholders (including, in each case, those who do not submit Ballots, those who submit Ballots to reject the Plan and those whose Ballots are rejected because they are illegible, incomplete and unsigned) will be bound by the Plan and the transactions contemplated thereby.

During the Chapter 11 Cases, the Company intends to operate its business in the ordinary course and to make payment in full on a timely basis to all of its general unsecured creditors, including all trade creditors,

customers and employees for all amounts due prior to and during the Chapter 11 Cases. The Plan provides that the Debtors, in certain circumstances, may reject certain executory contracts or unexpired leases.

The Company believes that confirmation of the Plan is in the best interests of creditors and that the Plan should be confirmed. The Company recommends that all Holders of Claims that are entitled to vote on the Plan vote to accept the Plan.

This Solicitation and Disclosure Statement, the Plan attached as Exhibit A (and the other exhibits, schedules and appendices hereto and thereto), the accompanying forms of ballot, and the related materials delivered together herewith are being furnished by AET to the Noteholders pursuant to sections 1125(a) and 1126(b) of the Bankruptcy Code, in connection with the solicitation by AET of votes to accept or reject, as the case may be, the Plan (and the transactions contemplated thereby, as described herein).

**The Voting Agent for the Plan is:**

**Bankruptcy Services, LLC**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**
**Attn: AET Voting Processing**
**Tel: 866-258-8898**

Applied Extrusion Technologies, Inc.'s legal advisors are Shearman & Sterling LLP. They can be contacted at:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Attn: Douglas P. Bartner, Esq. and Mona A. Touma, Esq.

This Solicitation is being made by AET in reliance on the exemption from the registration requirements of the United States Securities Act of 1933 (as amended from time to time, the "Securities Act") afforded by section 3(a)(9) of the Securities Act. The New Common Stock and New Notes will be issued pursuant to section 1145 of the Bankruptcy Code and will be subject to substantial restrictions on transfer as described in Article II of this Solicitation and Disclosure Statement.

**THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW NOTES AND THE NEW COMMON STOCK TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY NOTEHOLDER DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE COMPANY BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS. ALTHOUGH THE COMPANY HAS MADE EVERY EFFORT TO BE ACCURATE, EACH NOTEHOLDER SHOULD REVIEW THE PLAN AND THE OTHER EXHIBITS BEFORE CASTING A BALLOT.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE COMPANY AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.**

**ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN WHICH, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE COMPANY AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE COMPANY, ITS ADVISORS OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.**

NEITHER THE COMPANY'S INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS AND THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, AND ASSUME NO RESPONSIBILITY FOR AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS OR LIQUIDATION ANALYSIS. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS WILL PROVE CORRECT OR THAT THE COMPANY'S ACTUAL ABILITY TO COVER ITS FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED WITHIN THIS DISCLOSURE STATEMENT.

FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

SEE THE SECTION TITLED "RISK FACTORS" OF THE SOLICITATION AND DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS WHICH SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

----

All exhibits to the Solicitation and Disclosure Statement are incorporated into and are a part of this Solicitation and Disclosure Statement as if fully set forth herein.

In this Solicitation and Disclosure Statement, the terms "we," "our," "us" and "AET" refer to Applied Extrusion Technologies, Inc.

No person has been authorized to give any information or make any representation on our behalf not contained, or incorporated by reference, in this Solicitation and Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of this Solicitation and Disclosure Statement shall not under any circumstances create any implication that the information contained in this Solicitation and Disclosure Statement or incorporated by reference in this Solicitation and Disclosure Statement from any documents or reports that we file with the SEC is correct as of any time subsequent to the date hereof or the date of such documents or reports or that there has been no change in the information set forth herein or therein or in our affairs since the date hereof or thereof. All statements contained in this Solicitation and Disclosure Statement are made as of the date hereof unless otherwise specified.

This Solicitation and Disclosure Statement is solely for the purposes of this Solicitation. Neither this Solicitation nor the delivery of this Solicitation and Disclosure Statement constitutes an offering of the Notes, the New Notes, the Common Stock or any security of Reorganized AET or otherwise; and this Solicitation and Disclosure Statement may not be used for such purposes or in connection with the purchase or sale of any securities, including, without limitation, the Notes, the New Notes or the Common Stock.

## COMPANY INFORMATION

We are one of the largest North American manufacturers and suppliers of oriented polypropylene, or OPP, films, which are used primarily in consumer product labeling, flexible packaging and overwrap applications. AET has a leading position in most of the major high-end OPP films end-use product categories in North America and has a market share of approximately 25 percent.

Our corporate headquarters are located at 15 Read's Way, New Castle, DE 19720. Our telephone number is (302) 326-5500. Our website is www.aetfilms.com.

For further information about our company, we refer you to the reports and other information we file publicly with the SEC pursuant to the information requirements of the Exchange Act. Our filings with the SEC may be inspected without charge at the office of the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549. In addition, registration statements and certain other filings made with the SEC through its Electronic Data Gathering, Analysis and Retrieval (EDGAR) system are publicly available through the SEC's website at www.sec.gov.

## DOCUMENTS INCORPORATED BY REFERENCE

We are incorporating by reference specified documents that we file with the SEC, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this Solicitation and Disclosure Statement and any information we file later with the SEC will automatically update and supersede this information.

We incorporate by reference the documents listed below and any future filings made by us with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act until the Voting Deadline. The documents we are incorporating by reference are as follows:

- our Quarterly Reports on Form 10-Q for the quarters ended June 30, 2003, December 31, 2003, March 31, 2004 and June 30, 2004, respectively;

- our Current Reports on Form 8-K, filed with the SEC on March 23, 2004, June 18, 2004, July 1, 2004, July 23, 2004, August 6, 2004, August 25, 2004, September 3, 2004, October 6, 2004, October 20, 2004 and October 25, 2004 respectively;

- our joint proxy statement filed with the SEC on December 23, 2003, including any amendments thereto; and

- our Annual Report on Form 10-K for the year ended September 30, 2003.

Any statement contained in a document that is incorporated by reference will be modified or superseded for all purposes to the extent that a statement contained in this Solicitation and Disclosure Statement (or in any other document that is subsequently filed with the SEC and incorporated by reference) modifies or is contrary to that previous statement. Any statement so modified or superseded will not be deemed a part of this Solicitation and Disclosure Statement except as so modified or superseded. You may request a copy of these filings at no cost by writing or telephoning our investor relations department at the following address and number:

15 Read's Way
New Castle, DE 19720
(302) 326-5500

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain information contained in this Solicitation and Disclosure Statement should be considered "forward-looking statements" as defined by the Private Securities Litigation Reform Act of 1995. These statements represent, among other things, the expectations, beliefs, plans and objectives of management with respect to future financial performance or operations and/or assumptions underlying or judgments concerning matters discussed in this document. The words "believe," "estimate," "intend," "anticipate," "project," and "expect" and similar expressions are intended to identify forward-looking statements. All forward-looking statements involve certain risks, estimates, assumptions, and uncertainties with respect to future revenues, cash flows, expenses and the cost of capital, among other things.

Some important risk factors that could cause our actual results to differ materially from those expressed in forward-looking statements include, but are not limited to:

- Our ability to create, manufacture and market innovative, higher-margin products;

- Our ability to implement price increases and related volume losses;

- Intensified competition from our competitors;

- A continuation of, or an increase in, overcapacity in the oriented polypropylene films industry;

- An increase in the cost of polypropylene resin, our main raw material;

- The operating and financial restrictions and covenants in our debt agreements, which could adversely affect our ability to finance our operations and plan for or respond to changes in our business; and

- The confirmation of the Plan, as more fully described in Article X.A., "RISK FACTORS – Certain Bankruptcy Law Considerations".

We believe it is important to communicate our expectations to Noteholders and Stockholders. However, there may be events in the future that we are not able to accurately predict or over which we have no control. The risk factors listed in this Solicitation and Disclosure Statement under "Risk Factors" or discussed in our reports we file with the SEC and incorporated by reference herein, as well as any cautionary language contained in this Solicitation and Disclosure Statement or in our filed reports, provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations we describe in our forward-looking statements. Noteholders and Stockholders should be aware that the occurrence of the events described in these risk factors and elsewhere in this Solicitation and Disclosure Statement and our filed reports could have a material adverse effect on our business, operating results and financial condition.

**TABLE OF CONTENTS**

Page

COMPANY INFORMATION ........................................................................................ iii
DOCUMENTS INCORPORATED BY REFERENCE .......................................................... iii
SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS .................................. iv
SUMMARY OF THE SOLICITATION ............................................................................ 1
SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA .......................................... 12
I.      BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION ........................ 13
        A.    Background ............................................................................................ 13
        B.    Equity Ownership and Debt Structure ........................................................ 15
              1.    Equity Ownership Structure ............................................................. 15
              2.    Debt Structure ............................................................................... 15
II.     THE PLAN .................................................................................................... 17
        A.    Overview of Chapter 11 ........................................................................... 17
        B.    Administrative and Priority Tax Claims ...................................................... 17
              1.    Administrative Claims .................................................................... 17
              2.    Priority Tax Claims ........................................................................ 17
              3.    Professional Fees .......................................................................... 18
              4.    Claims Under DIP Credit Agreement ................................................ 18
        C.    Classification of Claims and Interests ....................................................... 19
              1.    Claims Against and Equity Interests in the Debtors ........................... 20
        D.    Treatment of Claims and Interests ........................................................... 21
              1.    Treatment of Claims and Equity Interests ......................................... 21
        E.    Means of Implementation of Plan ............................................................. 25
              1.    Substantive Consolidation for Purposes of Voting, Confirmation and
                    Distribution ................................................................................. 25
              2.    Private Company Status and Stock Transfer Limitations ..................... 26
              3.    Exit Facility .................................................................................. 26
              4.    Plan Funding Commitment .............................................................. 26
              5.    Cancellation of Notes, Instruments, Debentures and AET Equity Interests ... 27
              6.    Execution of Related Documents ...................................................... 27
              7.    Corporate Governance, Directors and Officers, and Corporate Action ... 27
              8.    Noteholder Cash ........................................................................... 28
              9.    Sources of Cash for Plan Distribution ............................................... 29
              10.   Issuance and Distribution of New Common Stock and New Notes; Reserve ... 29
              11.   Elimination of Classes ................................................................... 31
              12.   Management Incentive Plan; Employment Agreement .......................... 31
              13.   Stockholders' Agreement ................................................................ 32
              14.   Registration Rights ........................................................................ 32
        F.    Description of New Common Stock ............................................................ 32
        G.    Description of the New Notes ................................................................... 34
        H.    Distributions Under the Plan ................................................................... 41
              1.    Distributions for Claims Allowed as of the Effective Date ................... 41
              2.    Distribution by the Reorganized Debtors; Distributions with Respect to Debt
                    Securities .................................................................................... 41
              3.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ... 42
              4.    Distribution Record Date and Stockholder Distribution Record Date ..... 43
              5.    Timing and Calculation of Amounts to Be Distributed ......................... 43

|  |  | 6. | Setoffs and Recoupments | 43 |
|  |  | 7. | Surrender of Canceled Instruments or Securities | 44 |
|  |  | 8. | Lost, Stolen, Mutilated or Destroyed Debt Securities | 44 |
|  |  | 9. | Fractional Shares of New Common Stock, Whole New Notes and Incremental New Notes | 44 |
|  |  | 10. | Manner of Payment Under Plan of Reorganization | 45 |
|  | I. | Procedures for Treating and Resolving Disputed Claims and Equity Interests | | 45 |
|  | J. | Conditions to Confirmation and the Effective Date of the Plan | | 45 |
|  |  | 1. | Conditions Precedent to Confirmation | 45 |
|  |  | 2. | Conditions Precedent to the Occurrence of the Effective Date | 45 |
|  |  | 3. | Waiver of Conditions | 47 |
|  |  | 4. | Effect of Non-Occurrence of Effective Date Conditions | 47 |
|  |  | 5. | Substantial Consummation of Plan | 47 |
|  | K. | Legal Effects of Confirmation of the Plan | | 47 |
|  |  | 1. | Releases | 47 |
|  |  | 2. | Preservation of Rights of Action | 49 |
|  |  | 3. | Exculpation | 49 |
|  |  | 4. | Injunction | 50 |
|  |  | 5. | Discharge | 51 |
|  |  | 6. | Vesting of Rights | 51 |
|  | L. | Other Provisions | | 51 |
|  |  | 1. | Executory Contracts | 51 |
|  |  | 2. | Modification of the Plan; Revocation or Withdrawal of the Plan | 52 |
|  |  | 3. | Retention of Jurisdiction | 52 |
|  |  | 4. | Avoidance and Recovery Actions | 54 |
|  |  | 5. | Severability | 54 |
|  |  | 6. | Dissolution of Committees | 55 |
| III. | | THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS | | 56 |
|  | A. | Proposed Debtor in Possession Financing | | 56 |
|  | B. | First Day Orders | | 62 |
|  |  | 1. | Provisions for Employees | 62 |
|  |  | 2. | Trade Vendors | 62 |
|  |  | 3. | Cash Management | 62 |
|  |  | 4. | Retention of Professionals | 63 |
|  |  | 5. | Customer Programs | 63 |
|  |  | 6. | Taxes | 63 |
|  |  | 7. | Utility Service | 63 |
|  |  | 8. | Scheduling Order | 63 |
|  |  | 9. | DIP Motion | 63 |
| IV. | | EXIT FINANCING | | 64 |
| V. | | THE BUSINESS | | 71 |
|  | A. | General | | 71 |
|  | B. | Strategy | | 71 |
|  | C. | Industry Overview | | 73 |
|  | D. | Competitive Strengths | | 74 |
|  | E. | Products | | 75 |
|  | F. | Marketing and Customers | | 75 |
|  | G. | Manufacturing and Technology | | 76 |
|  | H. | Research and Development | | 77 |
|  | I. | Polypropylene and Other Raw Materials | | 77 |
|  | J. | Competition | | 77 |

| | K. | Patents and Trademarks | 78 |
|---|---|---|---|
| | L. | Government Regulation | 78 |
| | M. | Environmental, Health and Safety Matters | 78 |
| | N. | Employees | 79 |
| | O. | Properties | 79 |
| | P. | Legal Proceedings | 79 |
| VI. | | CAPITALIZATION | 80 |
| VII. | | VOTING PROCEDURES AND REQUIREMENTS | 81 |
| | A. | Ballots | 81 |
| | B. | Procedures for Casting and Deadlines for Voting on the Plan | 81 |
| | C. | Parties Entitled to Vote on the Plan | 82 |
| | D. | Counting of Ballots and Master Ballots for Determining Acceptance of the Plan | 83 |
| VIII. | | PROJECTIONS AND VALUATION ANALYSIS | 85 |
| | A. | Projections | 85 |
| | B. | Valuation | 92 |
| | | 1. Valuation Overview | 92 |
| | | 2. Methodology | 92 |
| | | 3. Valuation of Reorganized Company | 93 |
| IX. | | LIQUIDATION ANALYSIS | 95 |
| X. | | RISK FACTORS | 99 |
| | A. | Certain Bankruptcy Law Considerations | 99 |
| | | 1. Failure to Satisfy Vote Requirement | 99 |
| | | 2. Non-Confirmation or Delay of Confirmation of the Plan | 99 |
| | | 3. Non-Consensual Confirmation | 99 |
| | | 4. Risk of Non-Occurrence of the Effective Date | 100 |
| | | 5. Effect of the Chapter 11 Cases on Relations with Trade Vendors, Customers and our Employees | 100 |
| | B. | Factors Affecting the Value of the Securities to Be Issued Under the Plan of Reorganization | 101 |
| | | 1. Capital Requirements | 101 |
| | | 2. Variances from Projections | 101 |
| | | 3. Disruption of Operations | 101 |
| | | 4. Lack of Trading Market and Restrictions on Transfer | 101 |
| | | 5. Dividend Policies | 102 |
| | | 6. Interest on Notes May Be Deferred | 102 |
| | C. | Risks Relating to the Company | 102 |
| | | 1. Leverage and Debt Service | 102 |
| | | 2. Existing Credit Agreement and Liquidity | 103 |
| | | 3. Competition | 103 |
| | | 4. Rise in Costs of Raw Materials | 103 |
| | | 5. Industry Overcapacity | 103 |
| | | 6. New Product Development | 104 |
| | | 7. Other Risks Relating to AET | 104 |
| | D. | Risks of Voluntary Bankruptcy Filing | 104 |
| | | 1. General | 104 |
| | | 2. Failure to File Chapter 11 Petition | 104 |
| | | 3. Risk of Failure to Obtain Authority to Pay Prepetition Unsecured Claims in the Ordinary Course of Business | 104 |
| | | 4. Methods of Solicitation | 105 |
| | | 5. Classification and Treatment of Claims and Equity Interests | 105 |
| | | 6. Nonacceptance of the Plan—Confirmation by "Cramdown" | 106 |

|  |  | 7. | Certain Risks of Non-Confirmation | 107 |
|  |  | 8. | Alternatives to Confirmation and Consummation of the Plan | 108 |
| XI. | | | CERTAIN OTHER LEGAL CONSIDERATIONS | 109 |
|  | A. | | Section 3(a)(9) of the Securities Act | 109 |
|  | B. | | Section 1145 of the Bankruptcy Code | 109 |
| XII. | | | CERTAIN FEDERAL INCOME TAX CONSIDERATIONS | 111 |
|  | A. | | Tax Consequences to the Company | 111 |
|  |  | 1. | Cancellation of Debt Income | 111 |
|  |  | 2. | High Yield Discount Obligations – Limitation on Interest Deductions | 112 |
|  |  | 3. | Section 382 Limitation | 112 |
|  |  | 4. | Alternative Minimum Tax | 113 |
|  | B. | | Tax Consequences to the Large Noteholders who receive New Notes and Effective Date New Common Stock in Exchange for the Senior Notes | 114 |
|  |  | 1. | Exchange of the Senior Notes for New Notes and Effective Date New Common Stock | 114 |
|  |  | 2. | Consequences of Distribution of the Noteholder Cash to Holders of AET Common Stock | 115 |
|  |  | 3. | High Yield Discount Obligations | 115 |
|  |  | 4. | Subsequent Sale of Effective Date New Common Stock or New Notes | 115 |
|  |  | 5. | Original Issue Discount | 116 |
|  | C. | | Tax Consequences to Small Noteholders on the Redemption of the Senior Notes by the Company for Cash | 118 |
|  | D. | | Backup Withholding | 119 |
| XIII. | | | CONFIRMATION | 120 |
|  | A. | | Confirmation Hearing | 120 |
|  | B. | | Requirements for Confirmation | 120 |
|  | C. | | Class Acceptance of the Plan | 120 |
|  | D. | | Cramdown | 121 |
|  | E. | | Plan Meets Requirements for Confirmation | 121 |
|  |  | 1. | Best Interests of Creditors—Liquidation Analysis | 121 |
|  |  | 2. | Feasibility of the Plan | 122 |
|  | F. | | Alternatives to Confirmation and Consummation of the Plan | 122 |
|  |  | 1. | Liquidation Under Chapter 7 or Chapter 11 | 123 |
|  |  | 2. | Alternative Plans of Reorganization | 123 |
| | | | RECOMMENDATION AND CONCLUSION | 125 |

EXHIBITS
- A. Plan of Reorganization
- B. AET Current Report on Form 8-K filed with the SEC on August 25, 2004
- C. Plan Funding Commitment
- D. Stockholders' Agreement Term Sheet
- E. Description of the New Notes

## SUMMARY OF THE SOLICITATION

*This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Solicitation and Disclosure Statement and in the accompanying Plan.*

Background Information ........................ On July 30, 2004, we announced that we had reached an agreement with certain Noteholders on a proposed comprehensive recapitalization and financial restructuring of the Company. We intend to effectuate the proposed recapitalization and financial restructuring through a prepackaged plan of reorganization, referred to herein as the Plan, in voluntary Chapter 11 Cases. The Plan is included as Exhibit A at the end of this Solicitation and Disclosure Statement.

Noteholders holding approximately 70% of the aggregate principal amount of the outstanding Notes have entered into an agreement with us to vote for the Plan. We expect to commence the Chapter 11 Cases as soon as practicable after the Voting Deadline, after we have obtained the requisite numbers of votes for the Plan from the Holders of Allowed Large Note Claims, and only after certain other conditions have been satisfied.

The Solicitation..................................... By this Solicitation and Disclosure Statement, we are soliciting all Noteholders that are beneficial owners of the Notes, as of the close of business on the Voting Record Date, to vote in favor of the Plan.

The Plan .............................................. The general terms of the Plan are described herein. For the Plan to be effective and for any distributions to be made under the Plan, among other things, votes of at least two-thirds in amount of the Claims of the holders in each Impaired Class of Claims who actually cast votes in respect of the Plan and more than one-half in number of the holders of each Impaired Class of Claims who actually cast votes with respect to the Plan must be received and the Plan must be confirmed by the Bankruptcy Court, *provided, however*, that the Plan may still be confirmed by the Bankruptcy Court if at least one Impaired Class votes to accept the Plan and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code (as further described under Article XIII.D. "Confirmation—Cramdown"). The Plan provides that all Large Note Claims and Small Notes Claims shall be Allowed Large Note Claims and Allowed Small Note Claims respectively. Accordingly, in exchange for all Notes, which would be canceled on the Effective Date, the Noteholders would receive:

(a)    With respect to the Holders of Allowed Large Note Claims, a Ratable Portion of (i) $50 million of New Notes and 100% of the Effective Date New Common Stock (subject to dilution by the Management Incentive Plan, as described below and by any duly authorized issuance of capital stock of Reorganized AET including any New Common Stock authorized for the New Securities Reserve) (collectively, the "New Securities Allocation"); and (ii) the Large Noteholder Cash in an amount equal to the product of $2.5 million multiplied by a fraction, the numerator of which is the aggregate amount of Large Note Claims and the denominator of which is the sum of the aggregate amount of Large Note Claims and aggregate amount of Small Note Claims, which Large Noteholder Cash shall, subject to the limitations described below, be deemed to be received by the Indenture Trustee, on behalf of the Holders of Allowed Large Note Claims, from Reorganized AET, if the Class of Large Note Claims votes to accept the Plan, and deemed transferred by the Indenture Trustee to Reorganized AET for distribution of the Large Noteholder Cash to the Stockholders, subject to the limitations described below, provided, however, that no Holder of a Large Note Claim shall be entitled to receive the Large Note Holder Cash if the Class of Large Note Claims votes to reject the Plan. The Notes so exchanged will be canceled and the Company will no longer have any obligation with respect to the Notes. Holders of Allowed Large Note Claims, to the extent that such Claims constitute Effective Date Unidentified Claims, may receive the Small Noteholder Allocation if a Plan Funding Estimated Payment Default occurs or if such Claim is not identified as a Large Note Claim within 90 days after the Effective Date. See Article II.E.4. "The Plan – Means of Implementation of the Plan – Plan Funding Commitment" and Article II.E.10. "The Plan – Means of Implementation of the Plan – Issuance and Distribution of New Common Stock and New Notes; Reserve".

(b)    With respect to the Holders of Allowed Small Note Claims  (i) Cash, in an amount equal to the percentage of recovery of the Holders of Large Note Claims as disclosed in this Solicitation and Disclosure Statement multiplied by the amount

of such Holder's Claim (the "Small Noteholder Allocation") subject to the limitations described below and (ii) a Ratable Portion of the Small Noteholder Cash, in an amount equal to the product of $2.5 million multiplied by a fraction, the numerator of which is the aggregate amount of Small Note Claims and the denominator of which is the sum of the aggregate amount of Large Note Claims and aggregate amount of Small Note Claims, which Small Noteholder Cash shall, subject to the limitations described below, be deemed received by the Indenture Trustee, on behalf of the Holders of Small Note Claims, from Reorganized AET, if the Class of Small Note Claims vote to accept the Plan, and deemed transferred by the Indenture Trustee to Reorganized AET for distribution to the Stockholders, subject to the limitations described below, provided, however, that no Holder of a Small Note Claim shall be entitled to receive the Small Noteholder Cash if the Class of Small Note Claims votes to reject the Plan. The distribution of the Small Noteholder Allocation shall be contingent on the consummation of the Plan Funding Commitment. If a Plan Funding Estimated Payment Default occurs, then all Effective Date Unidentified Claims shall be deemed to be Allowed Small Note Claims and each Holder of an Allowed Small Note Claim shall receive, instead of the Small Noteholder Allocation, a Ratable Portion of the New Securities Allocation and any Effective Date Unidentified Claim shall be treated as Small Note Claims. If a Plan Funding True Up Payment Default occurs, then Reorganized AET may, to the extent of the payment deficiency resulting from the Plan Funding True Up Payment Default, either (x) distribute New Common Stock and New Notes from the New Securities Reserve or (y) fund such amounts that have not been tendered by the Plan Funders, in either case in satisfaction of the Post-Effective Date Unidentified Claims regardless of whether such Post-Effective Date Unidentified Claims are Large Note Claims or Small Note Claims. See Article II.E.4. "The Plan – Means of Implementation of the Plan – Plan Funding Commitment" and Article II.E.10. "The Plan – Means of Implementation of the Plan – Issuance and Distribution of New

Common Stock and New Notes; Reserve".

The Notes so exchanged will be canceled and the Company will no longer have any obligation with respect to the Notes.

The Stockholders that are holders of record on the Stockholder Distribution Record Date shall receive Noteholder Cash, equal to an aggregate amount of up to $2.5 million from Reorganized AET, which Noteholder Cash shall be deemed to be received by the Indenture Trustee, on behalf of the Class or Classes of Senior Note Claims voting to accept the Plan. The Indenture Trustee shall be deemed to have been instructed by the Holders of the Senior Notes that are in a Class or Classes that have voted to accept the Plan to transfer the Noteholder Cash to Reorganized AET for distribution to the Stockholders. Notwithstanding the foregoing, if (a) an official committee of equity security holders is appointed by a trustee or the Bankruptcy Court in the Chapter 11 Cases, then the Class or Classes of Senior Note Claims that have voted to accept the Plan shall be deemed to have contributed the Noteholder Cash to Reorganized AET and Reorganized AET shall retain the entire amount of Noteholder Cash for its own account, subject to the lenders' interests in such Noteholder Cash in accordance with the Exit Facility and shall not distribute the Noteholder Cash to the Stockholders; (b) (x) the Class of Large Note Claims votes to reject the Plan in accordance with Section 3.3(c) of the Plan or (y) the Class of Small Note Claims votes to reject the Plan in accordance with Section 3.3(d) of the Plan, then in either case, the Noteholder Cash of such rejecting Class shall be retained by Reorganized AET and shall not be distributed to the Stockholders or (c) the Bankruptcy Court holds, determines and rules that the Plan is not confirmable due to the distribution of the Noteholder Cash to the Stockholders, then the provisions of the Plan relating to the Noteholder Cash shall be deemed to be omitted for all purposes and Reorganized AET shall retain the entire amount of Noteholder Cash for its own account and shall not distribute the Noteholder Cash to the Stockholders.

The Plan contemplates and is predicated upon substantively consolidating the Debtors solely for the purposes of (i) voting, (ii) confirmation, and (iii) distribution in respect of the Class of Allowed Large Note Claims and the Class of Allowed Small Note Claims. It does not contemplate the substantive consolidation of the Debtors with respect to the other Classes of Claims or Equity Interests set forth in the

Plan, or for any other purpose.

The Plan provides for all AET Equity Interests to be canceled, and for the Holders of AET Equity Interests not to receive any distribution, *provided*, *however*, that the Holders of AET Common Stock may receive the Noteholder Cash, subject to the satisfaction of the conditions described above.

The Plan will also provide for a Management Incentive Plan to be established in the form of a stock option or other similar program equal to 5% of the Effective Date New Common Stock, or the equivalent of 5% of the Effective Date New Common Stock if such plan is not a stock option program, at the discretion of the Reorganized AET Board of Directors. Any issuances under the Management Incentive Plan would dilute the New Common Stock ownership percentages described above if such plan is a stock option program. The Management Incentive Plan will become effective only after the occurrence of the Effective Date. Following the Effective Date, the Management Incentive Plan may be amended or modified by the Reorganized AET Board of Directors in accordance with the terms thereof and any such amendment or modification shall not require an amendment of the Plan.

The Plan contemplates that Reorganized AET will not be a reporting Company under the Exchange Act.

In addition, the Plan calls for Reorganized Debtors' Boards of Directors to be designated by the Committee.

**The foregoing is only a brief summary of a few highlights of the Plan. You should read the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement.**

Treatment of Claims and Equity Interests.................................................

The table set forth below summarizes each Class of Claims and Equity Interests in the Plan, projected aggregate amount of each Class, the treatment of each Class, and the projected recoveries of each Class both in connection with the Plan and in a liquidation under Chapter 7 of the Bankruptcy Code. The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Article VIII.B. hereof and subject to dilution from the Management Incentive Plan.

| Class/Type of Claim or Interest | Projected Claims/ Interests | Plan Treatment of Class | Status/Voting Right | Projected Recovery Under Plan | Projected Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| Administrative Claims | The Debtors are not currently able to estimate the number of Holders or amount of Claims in this Class. | Paid in Full. | N/A | 100% | 100% |
| Priority Tax Claims | The Debtors are not currently able to estimate the number of Holders or amount of Claims in this Class. | Paid in Full. | N/A | 100% | 100% |
| DIP Credit Agreement Claims | Approximately $95 million. | Paid in Full. | N/A | 100% | 100% |
| Other Priority Claims | The Debtors are not currently able to estimate the number of Holders or amount of Claims in this Class. | Paid in Full | Unimpaired/ Deemed to Accept. | 100% | 100% |
| General Unsecured Claims | The Debtors are not currently able to estimate the aggregate amount of Claims in this Class. | Paid in Full. | Unimpaired/ Deemed to Accept. | 100% | 18% |
| Large Note Claims | The Debtors are not currently able to estimate with certainty the aggregate amount of Claims in this Class, but estimate that the amount of such Claims is at least $212 million.[1] | Ratable Portion of (i) New Notes and Effective Date New Common Stock and (ii) the Large Noteholder Cash, which Large Noteholder Cash shall, subject to the limitations described above. | Impaired/ Entitled to Vote. | 49% | 18% |

---

[1]    The Debtors estimate that the accrued and unpaid prepetition interest on the Large Note Claims would not be less than approximately $21.2 million, assuming a Petition Date of November 29, 2004

| Class/Type of Claim or Interest | Projected Claims/ Interests | Plan Treatment of Class | Status/Voting Right | Projected Recovery Under Plan | Projected Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| Small Note Claims | The Debtors are not currently able to estimate with certainty the aggregate amount of Holders of Claims in this Class but estimate that the amount of such Claims is not more than $63 million.[2] | (i) Cash, in an amount equal to (x) the percentage of recovery of the Holders of Large Note Claims as disclosed in this Solicitation and Disclosure Statement multiplied by (y) the amount of such Holder's Claim subject to the limitations described above and (ii) a Ratable Portion of Small Noteholder Cash, subject to the limitations described above. | Impaired/ Entitled to Vote. | 49% | 18% |
| Subordinated Claims | The Debtors are not currently able to estimate the aggregate amount of Claims in this Class. | Discharged. | Impaired; not entitled to receive any distribution or retention of any property under the Plan. Deemed to reject; not entitled to vote. | 0% | 0% |
| AET Equity Interests | Approximately 12.8 million shares. | Canceled. | Impaired; not entitled to receive any distribution or retention of any property under the Plan. Deemed to reject; not entitled to vote. | 0% | 0% |

---

[2]     The Debtors estimate that the accrued and unpaid prepetition interest on the Small Note Claims would not exceed approximately $6.7 million, assuming a Petition Date of November 29, 2004.

| | |
|---|---|
| Plan Funding Commitment | As of the date hereof, the Company entered into a funding commitment ("Plan Funding Commitment") with the Plan Funders to fund the Small Noteholder Allocation in accordance with the Plan, which commitment is more fully described herein and is attached as Exhibit C. See Article II.E.4."The Plan – Means of Implementation of the Plan – Plan Funding Commitment". |
| Effectiveness of the Plan | The Effective Date will not occur and distributions will not be made under the Plan unless the requisite votes to accept the Plan under the Bankruptcy Code have been received, the Plan satisfies the requirements set forth in section 1129 of the Bankruptcy Code, the Plan has been confirmed by the Bankruptcy Court and the other conditions to effectiveness of the Plan have been satisfied. We cannot assure you that the Plan, as currently contemplated, will receive the requisite votes to accept the Plan under the Bankruptcy Code, that the Plan will be confirmed by the Bankruptcy Court, in accordance with the Bankruptcy Code, or that the other conditions to effectiveness of the Plan will be satisfied. |
| | If the Plan is confirmed by the Bankruptcy Court and becomes effective, every Class of Claims against or Equity Interests in AET and AET Canada, including all Noteholders, all other creditors and Stockholders, will be bound by the terms of such Plan, whether or not the Holder of a Claim voted to accept the Plan. |
| Effective Date New Common Stock | The number of shares of common stock of Reorganized AET, $0.01 par value, representing 100% of the common equity of Reorganized AET on the Effective Date, and authorized under Article V of the Plan and the Amended AET Certificate of Incorporation. |
| New Notes | The New Notes will be the unsecured senior obligations of the Company, to be issued in an aggregate principal amount of $50 million, with a seven-year term and will be redeemable after the first year at declining premiums. Interest will accrue at a rate of 12% per annum, and will be payable, at the Company's option, in cash or may be deferred , in which case the deferred amount shall continue to bear interest at the rate of 12% per annum, as more fully described herein; *provided* that the interest will be paid in cash if certain minimum financial requirements are achieved. |
| Releases | In consideration of the contributions of certain parties to the Chapter 11 Cases to be commenced by the Debtors, the Plan provides for certain waivers, exculpations, releases and injunctions. See Article II.K.1. "The Plan—Legal Effects of |

Confirmation of the Plan—Releases."

Debtor-in-Possession Financing ................    On October 20, 2004, AET entered into a binding
Commitment Letter with General Electric Capital
Corporation ("GE Capital") pursuant to which GE Capital
has agreed to provide debtor in possession financing (the
"DIP Facility") in the amount of up to $125 million. The
proceeds from the DIP Facility will be used to repay AET's
indebtedness under its existing credit facility and will be
used for working capital and other general corporate
purposes of AET during the pendency of the Chapter 11
Cases.

Exit Financing .................................    On October 20, 2004, AET entered into a binding
Commitment Letter with GE Capital pursuant to which GE
Capital has agreed to provide a Senior Secured Credit
Facility (the "Exit Facility") in the amount of up to $125
million following consummation of the Plan. The Exit
Facility will be used to repay the DIP Facility and for
general corporate purposes.

Voting Record Date ...........................    Only Noteholders that are beneficial owners as of the close
of business on October 8, 2004 (the "Voting Record Date"),
or their legal representatives or nominees, will be entitled to
vote on the plan. AET reserves the right to establish a
different Voting Record Date in the event that the Company
decides to extend the Voting Deadline.

Distribution Record Date .....................    The Distribution Record Date will be the Business Day that
is five Business Days after the Confirmation Date. Only
Noteholders that are beneficial owners as of the Distribution
Record Date, or their legal representatives or nominees, will
be entitled to receive distributions under the Plan.
Distributions on account of Claims that are Allowed as of
the Effective Date shall be made as soon as practicable after
the Effective Date except as provided in the Plan.
Distributions on account of Claims that become Allowed
Claims after the Effective Date shall be made in accordance
with the Plan.

Voting Deadline; Extension; Termination;
Amendments ...................................    The Voting Deadline is 5:00 p.m., Eastern Standard Time,
on November 24, 2004 (the "Voting Deadline"); *provided*
that we may extend the Voting Deadline with the consent of
the Restructuring Agreement Noteholders. In such event,
the term Voting Deadline means the latest time and date as
to which this Solicitation is extended. Any such extension
will be followed as promptly as practicable by notice thereof
by press release or other public announcement. In the event
of an extension of the Voting Deadline, AET reserves the

9

right to establish a different Voting Record Date.

We reserve the right:

- with the consent of the Restructuring Agreement Noteholders, to extend the Voting Deadline;
- with the consent of the Restructuring Agreement Noteholders, to terminate this Solicitation at any time prior to the Voting Deadline without notice to any Noteholder; and
- with notice to the Noteholders, to amend this Solicitation at any time prior to the Voting Deadline.

Voting Procedures.......................................

If you are a beneficial owner of Notes as of the October 8, 2004 Voting Record Date, you should deliver a properly completed Ballot to your Nominee. The Nominee will then be required to complete and submit a Master Ballot to Bankruptcy Services, LLC, the Voting Agent, on or before the Voting Deadline. See Article VII. "Voting Procedures and Requirements."

Revocation or Withdrawal of Ballots.........

Once delivered to the Voting Agent and upon the expiration or termination of this Solicitation, Noteholders may not revoke or withdraw their Ballot, prior to the commencement of the Chapter 11 Cases; *provided*, *however*, that prior to the expiration or termination of this Solicitation, Noteholders may withdraw any votes cast even if such votes have been delivered to the Voting Agent. Subsequent to the commencement of the Chapter 11 Cases, Noteholders may, for cause, move the Bankruptcy Court to permit the revocation or withdrawal of their Ballot.

Voting Agent and Information Agent........

We have retained Bankruptcy Services, LLC as Voting Agent in connection with this Solicitation. Deliveries of the Ballot should be directed to Bankruptcy Services, LLC at the address set forth on the back cover page of this Solicitation and Disclosure Statement.

Bankruptcy Services, LLC is also the Information Agent in connection with this Solicitation. Any requests for assistance in completing, signing and delivering the Ballot or requests for additional copies of this Solicitation and Disclosure Statement or any of the other documents delivered with this Solicitation and Disclosure Statement may be directed to Bankruptcy Services, LLC at the address or telephone number set forth on the back cover page of this Solicitation and Disclosure Statement.

Certain U.S. Federal Income Tax Consequences...........................................

For a summary of certain U.S. federal income tax consequences of this Solicitation to Noteholders, see Article

10

XII. "Certain Federal Income Tax Considerations."

Risk Factors ........................................... Prior to deciding whether and how to vote on the Plan, each Holder of Claims entitled to vote should consider carefully all of the information in this Solicitation and Disclosure Statement, especially the Risk Factors described in Article X hereof.

# SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following selected consolidated financial information sets forth, for the periods and dates indicated, certain summary consolidated financial information of the Company.  We derived the summary consolidated statements of operations information and consolidated balance sheet information as of September 30, 1999, 2000, 2001, 2002 and 2003 and for each of the five years ended in the period September 30, 2003, from our consolidated financial statements, which have been audited by Deloitte & Touche, independent accountants.  We derived the summary consolidated financial information as of and for the nine months ended June 30, 2003 and 2004 from our unaudited consolidated financial statements  You should read the summary consolidated financial information presented below in conjunction with our consolidated financial statements and the notes thereto included in our Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K for the periods indicated.

| | Year Ended September 30,[a] | | | | | Nine Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001[b] | 2002[c] | 2003 | 2003 | 2004 |
| | (amounts in thousands, except per share amounts) | | | | | | |
| **Statement of Operations Data:** | | | | | | | |
| Sales | $ 237,042 | $ 268,375 | $ 279,840 | $ 252,092 | $ 247,364 | $ 189,223 | $ 197,100 |
| Cost of Sales | 191,949 | 219,546 | 222,719 | 208,099 | 203,154 | 152,061 | 170,145 |
| Gross profit | 45,093 | 48,829 | 57,121 | 43,993 | 44,210 | 37,162 | 26,955 |
| Operating expenses: | | | | | | | |
| Selling, general and administrative | 26,550 | 27,152 | 29,500 | 32,085 | 22,989 | 16,912 | 16.369 |
| Research and development | 7,123 | 6,759 | 6,419 | 6,605 | 7,209 | 5,442 | 5,131 |
| Restructuring and impairment charges | (2,215) | — | — | 9,002 | — | — | 695 |
| Loss on sale of assets | — | — | 7,054 | — | — | — | — |
| QPF acquisition and integration costs | — | — | 2,548 | 950 | — | — | — |
| Goodwill impairment | — | — | — | — | — | — | 9,874 |
| Operating profit (loss) | 13,635 | 14,918 | 11,600 | (4,649) | 14,012 | 14,808 | (5,114) |
| Non-operating expenses: | | | | | | | |
| Interest expense, net[c] | 18,909 | 21,096 | 27,748 | 29,147 | 29,912 | 22,439 | 27,784 |
| Acquisition costs and other | 3,641 | — | — | — | — | — | — |
| Loss before income taxes | (8,915) | (6,178) | (16,148) | (33,796) | (15,900) | | |
| Income tax expense (benefit)[c] | (3,566) | (2,223) | 10,264 | (2,045) | 1,053 | | |
| Net loss | $ (5,349) | $ (3,955) | $ (26,412) | $ (31,751) | $ (16,953) | $ (7,631) | $ (32,898) |
| Basic and Diluted Loss per common share | $ (.47) | $ (.33) | $ (2.23) | $ (2.55) | $ (1.33) | $ (.60) | $ (2.56) |
| EBITDA[d] | | | | | | | |
| **Balance Sheet Data:** | | | | | | | |
| Working capital | $ 36,621 | $ 48,221 | $ 75,893 | $ 40,987 | $ 28,047 | | |
| Total assets | 375,537 | 390,754 | 425,858 | 405,062 | 407,695 | 412,002 | 400,084 |
| Long-term debt | 182,500 | 209,500 | 277,462 | 277,876 | 271,790 | 278,187 | — |
| Stockholders' Equity | 98,952 | 97,004 | 68,822 | 38,761 | 34,357 | 44,196 | 2,720 |

(a)  The management of the Company is currently considering changing the end of the Company's fiscal year from September 30 to December 31, although it has not yet made a final decision with respect to such change  If it decides that such a change is desirable, it intends to present a recommendation for such a change to the Board of Directors of the Company at its first meeting immediately following the effectiveness of the Plan

(b)  These amounts include the operation of the nets and nonwovens business, which was divested at the end of fiscal 2001

(c)  In fiscal 2002, in conjunction with SFAS 145, the Company reclassified the extraordinary loss on the early extinguishment of debt in fiscal 2001 to interest expense and income tax expense

(d)  EBITDA is defined as earnings before interest, taxes, depreciation and amortization  Although EBITDA is not a measure of performance calculated in accordance with generally accepted accounting principles, management believes that it is useful in evaluating the Company because it is widely used as a measure to evaluate a company's operating cash flow before debt expense  EBITDA does not purport to represent cash generated by operating activities and should not be considered in isolation or as a substitute for measures of performance in accordance with generally accepted accounting principles  In addition, because EBITDA is not calculated identically by all companies, the presentation here may not be comparable to other similarly titled measures of other companies

# I.    BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION

## A.    Background

The Company decided to file a prepackaged plan of reorganization under the Bankruptcy Code as it offered the best alternative to restructure its balance sheet and access new working capital while continuing to operate in the ordinary course of business. The Company has significant debt obligations. Other factors leading to the reorganization include the impact of adverse economic conditions on the Company's industry, particularly the unforeseen escalations in costs of petroleum and associated products such as propylene and polypropylene resin, the Company's primary raw material. On June 16, 2004, the Company announced that it had lowered its earnings expectations for the second half of its fiscal year 2004. The lower earnings expectations were due primarily to lower than expected volumes of shipments and an unexpected significant increase in the cost of polypropylene resin, the Company's primary raw material, compared with the first half of fiscal year 2004, due to the rapid unforeseen escalations in the costs of petroleum. Recent price increases have offset a portion of these additional costs; however, market demand has not been sufficient to enable all of the cost increase to be passed on to the Company's customers. These factors contributed to a loss of gross profit and resulted in significant reduction in operating income and cash flow, severely impacting the Company's financial condition, its ability to maintain compliance with debt covenants under its existing credit agreement dated as of October 3, 2003 among AET, the other credit parties thereto, General Electric Capital Corporation, the other lenders signatory thereto and GECC Capital Markets Group, Inc. (the "Existing Credit Agreement") and to meet its interest payment obligation due on the Notes on July 1, 2004.

In light of the deteriorating financial and economic conditions facing the Company, we announced on June 16, 2004 that we had retained Miller Buckfire Lewis Ying & Co. ("MBLY"), as financial advisor, and Shearman & Sterling LLP ("Shearman & Sterling"), as special legal counsel, in order to assist in developing a financial restructuring plan, and that the Committee had been organized. At or around the same time, the Company commenced discussions with General Electric Capital Corporation, as agent, and the other lenders under the Existing Credit Agreement, about amending certain covenants under the Existing Credit Agreement to reflect the recent economic developments impacting the Company. On June 29, 2004, the Company's lenders under the Existing Credit Agreement agreed to restate certain provisions of the Existing Credit Agreement for the third fiscal quarter of 2004, including certain financial covenants and any Default (as defined in the Existing Credit Agreement) to the extent arising out of the failure to pay the interest on the Company's Notes. These amendments included, among other things, waiving any event of default with respect to nonpayment of interest on the Notes through September 1, 2004, which date has been extended to December 15, 2004, and is subject to further extension by the lenders. On October 1, 2004, the lenders under the Existing Credit Agreement again agreed to restate certain provisions of the Existing Credit Agreement for the fourth fiscal quarter of 2004, including certain financial covenants.

On July 1, 2004, the Company did not make the interest payment due on the Notes. At the same time, the Company continued discussions with the Committee to develop a consensual financial restructuring plan to deleverage the Company's capital structure. Shortly after its formation, the Committee requested permission to engage, at the Company's expense, independent legal and financial advisors to conduct due diligence and advise the Committee with respect to the viability of the restructuring alternatives proposed by the Company. The Committee engaged Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as its financial advisor and Milbank Tweed Hadley & McCloy LLP ("Milbank") as its legal advisor. During June and July of 2004, representatives of Houlihan Lokey conducted due diligence with respect to the Company's business operations and financial condition and Milbank conducted certain legal due diligence with respect to the Company.

13

Thereafter, the Company and the Restructuring Agreement Noteholders engaged in negotiations regarding a financial restructuring of the Company. The parties agreed to the terms of the restructuring incorporated in the Plan. Pursuant to the Plan, all Notes held by the Holders of Allowed Large Note Claims would be exchanged for a Ratable Portion of (A) the New Notes and the Effective Date New Common Stock and (B) the Large Noteholder Cash, as more fully described herein. Holders of Notes who are Holders of Allowed Small Note Claims would receive, in exchange for their Notes, (A) Cash equal to the product of (x) the percentage of recovery of the Holders of Large Note Claims as disclosed in the Solicitation and Disclosure Statement multiplied by (y) the aggregate amount of such Holder's Claim, subject to the limitations as more fully described herein and (B) a Ratable Portion of the Small Noteholder Cash, as more fully described herein. The Effective Date New Common Stock shall be subject to dilution by the Management Incentive Plan as more fully described herein and by any duly authorized issuance of capital stock of Reorganized AET after the Effective Date including any New Common Stock authorized for the New Securities Reserve. Subject to the conditions set forth herein, Holders of the Senior Notes that are in a Class or Classes that have voted to accept the Plan, shall be deemed to have instructed Reorganized AET to transfer the Noteholder Cash, in an amount of up to $2.5 million to the Indenture Trustee, on behalf of the Class or Classes of Senior Note Claims that have voted to accept the Plan. The Indenture Trustee will then be deemed to transfer the Noteholder Cash to Reorganized AET for distribution to the Stockholders, *provided* that an official committee of equity security holders is not appointed by a trustee or the Bankruptcy Court in the Chapter 11 Cases or the other events as described herein, have not occurred. If the Plan becomes effective, then on the Effective Date, the AET Common Stock and all other AET Equity Interests will be canceled.

The representatives and advisors of the Company and the Committee determined that the proposed restructuring would best be accomplished pursuant to a prepetition solicitation of votes to accept or reject a plan of reorganization under chapter 11 of the Bankruptcy Code. On July 30, 2004, we announced that we had reached an agreement in principle with certain Noteholders on a proposed comprehensive recapitalization through a prepackaged plan of reorganization. Pursuant to the agreement in principle, the Company did not pay interest on the Notes that was due on July 1, 2004.

On August 24, 2004, the Company and the Restructuring Agreement Noteholders entered into the Restructuring Agreement, attached hereto as Exhibit B, which requires the Company to effectuate the prepackaged plan of reorganization, subject to the conditions set forth therein. Pursuant to the Restructuring Agreement and subject to the terms and conditions specified therein, the Restructuring Agreement Noteholders also agreed to support the Plan and to forbear from accelerating the principal amount of the Notes or otherwise taking action against the Company with respect to the Event of Default (as defined in the Senior Note Indenture) occurring under the Senior Note Indenture for the Company's nonpayment of interest on the Notes after expiration of the grace period, subject to the conditions set forth therein. The Restructuring Agreement will terminate no later than immediately prior to the filing of the Chapter 11 Cases.

We have been informed by Ingalls & Snyder, LLC, who we believe is a broker or investment advisor to more than 300 beneficial owners of the Notes ("Ingalls & Snyder"), that it intends to recommend to the beneficial owners of its Notes to vote to reject the Plan because Ingalls & Snyder does not support the non-reporting, private company status of Reorganized AET. We believe that the beneficial owners of Ingalls & Snyder's Notes are Holders of Allowed Small Note Claims. In an attempt to be responsive to the concerns of Ingalls & Snyder regarding the non-reporting, private company status of the Reorganized Company, the Company has provided for cash distribution to the Holders of Small Note Claims in lieu of the Effective Date New Common Stock and New Notes.

Counsel to Ingalls & Snyder has contended that the Plan violates sections 1122 and 1129, among others, of the Bankruptcy Code and that the Plan is therefore unconfirmable. The Company believes that

there is a valid business purpose for the difference in treatment of Large Note Claims and Small Note Claims, that the treatment of the Holders of Small Note Claims is not less favorable than the treatment of the Holders of Large Note Claims and that the Plan does not unfairly discriminate against the Holders of the Small Note Claims. In the event that the Class of Small Note Claims votes to reject the Plan, but the Class of Large Note Claims votes to accept the Plan, the Company intends to file the Chapter 11 Cases and, with the prior approval of the Committee, seek confirmation of the Plan notwithstanding the possible rejection by the Class of Small Note Claims. Accordingly, the Company expects that Ingalls & Snyder would object to Confirmation of the Plan.

On October 14, 2004, the Boards of Directors of AET and AET Canada determined that consummation of the transactions contemplated by the proposed Plan was in the best interests of the Company, its creditors and equity security holders, and authorized the commencement of the Solicitation.

B.      Equity Ownership and Debt Structure

1.      Equity Ownership Structure

The authorized capital stock of AET, a Delaware corporation, consists of 30,000,000 shares of Common Stock. As of October 8, 2004, there were 12,833,532 shares of Common Stock outstanding. The Common Stock is traded on the NASDAQ National Market System. As of October 8, 2004, there were 229 registered holders of record of Common Stock. The Company has received a notice from the NASDAQ Listing Qualifications Staff that states if the Company cannot comply with the minimum bid price rule by January 18, 2005, the Common Stock will be delisted or transferred to the NASDAQ Small Cap Market. Additionally, the Company has received notice from the NASDAQ Listing Qualifications Staff that states that if the Company cannot comply with the minimum market value rule before November 11, 2004, the Common Stock will be delisted.

AET is the direct parent of AET Canada and Applied Extrusion Technologies Limited ("AET Limited"), a non-debtor subsidiary company organized under the laws of England and Wales. AET Limited is an inactive, wholly owned subsidiary of AET, has not operated since 2001 and currently owns de minimis assets.

AET Canada, a Delaware corporation, owns and operates AET's Canadian manufacturing operations. AET owns 100% of the capital stock of AET Canada.

2.      Debt Structure

(a)     Notes

The Notes have an aggregate principal amount of $275,000,000 and mature in 2011. The Notes pay cash interest at a rate of 10.75% on a semiannual basis and have no sinking fund requirements. The Notes are unsecured obligations of AET and are guaranteed by AET Canada. Under the Plan, the aggregate Allowed Claims arising from ownership of the Notes shall be $275,000,000 plus estimated accrued and unpaid prepetition interest through the Petition Date.

On July 1, 2004, AET failed to make an interest payment under the Senior Note Indenture in the amount of $14,781,250. On July 31, 2004, the grace period relating to such interest payment passed, and the failure to make such payment became an event of default under the Senior Note Indenture.

      (b)     Existing Credit Agreement

The Company entered into the Existing Credit Agreement with General Electric Capital Corporation on October 3, 2003. As it has been amended, the Existing Credit Agreement consists of a $50,000,000 term loan and a $60,000,000 revolving line of credit. Under the Existing Credit Agreement, the term loan and revolving line of credit bear interest at floating rates, ranging from Index Margins (as defined in the Existing Credit Agreement) plus 1.25% to 2.75% to LIBOR Margins (as defined in the Existing Credit Agreement) plus 2.75% to 4.25%. The Company is required to repay a portion of its borrowings under the term loan each quarter, so as to retire such indebtedness in its entirety by October 8, 2008. Under the revolving credit facility, AET can incur up to a maximum of $10 million in letters of credit.

The Company amended the Existing Credit Agreement on March 23, 2004 to, among other things, reduce the minimum EBITDA and fixed charge coverage ratio covenants through the third quarter of fiscal year 2005. On June 29, 2004, the Company's lenders under the Existing Credit Agreement agreed to further reduce the minimum EBITDA and the minimum fixed charge coverage ratio covenants for the third fiscal quarter of 2004, and to waive a Default (as defined in the Existing Credit Agreement) to the extent arising out of failure to pay the interest on the Notes. On July 30, 2004, the lenders under the Existing Credit Agreement agreed to waive, on certain terms, the Event of Default (under and as defined in the Existing Credit Agreement) arising on July 31, 2004, upon the expiration of the grace period for the nonpayment of interest on the Notes provided for in the Senior Note Indenture.

As at October 28, 2004, the principal amount outstanding under the term loan was $43,750,000.00, and AET had borrowings of $49,596,191.40 pursuant to its revolving credit facility. Unused availability under this revolving credit facility at October 28, 2004 was approximately $4,192,000.00. Outstanding letters of credit were $825,000.00 at October 28, 2004.

AET's obligations under the Existing Credit Agreement are secured by substantially all of AET's assets. AET Canada has guaranteed AET's obligations under the Existing Credit Agreement and has granted liens on substantially all of its assets to secure its guaranty.

## II.    THE PLAN

### A.    Overview of Chapter 11

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its financial affairs for the benefit of itself and its creditors and equity holders. The principal goals of chapter 11 are to permit the rehabilitation of the debtor and provide for equality of treatment of similarly situated creditors. To further these goals, the filing of a voluntary petition for relief under chapter 11 gives rise to an automatic stay of all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case or that otherwise interfere with the debtor's property or business.

The objectives of chapter 11 are implemented through the confirmation of a plan of reorganization. The plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. A debtor generally has the exclusive right to propose a plan of reorganization for 120 days following the filing of the petition. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding on the debtor and its creditors and equity interest holders. The confirmation of the plan generally results in a discharge of the debtor from any debt that arose prior to the date of the confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement.

### B.    Administrative and Priority Tax Claims

#### 1.    Administrative Claims

Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Administrative Claim that is Allowed shall be paid by the Debtors, in full, in Cash, in such amounts as are incurred in the ordinary course of business by the Debtors, or in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon (a) the later of the Effective Date or, if such Administrative Claim is Allowed after the Effective Date, the date upon which there is a Final Order allowing such Administrative Claim, (b) such other terms as may exist in the ordinary course of such Debtor's business and in accordance with the terms of any agreement governing or documents evidencing such Administrative Claim or (c) as may be agreed upon between the Holder of such Allowed Administrative Claim and the Debtors. Except as referred to in Section 2.3 of the Plan, there shall be no Bar Date with respect to Administrative Claims.

#### 2.    Priority Tax Claims

Each Allowed Priority Tax Claim shall be paid by the Debtors in full, in Cash upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Priority Tax Claim, (c) the date such an Allowed Priority Tax Claim would have been due and payable if the Chapter 11 Cases had not been commenced, or (d) as may be agreed upon between the Holder of such an Allowed Priority Tax Claim and the Debtors; *provided*, *however*, that each Debtor may, at its option, in lieu of payment in full of an Allowed Priority Tax Claim, make Cash payments on account of such Allowed Priority Tax Claim, deferred to the extent permitted pursuant to section 1129(a)(9)(C) of the Bankruptcy Code and, in such event, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim

17

at a rate to be agreed upon by the Debtors and the applicable governmental unit or as determined by the Bankruptcy Court.

        3.      Professional Fees

All final applications for Professional Fees for services rendered in connection with the Chapter 11 Cases prior to the Confirmation Date shall be filed with the Bankruptcy Court not later than sixty (60) days after the Effective Date.

MBLY has served as financial advisor to the Company in connection with the Plan pursuant to a letter agreement dated as of June 1, 2004. The engagement letter provides for, among other things, payment to MBLY of a $150,000 monthly financial advisory fee (the "Monthly Advisory Fee"), reimbursement of MBLY's travel and reasonable out-of-pocket expenses (including all fees, disbursements and other charges of counsel to be retained by MBLY, and of other consultants and advisors retained by MBLY with the Company's consent) and payment to MBLY of a $3,000,000 restructuring transaction fee (the "Restructuring Transaction Fee"). The aggregate Monthly Advisory Fees paid to MBLY shall be credited against the Restructuring Transaction Fee. This Restructuring Transaction Fee will be paid to MBLY in full in Cash on the earlier of one hundred eighty (180) days after the launch of this Solicitation and the Confirmation of the Plan, and any unpaid prepetition Monthly Advisory Fees and expenses of MBLY, then due and owing, will also be paid in full in cash at the same time, in each case without further application to the Bankruptcy Court, subject to any necessary approval by the Bankruptcy Court as reasonable under section 1129(a)(4) of the Bankruptcy Code (or unless the Bankruptcy Court orders otherwise). Any other amounts to be paid to MBLY in respect of services rendered and expenses incurred during the Chapter 11 Cases shall be subject to the approval of the Bankruptcy Court as provided in Section 2.3 of the Plan.

Notwithstanding Section 2.3(a) of the Plan, if an official committee of unsecured creditors is not appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases or if Milbank Tweed Hadley & McCloy LLP, Houlihan Lokey Howard & Zukin or any other professionals engaged by the Restructuring Agreement Noteholders are not Professionals retained in the Chapter 11 Cases, then the fees and expenses incurred on or after the Petition Date by Milbank Tweed Hadley & McCloy LLP, as counsel to the Restructuring Agreement Noteholders, Houlihan Lokey Howard & Zukin, as financial advisor to the Restructuring Agreement Noteholders, and any other professionals retained by the Restructuring Agreement Noteholders, including but not limited to, local counsel, pursuant to their respective agreements with AET entered into prior to, on or subsequent to the Petition Date, shall be paid by AET or Reorganized AET as Administrative Claims in the ordinary course of AET's business, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing, unless specifically required by the Bankruptcy Court. The Indenture Trustee Fees and Expenses incurred on or after the Petition Date, including those of its counsel and financial advisor, if any, shall be paid by AET or Reorganized AET as Administrative Claims in the ordinary course of AET's business, without application by or on behalf of any such parties to the Bankruptcy Court, and without notice and a hearing, unless specifically required by the Bankruptcy Court. If AET or Reorganized AET and any such professional cannot agree on the amount of fees and expenses to be paid by such party, the reasonableness of any such fees and expenses shall be determined by the Bankruptcy Court.

        4.      Claims Under DIP Credit Agreement

On the Effective Date, all amounts outstanding under the DIP Credit Agreement shall be paid in full in Cash or as otherwise provided in the DIP Credit Agreement.

C.      Classification of Claims and Interests

Section 1123(a)(1) of the Bankruptcy Code requires a plan of reorganization to designate classes of claims and classes of interests. The Plan segregates the various Claims against the Debtors into various classes.

The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. The Company believes that all Claims and Equity Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Company would seek, with the consent of the Restructuring Agreement Noteholders, (i) to modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) to use the acceptances received from any Holder of Claims pursuant to this Solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Holders, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan adversely affects the treatment of a Holder of Claims and requires resolicitation, the Company will, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of the Restructuring Agreement Noteholders, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. (See Article X.D. "RISK FACTORS – Risks of Voluntary Bankruptcy Filing.")

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. The Debtors believe that they have complied with the requirement of equal treatment for each Claim or Equity Interest of a particular class.

Only Classes that are "impaired" (as defined under section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan. As a general matter, a Class of Claims or Equity Interests is considered to be "unimpaired" under a plan of reorganization if the plan does not alter the legal, equitable and contractual rights of the Holders of such Claims or Equity Interests. Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted the Plan. Holders of Claims or Equity Interests which do not receive or retain anything under the Plan are deemed to have rejected the Plan. Any Class of Claims or Equity Interests that is not occupied by an Allowed Claim or an Allowed Equity Interest, or a Claim or Equity Interest temporarily allowed under Rule 3018 of the Bankruptcy Rules as of the date of the commencement of the Confirmation Hearing, shall be deemed deleted from the Plan for all purposes.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A

Claim or Equity Interest is in a particular Class only to the extent that such claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Intercompany Claims are not classified and shall be reinstated or discharged in accordance with Section 5.1 of the Plan. "Allowed" means any Claim or portion thereof against any Debtor, (a) proof of which was filed within the applicable period of limitation, if any, fixed by the Bankruptcy Court in accordance with Bankruptcy Rule 3003(c)(3) as to which (i) no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (ii) any objection has been settled, waived, withdrawn or denied by a Final Order or (iii) if an objection has been interposed, such Claim as has been allowed (whether in whole or in part) by a Final Order, (b) which, if no proof of claim was so filed, has been listed by a Debtor in its Schedules, if any, as liquidated in an amount and not disputed or contingent and as to which (i) no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, or (ii) any objection has been settled, waived, withdrawn or denied by a Final Order or (iii) if an objection has been interposed, such Claim as has been allowed (whether in whole or in part) by a Final Order, (c) which Claim arises from the recovery of property under section 550 or 553 of the Bankruptcy Code and is allowed in accordance with section 502(h) of the Bankruptcy Code, (d) which Claim is expressly allowed under the Plan, (e) which Claim is allowed by a Final Order or (f) which Claim is not otherwise objected to or disputed; *provided, however,* that with reference to any Claim, the term "Allowed" for purposes of distribution under the Plan shall not include, unless otherwise specified in the Plan, interest on such Claim from and after the Petition Date.

The Plan classifies General Unsecured Claims as a separate Class because this Class comprises largely trade creditors. Many of these creditors are key suppliers of products and services used by the Company. Any impairment of these Claims could be detrimental to the ability of the Company to obtain essential trade credit and could substantially impair the ability of the Company to do business with trade creditors whose goods and services are essential for the Company. Accordingly, General Unsecured Claims are unimpaired under the Plan.

In order to effectuate this nonimpairment of General Unsecured Claims, the Company intends to seek authority from the Bankruptcy Court to make payments on account of obligations to general unsecured creditors in the ordinary course of business, including any such obligations arising prior to the commencement of the Chapter 11 Cases. If the Debtors are unable to obtain such Bankruptcy Court authorization, the Plan may have to be amended to provide for payment in full on the Effective Date to the Holders of General Unsecured Claims.

The Plan classifies the Noteholders into two separate classes for purposes of recovery: Holders of Large Note Claims and Holders of Small Note Claims. "Small Note Claims" means all Claims (including without limitation guaranty claims) arising from, related to or connected with the Senior Notes of Holders who hold less than $500,000 in principal amount of the Senior Notes. "Large Note Claims" means all Claims (including without limitation guaranty claims) arising from, related to or connected with the Senior Notes of Holders who hold $500,000 or more in principal amount of the Senior Notes.

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

      1.      Claims Against and Equity Interests in the Debtors

            Class 1—Other Priority Claims against the Debtors

            Class 2—General Unsecured Claims against the Debtors

Class 3—Large Note Claims against the Debtors

Class 4—Small Note Claims against the Debtors

Class 5 – Subordinated Claims against the Debtors

Class 6—AET Equity Interests

D.    Treatment of Claims and Interests

The treatment of Claims and Equity Interests pursuant to the Plan is as follows:

1.    Treatment of Claims and Equity Interests

(a)    Class 1—Other Priority Claims against the Debtors

(i)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Plan.  Unless the Holder of an Allowed Other Priority Claim against the Debtors and the Debtors agree to a different treatment, each Holder of an Allowed Other Priority Claim against the Debtors shall receive one of the following alternative treatments, at the election of the Debtors:

(A)    to the extent then due and owing on the Effective Date, such Allowed Other Priority Claim will be paid in full, in Cash by the Reorganized Debtors;

(B)    to the extent not due and owing on the Effective Date, such Allowed Other Priority Claim will be paid in full in Cash by the Reorganized Debtors when and as such Allowed Other Priority Claim becomes due and owing in the ordinary course of business in accordance with the terms thereof; or

(C)    such Allowed Other Priority Claim will be otherwise treated in any manner such that Class 1 shall not be impaired pursuant to section 1124 of the Bankruptcy Code.

Any default with respect to any Other Priority Claim against the Debtors that existed immediately prior to the filing of the Chapter 11 Cases shall be deemed cured upon the Effective Date.

(ii)    *Voting*:  Class 1 is Unimpaired.  The Holders of Other Priority Claims against the Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(b)    Class 2—General Unsecured Claims against the Debtors

    (i)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed General Unsecured Claims against the Debtors are unaltered by the Plan.  Unless the Holder of an Allowed General Unsecured Claim and the Debtors agree to a different treatment, each Holder of an Allowed General Unsecured Claim against the Debtors shall receive one of the following alternative treatments, at the election of the Debtors:

        (A)    to the extent then due and owing on the Effective Date, such Allowed General Unsecured Claim will be paid in full, in Cash by the Reorganized Debtors in accordance with the terms thereof;

        (B)    to the extent not due and owing on the Effective Date, such Allowed General Unsecured Claim will be paid in full, in Cash by the Reorganized Debtors when and as such Allowed General Unsecured Claim becomes due and owing in the ordinary course of business in accordance with the terms thereof; or

        (C)    such Allowed General Unsecured Claim will be otherwise treated in any other manner such that Class 2 shall not be impaired pursuant to section 1124 of the Bankruptcy Code.

    Any default with respect to any General Unsecured Claim against the Debtors that existed immediately prior to the filing of the Chapter 11 Cases shall be deemed cured upon the Effective Date.

    (ii)    *Voting*:  Class 2 is Unimpaired.  The Holders of General Unsecured Claims against the Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(c)    Class 3—Large Note Claims against the Debtors

    (i)    *Treatment*:  Each Large Note Claim constitutes an Allowed Large Note Claim.  On the Effective Date, each Holder of an Allowed Large Note Claim shall receive, in full satisfaction of such Allowed Large Note Claim, its Ratable Portion of the Large Noteholder Distribution; *provided*, *however*, that no Holder of a Large Note Claim shall be entitled to receive the Large Noteholder Cash if Class 3 votes to reject the Plan. By accepting the New Securities Allocation, each Holder of a Large Note Claim shall be deemed to become a party to the Stockholders' Agreement.  To the extent that the Plan

Funders tender funds to the Company pursuant to the Plan Funding Commitment so that there is not a Plan Funding Estimated Payment Default, then the Plan Funders' Allowed Large Note Claims shall be increased by the dollar amount of the Small Note Claims or other Effective Date Unidentified Claims that are satisfied pursuant to the Plan Funding Commitment. The distribution of the New Securities Allocation to the Plan Funders in accordance with the Plan Funding Commitment, if any, shall be in full satisfaction of the repayment by the Debtors of any funds tendered pursuant to the Plan Funding Commitment. If a Plan Funding Estimated Payment Default does not occur, then at the end of the Post-Effective Date Period, Holders of Effective Date Unidentified Claims shall receive the treatment described in Section 5.9 of the Plan. If a Plan Funding Estimated Payment Default occurs, then the Plan Funders' Allowed Large Note Claims shall not be increased and all Effective Date Unidentified Claims shall be deemed to be Small Note Claims and shall receive the treatment described in Section 3.3(d) herein.

If Class 3 votes to accept the Plan, then the Indenture Trustee shall be deemed to receive, on behalf of the Holders of the Large Note Claims, the Large Noteholder Cash. The Large Noteholder Cash shall be deemed to be returned to Reorganized AET for the benefit of the Holders of the AET Common Stock, in accordance with and subject to satisfaction of the conditions set forth in Section 5.6 of the Plan. If the conditions in Section 5.6 of the Plan are not satisfied, then the Holders of the Allowed Large Note Claims shall be deemed to have contributed the Large Noteholder Cash to Reorganized AET, and Reorganized AET shall be authorized to retain the Large Noteholder Cash for its own account.

(ii)  *Voting*: Class 3 is Impaired and the Holders of Allowed Large Note Claims are entitled to vote to accept or reject the Plan.

(d)  Class 4—Small Note Claims against the Debtors

(i)  *Treatment*: Each Small Note Claim constitutes an Allowed Small Note Claim. On the Effective Date, (A) if a Plan Funding Estimated Payment Default has not occurred, each Holder of an Allowed Small Note Claim shall receive, in full satisfaction of such Allowed Small Note Claim, the Small Noteholder Allocation and a Ratable Portion of the Small Noteholder Cash or (B) if a Plan Funding Estimated Payment Default occurs, then all Effective Date Unidentified Claims shall be deemed to be Allowed Small Note Claims, and each Holder of an Allowed Small Note Claim shall receive, instead of the Small Noteholder Allocation, its

23

Ratable Portion of the New Securities Allocation; *provided*, *however*, that in the case of either (A) or (B), no Holder of a Small Note Claim shall be entitled to receive the Small Noteholder Cash if Class 4 votes to reject the Plan.  If a Plan Funding Estimated Payment Default does not occur, then at the end of the Post-Effective Date Period, Holders of Effective Date Unidentified Claims shall receive the treatment described in Section 5.9 of the Plan.

If Class 4 votes to accept the Plan, then the Indenture Trustee shall be deemed to receive, on behalf of the Holders of Small Note Claims, the Small Noteholder Cash.  The Small Noteholder Cash shall be deemed to be returned to Reorganized AET, for the benefit of the Holders of the AET Common Stock, in accordance with and subject to satisfaction of the conditions set forth in Section 5.6 of the Plan.  If the conditions in Section 5.6 of the Plan are not satisfied, then the Holders of the Allowed Small Note Claims shall be deemed to have contributed the Small Noteholder Cash to Reorganized AET, and Reorganized AET shall be authorized to retain the Small Noteholder Cash for its own account.

    (ii)    *Voting*:  Class 4 is Impaired and Holders of Allowed Small Note Claims are entitled to vote to accept or reject the Plan.

(e)    Class 5—Subordinated Claims against the Debtors

    (i)    *Treatment*:  On the Effective Date, Subordinated Claims will be discharged and each Holder thereof shall not receive or retain any distribution or property on account of its Subordinated Claim.

    (ii)    Voting:  Class 5 is Impaired.  The Holders of Subordinated Claims are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(f)    Class 6—AET Equity Interests

    (i)    *Treatment*:  On the Effective Date, AET Equity Interests will be canceled and each Holder thereof shall not be legally entitled to receive or retain any distribution on account of its AET Equity Interests.

    (ii)    *Voting*:  Class 6 is Impaired.  The Holders of AET Equity Interests are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Notwithstanding any other provision of the Plan, any Allowed Claim against the Debtors shall be reduced by the amount, if any, that was paid by the Debtors to the Holder of such Claim prior to the

Effective Date, including pursuant to any Final Order entered by the Bankruptcy Court. Nothing in the Plan shall preclude the Reorganized Debtors from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court or any document or agreement entered into and enforceable pursuant to the terms of the Plan, nothing shall affect the Debtors' or Reorganized Debtors' Causes of Action, rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, setoffs or recoupments against, Unimpaired Claims and all Causes of Action for the affirmative relief against the holders thereof.

      E.      Means of Implementation of Plan

            1.      Substantive Consolidation for Purposes of Voting, Confirmation and Distribution

The Plan contemplates and is predicated upon substantively consolidating the Debtors solely for the purposes of (i) voting, (ii) confirmation, and (iii) distribution in respect of Classes 3 and 4. The Plan does not contemplate the substantive consolidation of the Debtors with respect to the other Classes of Claims or Equity Interests set forth in the Plan, or for any other purpose. On the Effective Date, (i) all guarantees of any Debtor of the payment, performance, or collection of another Debtor with respect to Class 3 and 4 Claims shall be deemed eliminated and canceled, (ii) any obligation of any Debtor and all guarantees with respect to Class 3 and 4 Claims thereof executed by one or more of the other Debtors shall be treated as a single obligation, and (iii) each Class 3 or 4 Claim against any Debtor shall be deemed to be against the consolidated Debtors and shall be deemed a single Class 3 or 4 Claim against and a single obligation of the consolidated Debtors. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Class 3 or 4 Claims based upon guarantees of collection, payment, or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect. Except as set forth in Section 5.1 of the Plan, such substantive consolidation shall not (other than for purposes related to the Plan) (i) affect the legal and corporate structures of the Reorganized Debtors, (ii) cause any Debtor to be liable for any Claim under the Plan for which it otherwise is not liable, and the liability for any such Claim shall not be affected by such substantive consolidation, (iii) affect Intercompany Claims or (iv) affect any obligations under any leases or contracts assumed in the Plan or otherwise subsequent to the filing of the Chapter 11 Cases.

On the Effective Date, (i) the Intercompany Claims of Debtors against Debtors shall be reinstated or discharged and satisfied at the option of the Reorganized Debtors by contributions, distributions, or otherwise and (ii) the Interests of any Debtor in a non-Debtor affiliate shall remain outstanding.

Unless the Bankruptcy Court has approved the substantive consolidation of the Chapter 11 Cases by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors as provided in Section 5.1 of the Plan. If no objection to substantive consolidation is timely filed and served by any Holder of a Claim that is Impaired by the Plan as provided therein on or before the deadline for objection to Confirmation of the Plan, the Substantive Consolidation Order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing shall coincide with the Confirmation Hearing.

2.    Private Company Status and Stock Transfer Limitations

Reorganized AET currently expects to have less than 300 holders of record of New Common Stock on the Effective Date. Accordingly, it will not be subject to the periodic reporting and other procedural requirements of the Exchange Act. This is expected to result in significant cost savings. In order to ensure that Reorganized AET does not inadvertently become subject to the requirements of the Exchange Act, the Stockholders' Agreement and the Amended AET Certificate of Incorporation will impose restrictions on transfer that are designed to limit the number of stockholders to a number below that which would trigger the reporting requirements under Exchange Act. For a more complete summary of the restrictions on transfer provided in the Stockholders' Agreement, the Amended AET Certificate of Incorporation, and Amended AET By-Laws, see Article II.F. "The Plan - Description of New Common Stock". For a summary of the restrictions on transfer provided in the New Note Indenture, see Article II.G. "The Plan - Description of the New Notes".

3.    Exit Facility

On or prior to the Effective Date, the Reorganized Debtors shall be authorized to execute and deliver the Exit Facility Documents.

4.    Plan Funding Commitment

As of the date of the Solicitation and Disclosure Statement, the Company entered into the Plan Funding Commitment with the Plan Funders to fund the Small Noteholder Allocation in accordance with the terms of the Plan. Pursuant to the Plan Funding Commitment, the Plan Funders have committed to fund the Total Plan Funding Payment (as defined in the Plan Funding Commitment) in a dollar amount not to exceed $31,600,000. The following is a summary and is qualified in its entirety by the Plan Funding Commitment attached hereto as Exhibit C.

The amounts committed by the Plan Funders will be payable to the Debtors in two installments, subject to the satisfaction of the conditions in the Plan Funding Commitment. The first payment installment, or the "Estimated Plan Funding Payment", will be made after occurrence of the Escrow Date (as defined in the Plan Funding Commitment) shortly after the Confirmation Date and after satisfaction of the Conditions Precedent, as defined and more fully described in the Plan Funding Commitment. The Estimated Plan Funding Payment will be based on the Debtors' estimation of the dollar amount of the Allowed Small Note Claims as of the Escrow Date. The Estimated Plan Funding Payment is also subject to certain Participant Termination Events, as defined and more fully described in the Plan Funding Commitment, including a requirement to consummate the Estimated Plan Funding Payment by the earlier of February 28, 2005 and three days after the Escrow Date.

The second payment installment, or the "True Up Plan Funding Payment", will be made approximately 90 days after the Effective Date. During the 90-day period following the Effective Date, the Company has agreed to use commercially reasonable efforts to identify the Effective Date Unidentified Claims as Small Note Claims or Large Note Claims. The True Up Plan Funding Payment will be based on the Debtors' estimation of Effective Date Unidentified Claims as Allowed Small Note Claims and Final Unclassified Allowed Senior Note Claims (as defined in the Plan Funding Commitment).

If a Participant Termination Event occurs or there is a Defaulting Funder (as defined in the Plan Funding Commitment) with respect to the Estimated Plan Funding Payment, and no other Plan Funder funds such Defaulting Funder's payment, then no payment will be made by the Plan Funders

pursuant to the Plan Funding Commitment. In such event, the Debtors will distribute a Ratable Portion of the New Securities Allocation to the Holders of Small Note Claims and the Holders of Effective Date Unidentified Claims. In addition, a New Securities Reserve would not be established pursuant to the Plan.

If there is a True Up Defaulting Participant (as defined in the Plan Funding Commitment), and no other Plan Funder funds such True Up Defaulting Participant's payment, the Company may, to the extent of the payment deficiency resulting from the Plan Funding True Up Payment Default either (x) distribute New Common Stock and New Notes from the New Securities Reserve or (y) fund any amounts that have not been tendered by the Plan Funders, in either case in satisfaction of the Post-Effective Date Small Note Claims and the Post-Effective Date Unidentified Claims, regardless of whether such Post-Effective Date Unidentified Claims are Large Note Claims or Small Note Claims. See Article II.E.10 "The Plan – Means of Implementation of the Plan – Issuance and Distribution of New Common Stock and New Notes; Reserve" and section 5.9 of the Plan.

In consideration for the funds tendered by the Plan Funders, the Allowed Large Note Claim of each Plan Funder shall be automatically increased by the amount of the Small Noteholder Claim or the Effective Date Unidentified Claim, as the case may be, that is satisfied by the amount funded by each such Plan Funder without necessity for further action, it being understood that this shall not be deemed to be a purchase of the Allowed Small Noteholder Claims by the Plan Funders. The increased distribution of New Notes and New Common Stock to the Plan Funders will satisfy in full the Company's obligations to each of the Participants with respect to their payments pursuant to the Plan Funding Commitment. In addition, the Plan Funding Commitment provides for commitment fees to be paid by the Company to the Plan Funders in an amount of 2% of payments actually made pursuant to the Plan Funding Commitment.

5.      Cancellation of Notes, Instruments, Debentures and AET Equity Interests

Pursuant to Section 5.3 of the Plan, on the Effective Date, except to the extent provided elsewhere in the Plan or the Confirmation Order, and provided that the treatments provided for therein and the distributions contemplated by Article VII of the Plan are made, (a) the Senior Notes and (b) all AET Equity Interests, including all AET Common Stock, Junior Preferred Rights and Junior Preferred Stock, shall be canceled and deemed terminated. On the Effective Date, except to the extent provided in Section 7.2 of the Plan or otherwise in the Plan, any indenture relating to any of the foregoing, including, without limitation, the Senior Note Indenture, shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code.

6.      Execution of Related Documents

Pursuant to Section 5.4 of the Plan, on the Effective Date, all Plan Documents entered into pursuant to the Plan, including, without limitation, the Exit Facility, the New Note Indenture, the Stockholders' Agreement and any other agreement entered into or instrument issued in connection with any of the foregoing or any other Plan Document, shall be executed and delivered by the Reorganized Debtors and shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and as specified therein.

7.      Corporate Governance, Directors and Officers, and Corporate Action

On the Effective Date, Reorganized AET shall file the Amended AET Certificate of Incorporation, and Reorganized AET Canada shall file the Amended AET Canada Certificate of Incorporation, in each case with the Secretary of State of the State of Delaware in accordance with

sections 102 and 103 of the Delaware General Corporation Law. Each of the Amended Certificates of Incorporation will, among other things, prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a) of the Bankruptcy Code. The Amended AET Certificate of Incorporation shall provide for the number of authorized shares of New Common Stock of Reorganized AET and provide that the par value of the New Common Stock shall be $0.01. After the Effective Date, each of the Reorganized Debtors may amend and restate its Amended Certificate of Incorporation and other constituent documents as permitted by their terms and by the Delaware General Corporation Law.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code and except as otherwise described herein, as of the Effective Date, the initial officers of the Reorganized Debtors shall be the officers of the Debtors immediately prior to the Effective Date. On the Effective Date, the directors designated by the Committee and filed with the Bankruptcy Court prior to the Confirmation Date shall serve as the initial board of directors of each of the Reorganized Debtors. Pursuant to section 1129(a)(5), the Debtors will disclose, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the initial board of directors of the Reorganized Debtors (which Persons shall have been designated by the Committee), and, to the extent such Person is an insider, the nature of any compensation for such Person. The classification and composition of the board of directors of each of the Reorganized Debtors shall be consistent with the Stockholders' Agreement, the Amended Certificates of Incorporation, the Amended By-Laws of the Reorganized Debtors and the Delaware General Corporation Law.

On the Effective Date, the adoption of the Amended Certificates of Incorporation or similar constituent documents, the adoption of the Amended By-Laws, the selection of directors and officers for the Reorganized Debtors and all other actions contemplated by the Plan (whether to occur before, on or after Effective Date of the Plan) shall be authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of directors of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals of the corporate actions in Section 5.5(c) of the Plan shall be effective notwithstanding any requirements under the Delaware General Corporation Law or other applicable non-bankruptcy law.

8.    Noteholder Cash

In recognition of the contribution of the Holders of AET Common Stock prior to the Chapter 11 Cases (but subject to conditions set forth below), Holders of Senior Notes that are in a Class or Classes that have voted to accept the Plan, shall be deemed to have instructed Reorganized AET to transfer the Noteholder Cash to the Indenture Trustee, which Noteholder Cash shall be deemed to have been transferred to the Indenture Trustee, on behalf of the Class or Classes of Senior Note Claims that have voted to accept the Plan. Holders of Senior Notes that are in a Class or Classes that have voted to accept the Plan shall also be deemed to have instructed the Indenture Trustee to transfer such Noteholder Cash to Reorganized AET, and the Indenture Trustee shall be deemed to have transferred the Noteholder Cash to Reorganized AET, for the benefit of the Holders of AET Common Stock. In recognition of these deemed transfers, Reorganized AET shall distribute the Noteholder Cash to the Holders of the AET Common Stock that are Holders of record as of the Stockholder Distribution Record Date. Nothwithstanding the foregoing, if (a) an official committee of equity security holders is appointed by a trustee or the Bankruptcy Court in the Chapter 11 Cases, then the Class or Classes of Senior Note Claims that have

voted to accept the Plan shall be deemed to have contributed the Noteholder Cash to Reorganized AET, and Reorganized AET shall retain the entire amount of Noteholder Cash for its own account, subject to the lenders' interests in such Noteholder Cash in accordance with the Exit Facility, and shall not distribute the Noteholder Cash to the Holders of the AET Common Stock; (b)(x) the Class of Large Note Claims votes to reject the Plan in accordance with Section 3.3(c) of the Plan or (y) the Class of Small Note Claims votes to reject the Plan in accordance with Section 3.3(d) of the Plan, then in either case, the Noteholder Cash of such rejecting Class shall be retained by Reorganized AET and shall not be distributed to the Holders of the AET Common Stock or (c) the Bankruptcy Court holds, determines or rules that the Plan is not confirmable due to the distribution of the Noteholder Cash to the Holders of the AET Common Stock, then the provisions of the Plan relating to the Noteholder Cash shall be deemed to be omitted for all purposes and Reorganized AET shall retain the entire amount of Noteholder Cash for its own account and shall not distribute the Noteholder Cash to the Holders of the AET Common Stock.

9.      Sources of Cash for Plan Distribution

Pursuant to Section 5.7 of the Plan, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan shall be obtained from existing Cash balances, the operations of the Debtors or Reorganized Debtors, the Plan Funding Commitment or post-Confirmation Date borrowing under other available facilities of the Debtors or Reorganized Debtors, including, without limitation, to the extent available, the Exit Facility.

10.      Issuance and Distribution of New Common Stock and New Notes; Reserve

(a)      The issuance of Effective Date New Common Stock, the New Common Stock to be issued for purposes of the New Securities Reserve and New Notes by Reorganized AET is hereby authorized without the need for any further corporate action or compliance with any applicable non-bankruptcy law. On or as soon as practicable after the Effective Date, and with respect to Holders of Senior Notes that have provided appropriate registration information prior to the Effective Date, no later than five (5) Business Days after the Effective Date, the Indenture Trustee or the Senior Note Disbursing Agent shall distribute, in accordance with the terms of the Plan, the Effective Date New Common Stock and New Notes to Holders of the Large Note Claims (that are identified as such) under the terms of the Senior Note Indenture. Notwithstanding the foregoing, if there is a Plan Funding Estimated Payment Default, then the New Common Stock and New Notes will be distributed in accordance with the Plan to all Holders of Senior Notes, without regard to whether such Holders hold Large Note Claims, Small Note Claims or Effective Date Unidentified Claims.

(b)      On or prior to the Effective Date, and provided that there has not been a Plan Funding Estimated Payment Default, the Debtors and the Committee shall establish the New Securities Reserve. If there has been a Plan Funding Estimated Payment Default, then no New Securities Reserve shall be established and distributions shall be made in accordance with Sections 3.3(c) and 3.3(d) of the Plan. Reorganized AET shall, during the Post-Effective Date Period, use commercially reasonable efforts to identify the Effective Date Unidentified Claims as either Post-Effective Date Large Note Claims or Post-Effective Date Small Note Claims. Post-Effective Date Large Note Claims, Post-Effective Date Small Note Claims and any Post-Effective Date Unidentified Claims shall receive the treatment specified below.

(i)      *Post-Effective Date Large Note Claims.* After expiration of the Post-Effective Date Period, distributions to Holders of Post-Effective Date Large Note Claims shall be made from the New Securities Reserve, and such distributions shall be equal in amount to the ratio (expressed as a percentage) that the amount of such Post-Effective Date Large Note Claim

bears to the aggregate amount of Effective Date Unidentified Claims.

(ii) *Post-Effective Date Small Note Claims.* After Expiration of the Post-Effective Date Period, Holders of Post-Effective Date Small Note Claims shall receive the Small Noteholder Allocation pursuant to the Plan Funding Commitment, and the delivery of such distributions shall be treated in accordance with Section 7.3 of the Plan; *provided, however*, that if a Plan Funding True Up Payment Default occurs, then Reorganized AET may, to the extent of the payment deficiency resulting from the Plan Funding True Up Payment Default, either (x) distribute New Common Stock and New Notes from the New Securities Reserve or (y) fund any amounts that have not been tendered by the Plan Funders, in either case in satisfaction of the Post-Effective Date Small Note Claims. In the event that a Plan Funding True Up Payment Default occurs and Reorganized AET distributes New Common Stock and New Notes to the Holders of Post-Effective Date Small Note Claims from the New Securities Reserve, in whole or in partial satisfaction of such Claims, such distribution shall be equal in amount to the ratio (expressed as a percentage) that the amount of such Post-Effective Date Small Note Claims (after reduction for application of any amounts of the Plan Funding True Up Payment actually made by the Plan Funders or by the Reorganized Debtors) bears to the aggregate amount of Effective Date Unidentified Claims.

(iii) *Post-Effective Date Unidentified Claims.* After expiration of the Post-Effective Date Period, Holders of any remaining Post-Effective Date Unidentified Claims shall receive the Small Noteholder Allocation pursuant to the Plan Funding Commitment, regardless of whether such Claims are Large Note Claims or Small Note Claims, and the delivery of such distributions shall be treated in accordance with Section 7.3 of the Plan; *provided, however*, that if a Plan Funding True Up Payment Default occurs, then Reorganized AET may, to the extent of the payment deficiency resulting from the Plan Funding True Up Payment Default, either (x) distribute New Common Stock and New Notes from the New Securities Reserve or (y) fund any amounts that have not been tendered by the Plan Funders, in either case in satisfaction of the Post-Effective Date Unidentified Claims, regardless of whether such Post-Effective Date Unidentified Claims are Large Note Claims or Small Note Claims. In the event that a Plan Funding True Up Payment Default occurs and Reorganized AET distributes New Common Stock and New Notes to the Holders of Post-Effective Date Unidentified Claims from the New Securities Reserve, in whole or in partial satisfaction of such Claims, such distribution shall be equal in amount to

the ratio (expressed as a percentage) that the amount of such Post-Effective Date Unidentified Claims (after reduction for application of any amounts of the Plan Funding True Up Payment actually made by the Plan Funders or by the Reorganized Debtors) bears to the aggregate amount of Effective Date Unidentified Claims.

(c)    If there is a Plan Funding True Up Payment Default and the Reorganized Debtors elect to fund the amounts not tendered by the Plan Funders (pursuant to Sections 5.9(b)(ii)(y) and 5.9 (b)(iii)(y) of the Plan) then the New Notes in the new Securities Reserve shall be canceled and the authorized New Common Stock shall not be issued for the New Securities Reserve (in each case to the extent that payment is actually made by the Reorganized Debtors and not tendered by the Plan Funders) with respect to any amounts held therein on account of Post-Effective Date Small Note Claims and Post-Effective Date Unidentified Claims.

11.    Elimination of Classes

Any Class of Claims or Equity Interests that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or an Allowed Equity Interest, or a Claim or Equity Interest temporarily allowed under Rule 3018 of the Bankruptcy Rules, shall be deemed deleted from the Plan for all purposes.

12.    Management Incentive Plan; Employment Agreement

On or within 30 days after the Effective Date, the Management Incentive Plan in the form of a stock option or other similar program representing 5% or the equivalent of 5% of the Effective Date New Common Stock shall be adopted by the Reorganized AET Board of Directors in their discretion. The Management Incentive Plan shall become effective only after the occurrence of the Effective Date and such initial adoption of the Management Incentive Plan by the Reorganized AET Board of Directors shall not be subject to the vote of the holders of New Common Stock notwithstanding any provision in the Stockholders' Agreement. Following the Effective Date, the Management Incentive Plan may be amended or modified by the Reorganized AET Board of Directors in accordance with the terms thereof and any such amendment or modification shall not require an amendment of the Plan.

On the Effective Date, David N. Terhune, currently the President and Chief Operating Officer of AET, will become the President and Chief Executive Officer of Reorganized AET. Mr. Terhune has a 3 year contract with AET currently which contract is expected to be modified prior to the Confirmation Date and such contract as modified shall be assumed by the Reorganized Debtors. Such contract as initially assumed by the Reorganized Debtors shall not be subject to the vote of holders of New Common Stock notwithstanding any provision of the Stockholders' Agreement.

On the Effective Date, Amin J. Khoury will retire from his position as Chief Executive Officer of AET as well as from any other position which he currently holds with AET and any of its subsidiaries and affiliates. In addition, Mr. Khoury has agreed to provide consulting and advisory services to the board of directors of the Reorganized Company on terms and conditions to be agreed upon. In addition to customary terms in agreements of this nature, Mr. Khoury's Retirement and Release Agreement provides for a release, on the Effective Date, by Mr. Khoury, his successors and assigns of all claims he may assert against AET, Reorganized AET, its subsidiaries and affiliates and the Restructuring Agreement Noteholders.

13.    Stockholders' Agreement

Provided that no Plan Funding Estimated Payment Default occurs, the Stockholders' Agreement shall be deemed to be executed by all Holders of Large Note Claims and shall be binding upon each of such Holders and shall be deemed to be delivered by each of such Holders on the Effective Date. The Stockholders' Agreement will contain provisions governing the composition of the board of directors of the Reorganized Debtors, prior approval rights of the holders of the New Common Stock, restrictions on transfer of the New Common Stock, preemptive rights to purchase or subscribe for securities in Reorganized AET, registration rights, information rights, and other terms and provisions as more fully described in the Stockholders' Agreement Term Sheet attached hereto as Exhibit D. Notwithstanding the foregoing, preemptive rights will not be available (i) to any holder of New Common Stock if the offer of preemptive rights to such holder of New Common Stock would otherwise require registration under the Securities Act or any other securities laws, or (ii) if Reorganized AET reasonably determines that the offering of such preemptive rights would, if effected, require the Reorganized Debtors to file reports of other information pursuant to Section 13 of the Exchange Act, including pursuant to Section 12(g)(1) of the Exchange Act. Some or all of these terms and provisions will be also reflected in the Amended Certificates of Incorporation and the Amended By-Laws of the Reorganized Debtors.

14.    Registration Rights

Parties to the Stockholders' Agreement are entitled to certain demand and piggyback registration rights. Subject to the limitations set forth in the Stockholders' Agreement, these rights include: (i) prior to the time that Reorganized AET is subject to the reporting requirements under the Exchange Act, parties who hold a majority of the outstanding New Common Stock will be entitled to cause Reorganized AET to file a resale registration statement covering the sale of the New Common Stock held by such parties; (ii) following the time that Reorganized AET is subject to the reporting requirements under the Exchange Act, parties who believe they will be deemed to be underwriters due to their status as affiliates for resale purposes will be entitled to cause Reorganized AET to file a resale registration statement covering the sale of the New Common Stock held by such parties; and (iii) certain piggyback registration rights in connection with any such demand registrations.

F.    Description of New Common Stock

Pursuant to Reorganized AET's Amended Certificate of Incorporation, an as yet undetermined number of shares of common stock, par value $0.01 per share, will be authorized. All shares of the New Common Stock, when issued pursuant to the Plan, will be fully paid and nonassessable.

As of the Effective Date and subject to any restrictions on dividends that will be imposed by the Exit Facility and the Stockholders' Agreement, the holders of the New Common Stock will be entitled to such dividends (whether payable in Cash, property or stock) as may be declared from time to time by the board of directors of Reorganized AET upon receiving prior approval of the holders of at least 60% of the New Common Stock and will be entitled, after payment of all prior claims, to receive ratably all assets of Reorganized AET upon the liquidation, dissolution or winding-up of Reorganized AET. The New Common Stock does not give the holders thereof any redemption or conversion rights. Holders of New Common Stock that are or are deemed to be parties to the Stockholders' Agreement are entitled to preemptive rights to purchase or subscribe for securities in Reorganized AET, subject to certain limitations set forth in the Stockholders' Agreement. Notwithstanding the foregoing, preemptive rights will not be available (i) to any holder of New Common Stock if the offer of preemptive rights to such holder of New Common Stock would otherwise require registration under the Securities Act or any other securities laws, or (ii) if Reorganized AET reasonably determines that the offering of such preemptive

rights would, if effected, require the Reorganized Debtors to file reports or other information pursuant to Section 13 of the Exchange Act, including pursuant to Section 12(g)(1) of the Exchange Act.

On the Effective Date, each holder of the New Common Stock that is or is deemed to be a party to the Stockholders' Agreement will be deemed to have acknowledged and agreed with each of the restrictions on transfer set forth in whole or in part in the Stockholders' Agreement, the Amended AET Certificate of Incorporation and the Amended AET Bylaws, including without limitation, the following :

    (1)    It understands and acknowledges that the New Common Stock has not been registered under the Securities Act or any other applicable securities law, the New Common Stock is being offered pursuant to the exemption set forth in Section 1145(a)(1) of the Bankruptcy Code in a transaction not requiring registration under the Securities Act or any other securities laws, and the New Common Stock may not be offered, sold, pledged or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities law, pursuant to an exemption therefrom or in a transaction not subject thereto and in each case in compliance with the conditions for transfer set forth in paragraph 3 below.

    (2)    It acknowledges that the Solicitation and Disclosure Statement relates to an offering that is exempt from registration under the Securities Act and does not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities.

    (3)    It understands that Reorganized AET shall not permit a holder of New Common Stock to sell, assign, pledge, encumber or otherwise transfer the New Common Stock, nor shall Reorganized AET issue, sell or otherwise transfer any New Common Stock:

        (i)    unless any transferee of New Common Stock executes and delivers to Reorganized AET an instrument in form and substance satisfactory to Reorganized AET confirming that such transferee takes such New Common Stock and agrees to be bound by the terms and conditions of the Stockholders' Agreement; and

        (ii)    if Reorganized AET reasonably determines that such transfer would (i) trigger an "ownership change" under section 382 of the Code and results in any limitation on the ability of Reorganized AET to utilize its then-current NOLs, or (ii) result in Reorganized AET having more than 300 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder) of the New Common Stock.

    (4)    It understands that (i) in the event that any holder or group of holders beneficially owning in excess of 60% of the outstanding New Common Stock propose to sell all of their shares of New Common Stock, such holder or group of holders may require all of

the other holders of New Common Stock to sell all of their shares of New Common Stock to the transferee in such transaction on the same terms and conditions as proposed by the transferring holder or group of holders, and (ii) in connection with a sale of 40% or more of the outstanding New Common Stock by a holder or group of holders, in one transaction or in a series of related transactions, all holders of New Common Stock will have the right to sell a pro rata portion of their shares of New Common Stock to the transferee in such transaction on the same terms and conditions as proposed by the transferring holder or group of holders.

(5)    It understands that the certificates evidencing the New Common Stock will, unless otherwise agreed by Reorganized AET and the holder thereof, bear a legend substantially to the following effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933 OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN THE RESTATED CERTIFICATE OF INCORPORATION, AS AMENDED (THE "CERTIFICATE OF INCORPORATION") AND THE STOCKHOLDERS' AGREEMENT TO BE ENTERED INTO ON OR PRIOR TO THE EFFECTIVE DATE, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS' AGREEMENT"). NO REGISTRATION OR TRANSFER OF THESE SHARES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE A COPY OF THE CERTIFICATE OF INCORPORATION AND STOCKHOLDERS' AGREEMENT, CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF STOCK, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

Some or all of these terms and provisions will be also reflected in the Amended Certificates of Incorporation and the Amended By-Laws of the Reorganized Debtors.

G.    Description of the New Notes

*General*

The New Notes, in an aggregate principal amount of $50,000,000, will be issued pursuant to an indenture (the "New Note Indenture") with terms and conditions substantially similar to those set forth in Exhibit E (the "Description of the New Notes"). The New Notes will be the unsecured senior obligations of Reorganized AET and will be *pari passu* in right of payment with any unsecured, unsubordinated indebtedness and senior in right of payment to any future subordinated indebtedness of Reorganized AET. The payment obligations on the New Notes will be guaranteed, jointly and severally, by each Subsidiary

Guarantor (as defined in the New Note Indenture) who is also a guarantor under the Exit Facility and any Restricted Subsidiary that, after the date of the New Note Indenture, guarantees or becomes a guarantor or obligor in respect to any other Indebtedness of the Company or any other Restricted Subsidiary, subject to the exceptions contained in the New Note Indenture. Each Guarantee will be (a) a general unsecured obligation of the Guarantor (as defined in the New Note Indenture); (b) effectively subordinated in right of payment to any existing and future secured indebtedness of such guarantor to the extent of the assets securing such indebtedness; (c) *pari passu* in right of payment with any unsecured, unsubordinated indebtedness of such guarantor; and (d) senior in right of payment to any future subordinated indebtedness of the guarantor. The term of the New Notes will be seven years from the date of issuance.

### *Interest*

Each New Note will bear interest at the rate of 12% per annum. Interest will be paid in full in cash on each interest payment date or may be deferred in full at Reorganized AET's option, *provided*, *however,* that an interest payment for interest accrued and payable for the immediately preceding six months will be paid in full in cash on the applicable interest payment date if both of the following requirements are met: (i) the amount of the sum of (x) Cash and Cash Equivalents (as defined in the New Note Indenture) and (y) amounts available for borrowing under the $55 million revolving credit component of the Exit Facility, at the time of Reorganized AET's most recently ended fiscal quarter for which financial statements are available immediately preceding such interest payment date (which in the case of Cash and Cash Equivalents will be the amount of such items set forth on Reorganized AET's consolidated balance sheet), after giving effect to such interest payment on the New Notes, is at least $25 million and (ii) the ratio of Indebtedness (as defined in the New Note Indenture) at the end of the most recently ended fiscal year, as set forth on Reorganized AET's consolidated balance sheet, to EBITDA, with EBITDA calculated for the most recently ended fiscal year for which audited financial statements are available, does not exceed 3.5 to 1.

If Reorganized AET elects to defer any interest payment on the New Notes in accordance with the provisions of the Indenture, the amount of interest so deferred, together with all prior amounts of interest that have previously been deferred shall constitute the "Cumulative Deferred Amount". Interest on the Cumulative Deferred Amount will accrue at the rate of 12.0% per annum, and (unless Reorganized AET defers the payment of interest as described above, in which event such interest will be added to the Cumulative Deferred Amount) such interest on the Cumulative Deferred Amount will be payable on each interest payment date and will be equal in right of payment to all interest due and payable on the New Notes on such interest payment date. The obligation to pay the Cumulative Deferred Amount shall be deemed an obligation to pay principal, and such Cumulative Deferred Amount will be payable at the time Reorganized AET makes a payment on the outstanding principal amount of the New Notes and will be equal in right of payment to such payments of the outstanding principal amount of the New Notes. References in this section to "interest" shall be deemed to include references to interest on the Cumulative Deferred Amount, as applicable.

### *Optional Redemption*

As more fully set forth in the Description of Notes attached hereto as Exhibit E, Reorganized AET may redeem up to 35% of the sum of the initial aggregate principal amount of the New Notes plus any Cumulative Deferred Amount at a redemption price equal to 112% of the sum of the principal amount of New Notes plus any Cumulative Deferred Amount, together with accrued and unpaid interest, if any, to the date of redemption (subject to the right of holders of record on relevant record dates to receive interest due on relevant interest payment dates), with the net proceeds of one or more Qualified Equity Offerings (as defined in the New Note Indenture); *provided* that: (a) at least 65% of the sum of the aggregate principal amount of New Notes plus any Cumulative Deferred Amount of the New Notes originally

issued remains outstanding immediately after the occurrence of such redemption; and (b) the redemption must occur within 60 days of the date of the closing of such Qualified Equity Offering.

The New Notes will be redeemable at the option of Reorganized AET, at the redemption prices (expressed as percentages of the sum of the principal amount of New Notes plus any Cumulative Deferred Amount) set forth below, plus accrued and unpaid interest, if any, to the redemption date as more fully set forth in the Description of Notes attached hereto as Exhibit E:

| Year | Redemption Price |
|------|------------------|
| 2005 | 106% |
| 2006 | 103% |
| 2007 | 101% |
| 2008 and thereafter | 100% |

*Notice to Investors*

The New Notes have not been registered under the Securities Act or the securities laws of any state and may not be offered or sold within the United States (a) except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and (b) unless and until all restrictions on transfer set forth in the New Note Indenture shall have been complied with.

Each recipient of the New Notes, by its acceptance thereof, will be deemed to have acknowledged, represented to, and agreed with Reorganized AET to comply with each of the transfer restrictions set forth in the Description of the New Notes, under the heading "Notice to Investors," including, without limitation, the following:

(1)    It understands and acknowledges that the New Notes have not been registered under the Securities Act or any other applicable securities law, the New Notes are being offered pursuant to the exemption set forth in Section 3(a)(9) of the Securities Act and are being issued pursuant to the exemption set forth in Section 1145 of the Bankruptcy Law in a transaction not requiring registration under the Securities Act or any other securities laws, and to the extent that Section 1145 of the Bankruptcy Law is not applicable, none of the New Notes may be offered, sold, pledged or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities law, pursuant to an exemption therefrom or in a transaction not subject thereto and in each case in compliance with the conditions for transfer set forth in paragraphs (5) and (6) below.

(2)    It acknowledges that this Solicitation and Disclosure Statement relates to an offering that is exempt from registration under the Securities Act and does not comply in important respects with SEC rules that would apply to an offering document relating to a public offering of securities.

(3)    It acknowledges that neither Reorganized AET nor any person representing Reorganized AET has made any representation to it with respect to Reorganized AET or the offering or sale of any New Notes, other than the information contained in the

Solicitation and Disclosure Statement, which Solicitation and Disclosure Statement has been delivered to it. It has had access to such financial and other information as it has deemed necessary in connection with its decision to purchase any of the New Notes, including an opportunity to ask questions of and request information from Reorganized AET, and it has received and reviewed all information that was requested.

(4)     It (i) acknowledges and confirms that it is a single "holder of record" of the New Notes, as that term is defined in Rule 12g5-1 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or (ii) has identified to the Security Registrar, the number of persons who, after the Transfer, shall be deemed to be "holders of record" of its New Notes, as determined in accordance with Rule12g5-1 of the Exchange Act.

(5)     It understands that the New Notes have not been registered under the Securities Act or the securities laws of any jurisdiction and that:

(a)     the New Notes may be offered, resold, pledged or otherwise transferred (i) without registration under the Securities Act in reliance on Section 1145 of the Bankruptcy Laws or (ii) to the extent Section 1145 of the Bankruptcy Laws is not applicable, only (A) to a person who the seller reasonably believes is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A, in a transaction meeting the requirements of Rule 144 under the Securities Act, to an institutional accredited investor, as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, that, prior to such transfer, furnishes the Trustee and Reorganized AET a signed letter containing certain representations and agreements the form of which can be obtained from Reorganized AET, or in accordance with another exemption from the registration requirements of the Securities Act (and based upon an opinion of counsel if Reorganized AET requests), (B) to Reorganized AET, or (C) pursuant to an effective registration statement and, in each case, in accordance with any applicable securities laws of any state of the United States or any other applicable jurisdiction;

(b)     so long as Reorganized AET is not required to file periodic reports, information and documents under the Exchange Act, (I) it may not sell, pledge or otherwise transfer (any such sale, pledge or transfer a "Transfer") its New Notes unless, prior to the date of the proposed transfer it submits a certification in writing from the proposed transferee to the Security Registrar that (i) after the Transfer, such New Notes shall be deemed to be "held of record" by one person, as that term is defined in Rule 12g5-1 of the Exchange Act, or (ii) identifies the number of persons who, after the Transfer, shall be deemed to be "holders of record" of such New Notes, as determined in accordance with Rule 12g5-1 of the Exchange Act and (II) each request for a registration of Transfer of the New Notes shall be accompanied by a request in writing (a "Request") to the Security Registrar that, in addition to certain customary requirements, shall include (i) the name, address and telephone number of the proposed transferee, (ii) the date on which the proposed Transfer is expected to take place, (iii) the name of the proposed transferor of the New Notes to be transferred, (iv) the aggregate principal amount of the New Notes to be transferred and (v) written

evidence, satisfactory to Reorganized AET and the Security Registrar, from the proposed transferor that the Transfer is being made in compliance with applicable federal and state securities laws.

(c)     the New Notes may be offered, resold, pledged or otherwise transferred only in principal amounts of $90,000 and integral multiples of $1.00 in excess thereof;

(d)     by holding the New Notes it agrees that (i) it will keep confidential and will not publish, reproduce, or use, or disclose to any other person or entity any information furnished or provided by Reorganized AET on its Qualified Internet Site, (ii) it will use reasonable efforts to safeguard the information on Reorganized AET's Qualified Internet Site and will use at least the same degree of care and skill such holder takes with its own confidential information, and (iii) it is not affiliated with any competitor, customer or supplier or is not an employee of Reorganized AET that is set forth on the written list of competitors, customers, suppliers and employees of Reorganized AET furnished by Reorganized AET to the independent third party host of the Qualified Internet Site and to the Trustee from time to time; and

(e)     it will, and each subsequent holder is required to, notify any subsequent purchaser from it of the resale restrictions set forth in (a) through (d) above.

(6)     It acknowledges and agrees that, so long as Reorganized AET is not required to file periodic reports, information and documents under the Exchange Act, a registration of Transfer of the New Notes will be made on the books of the Security Registrar only if (A) such Transfer involves a Transfer to one or more existing Holders of New Notes, (B) such Transfer involves a Transfer of 100% of the aggregate principal amount of New Notes owned by the proposed transferor to a single Person who has certified to the Security Registrar that it will be treated as a single "holder of record" under Rule 12g5-1 of the Exchange Act, or (C) following such proposed Transfer, the aggregate number of holders of record of the New Notes, as calculated in accordance with Rule 12g5-1 of the Exchange Act, is less than 300.

Each Holder of the New Notes understands that the certificates evidencing the New Notes will, unless otherwise agreed by Reorganized AET and the holder thereof, bear a legend substantially to the following effect:

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED PURSUANT TO SECTION 1145 OF CHAPTER 11 OF TITLE 11, UNITED STATES CODE, AS AMENDED (THE "BANKRUPTCY LAW") IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED (OTHER THAN IN ACCORDANCE WITH SECTION 1145 OF THE BANKRUPTCY LAW) IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. THIS SECURITY MAY BE

TRANSFERRED ONLY IN PRINCIPAL AMOUNTS OF $90,000 AND INTEGRAL MULTIPLES OF $1.00 IN EXCESS THEREOF. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF REORGANIZED AET THAT:

(A)     SUCH SECURITY MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, (i) WITHOUT REGISTRATION UNDER THE SECURITIES ACT IN RELIANCE ON SECTION 1145 OF THE BANKRUPTCY LAW, OR (ii) TO THE EXTENT SECTION 1145 OF THE BANKRUPTCY LAW IS NOT APPLICABLE, ONLY

        (a)     TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (c) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(a)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR")) THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE AND REORGANIZED AET A SIGNED LETTER CONTAINING CERTAIN REPRESENTATIONS AND AGREEMENTS (THE FORM OF WHICH CAN BE OBTAINED FROM REORGANIZED AET), OR (d) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN OPINION OF COUNSEL IF REORGANIZED AET SO REQUESTS),

        (b)     TO REORGANIZED AET, OR

        (c)     PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION;

(B)     SO LONG AS REORGANIZED AET IS NOT REQUIRED TO FILE PERIODIC REPORTS, INFORMATION AND DOCUMENTS UNDER THE EXCHANGE ACT, A REGISTRATION OF TRANSFER OF THIS SECURITY WILL BE MADE ON THE BOOKS OF THE SECURITY REGISTRAR ONLY IF (i) SUCH TRANSFER INVOLVES A TRANSFER TO ONE OR MORE EXISTING HOLDERS OF NEW NOTES, (ii) SUCH TRANSFER INVOLVES A TRANSFER OF 100% OF THE AGGREGATE PRINCIPAL AMOUNT OF NEW NOTES OWNED BY THE PROPOSED TRANSFEROR TO A SINGLE PERSON WHO HAS CERTIFIED TO THE SECURITY REGISTRAR THAT IT WILL BE TREATED AS A SINGLE "HOLDER OF RECORD" UNDER RULE 12g5-1 OF THE EXCHANGE ACT, OR (iii) FOLLOWING SUCH PROPOSED TRANSFER, THE AGGREGATE NUMBER OF HOLDERS OF RECORD OF THE NEW NOTES, AS CALCULATED IN ACCORDANCE WITH RULE 12g5-1 OF THE EXCHANGE ACT, WILL BE LESS THAN 300.

ANY TRANSFER OF THIS SECURITY IN VIOLATION OF THE RESTRICTIONS SET FORTH IN THE NEW NOTE INDENTURE, INCLUDING, WITHOUT LIMITATION, ANY TRANSFER THAT CONTRAVENES THE RESTRICTIONS SET FORTH IN (i) THROUGH (iii) ABOVE, SHALL NOT BE REGISTERED ON THE BOOKS OF THE SECURITY REGISTRAR AND, ACCORDINGLY, SHALL BE NULL AND VOID IN ALL RESPECTS. REORGANIZED AET WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS SECURITY A COPY OF THE RELEVANT SECTION OF THE NEW NOTE INDENTURE, CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF THIS SECURITY, UPON WRITTEN REQUEST TO REORGANIZED AET AT ITS PRINCIPAL PLACE OF BUSINESS;

(C)    SUCH SECURITY MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN PRINCIPAL AMOUNTS OF $90,000 AND INTEGRAL MULTIPLES OF $1.00 IN EXCESS THEREOF;

(D)    BY HOLDING THIS SECURITY, SUCH HOLDER AGREES THAT

(i)    IT WILL KEEP CONFIDENTIAL AND WILL NOT PUBLISH, REPRODUCE, USE, OR DISCLOSE TO ANY OTHER PERSON OR ENTITY ANY INFORMATION FURNISHED OR PROVIDED BY REORGANIZED AET ON ITS QUALIFIED INTERNET SITE (AS DEFINED IN THE NEW NOTE INDENTURE); PROVIDED, HOWEVER THAT A HOLDER OF THIS SECURITY WILL BE PERMITTED TO DISCLOSE THE TAX TREATMENT AND TAX STRUCTURE OF ANY TRANSACTION CONTEMPLATED BY THE DISCLOSURE STATEMENT (AS DEFINED IN THE NEW NOTE INDENTURE)(INCLUDING ANY MATERIALS, OPINIONS OR ANALYSES RELATING TO SUCH TAX TREATMENT OR TAX STRUCTURE, BUT WITHOUT DISCLOSURE OF IDENTIFYING INFORMATION OR, EXCEPT TO THE EXTENT RELATING TO SUCH TAX STRUCTURE OR TAX TREATMENT, ANY NONPUBLIC COMMERCIAL OR FINANCIAL INFORMATION),

(ii)    IT WILL USE REASONABLE EFFORTS TO SAFEGUARD THE INFORMATION ON REORGANIZED AET'S QUALIFIED INTERNET SITE AND WILL USE AT LEAST THE SAME DEGREE OF CARE AND SKILL SUCH HOLDER TAKES WITH ITS OWN CONFIDENTIAL INFORMATION, AND

(iii)    IT IS NOT AFFILIATED WITH ANY COMPETITOR, CUSTOMER, OR SUPPLIER OF REORGANIZED AET OR IS NOT AN EMPLOYEE OF REORGANIZED AET THAT IS SET FORTH ON THE LIST OF COMPETITORS, CUSTOMERS, SUPPLIERS AND

EMPLOYEES OF REORGANIZED AET FURNISHED FROM TIME TO TIME BY REORGANIZED AET TO THE INDEPENDENT THIRD PARTY HOST OF THE QUALIFIED INTERNET SITE AND THE TRUSTEE; AND

(E)     THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN (A) THROUGH (D) ABOVE."

(7)     It agrees that it will deliver to each person to whom it transfers New Notes notice of any restriction on transfer of such New Notes.

(8)     It acknowledges and agrees that any Transfer of New Notes attempted to be made in violation of the restrictions set forth in paragraphs (1) and (6) above shall not be registered on the books of the Security Registrar and, accordingly, shall be null and void in all respects.

(9)     It acknowledges that Reorganized AET and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations, warranties and agreements and agrees that if any of the acknowledgements, representations, warranties and agreements deemed to have been made by its purchase of the New Notes are no longer accurate, it shall promptly notify Reorganized AET.

See also Article XII.B.5 "Certain Federal Income Tax Considerations – Tax Consequences to the Large Noteholders who receive New Notes and Effective Date New Common Stock in Exchange for the Senior Notes – Original Issue Discount"

H.     Distributions Under the Plan

1.     Distributions for Claims Allowed as of the Effective Date

Any distributions to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter except as otherwise specified in the Plan.  For purposes of determining the accrual of interest or rights in respect of any other payment from and after the Effective Date, the Effective Date New Common Stock and New Notes to be issued under the Plan shall be deemed issued as of the Effective Date regardless of the date on which they are actually dated, authenticated or distributed.  See Section 7.1 of the Plan.

2.     Distribution by the Reorganized Debtors; Distributions with Respect to Debt Securities

Reorganized AET, as Disbursing Agent, shall make all initial distributions required under the Plan.  Notwithstanding the provisions of Article V of the Plan regarding the cancellation of the Senior Note Indenture, the Senior Note Indenture shall continue in effect to the extent necessary to allow the Indenture Trustee to receive and make distributions pursuant to the Plan on account of the Senior Notes.  In lieu of the Indenture Trustee Charging Lien, the Indenture Trustee Fees and Expenses shall be paid pursuant to Sections 2.3(b) and 3.3(b) of the Plan, *provided*, *however*, that if for any reason Sections 2.3(b) or 3.3(b) of the Plan were determined not to be applicable to the Indenture Trustee Fees and Expenses, or were deleted or modified such that the Plan no longer authorized AET or Reorganized AET

to pay any portion of the Indenture Trustee Fees and Expenses, then the Indenture Trustee would retain the Indenture Trustee Charging Lien, notwithstanding the provisions of Article V of the Plan regarding the cancellation of the Senior Note Indenture, to the extent of any unpaid Indenture Trustee Fees and Expenses as of the Effective Date, invoices for which were submitted for payment prior to the Effective Date. Distribution for the benefit of holders of Allowed Senior Note Claims will not be reduced on account of the payment of the Indenture Trustee Fees and Expenses pursuant to Sections 2.3(b) and 3.3(b) of the Plan. Notwithstanding the foregoing, for providing services related to distributions to the Holders of Allowed Senior Note Claims, to the extent such services are not provided by the Senior Note Disbursing Agent, and for providing services that remain unbilled prior to the Effective Date, the Indenture Trustee shall receive from the Reorganized Debtors reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred, including those of its professionals, in connection with such services in accordance with the terms and conditions of the Senior Note Indenture, and to the extent such fees and expenses are not paid by the Reorganized Debtors after due demand therefor, the Indenture Trustee would retain the Indenture Trustee Charging Lien notwithstanding the provisions of Article V of the Plan regarding the cancellation of the Senior Note Indenture.

        3.        Delivery and Distributions and Undeliverable or Unclaimed Distributions

        (a)        Delivery of Distributions in General

Except as otherwise provided in Section 7.3(a) of the Plan, distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated in the records of the Debtors. Distributions of the New Securities Allocation and New Common Stock and New Notes from the New Securities Reserve shall be made by the Senior Note Disbursing Agent and/or the Indenture Trustee in accordance with Section 5.9 of the Plan. Distributions of the Small Noteholder Allocation shall be made by the Senior Note Disbursing Agent and/or the Indenture Trustee to the record holders of Senior Notes, as reflected in the records of the Indenture Trustee as of the Distribution Record Date (the "Registered Holder"). Except as otherwise provided by the Plan or the Bankruptcy Code with respect to undeliverable distributions, distributions of the New Securities Allocation and the Small Noteholder Allocation to the Registered Holders and the Holders of Large Note Claims and Small Note Claims, respectively, shall be made to the Indenture Trustee and/or the Senior Note Disbursing Agent for further distribution in accordance with the provisions of the Senior Note Indenture and the provisions of the Plan.

        (b)        Undeliverable Distributions

*Holding of Undeliverable Distributions.* If any Allowed Claim Holder's distribution is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Senior Note Disbursing Agent, as the case may be, are notified in writing of such Holder's then current address. Undeliverable distributions shall remain in the possession of the Reorganized Debtors or the Senior Note Disbursing Agent, as the case may be, pursuant to Article VII of the Plan until such time as a distribution becomes deliverable. Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind.

*After Distributions Become Deliverable.* Except as otherwise provided in the Plan, within 20 days after the end of each calendar quarter following the Effective Date, the Reorganized Debtors shall make all distributions that become deliverable during the preceding calendar quarter.

*Failure to Claim Undeliverable Distributions.* The Reorganized Debtors will file with the Bankruptcy Court, from time to time, a listing of the Holders of unclaimed distributions. This list will be maintained until the entry of an order and/or final decree closing the Chapter 11 Cases. Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable distribution within

one year after the Effective Date shall have its Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Reorganized Debtors or their property. Any Noteholder Cash that remains unclaimed or otherwise not deliverable to any Holders of AET Common Stock after one year following the Effective Date shall become vested in the Reorganized Debtors and such Holder of AET Common Stock shall be deemed to have waived its rights to such payments. In such cases: (A) with respect to any Small Noteholder Allocation, any Cash held for distribution on account of such undeliverable Small Note Claims shall be retained by the Reorganized Debtors; (B) any Cash held for distribution on account of Claims other than the Small Notes Claims shall be the property of the Reorganized Debtors, free of any restrictions thereon, but subject to the lenders' interests in such Cash in accordance with the Exit Facility; (C) any New Common Stock held for distribution on account of such Claims shall be canceled and of no further force or effect; (D) any New Notes held for distribution on account of such Claim shall be canceled and of no further force or effect. Nothing contained in the Plan shall require the Reorganized Debtors, the Senior Note Disbursing Agent or the Indenture Trustee to attempt to locate any Holder of an Allowed Claim; and (E) any Noteholder Cash held for distribution on account of the AET Common Stock shall be returned to or retained by the Reorganized Debtors.

*Compliance with Tax Requirements.* In connection with the Plan, any federal, state or local withholding taxes or amounts required to be withheld under applicable law shall be deducted from distributions under the Plan. All Entities holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

4.      Distribution Record Date and Stockholder Distribution Record Date

As of the close of business on the Distribution Record Date, the transfer registers for the Senior Notes shall be closed and the transfer of Senior Notes shall be prohibited. AET, Reorganized AET, the Indenture Trustee and the Senior Note Disbursing Agent shall have no obligation to recognize the transfer of any Senior Notes that has occurred after the Distribution Record Date, or, with respect to the Noteholder Cash, the transfer of any AET Common Stock that has occurred after the Stockholder Distribution Record Date, and shall be entitled for all purposes in the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date and the Stockholder Distribution Record Date, respectively.

5       Timing and Calculation of Amounts to Be Distributed

On or as soon as practicable after the Effective Date (except as otherwise specified in the Plan), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for such Allowed Claims in the applicable Class. Beginning on the date that is 20 calendar days after the end of the calendar quarter following the Effective Date and 20 calendar days after the end of each calendar quarter thereafter, distributions shall also be made, pursuant to Section 8.3 of the Plan, to Holders of Disputed Claims in any such Class whose Disputed Claims were allowed during the preceding calendar quarter. Such quarterly distributions shall also be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

6.      Setoffs and Recoupments

The Reorganized Debtors may, pursuant to applicable law, set off or recoup against any Allowed Claim (other than to the Large Note Claims and Small Note Claims (which Claims shall not be subject to setoff, recoupment or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code)) and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that

the Debtors or Reorganized Debtors may hold against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights and Causes of Action that the Debtors or Reorganized Debtors may possess against such Holder.

      7.    Surrender of Canceled Instruments or Securities

To the extent that any holder of a Senior Note Claim holds any instrument, certificate or other physical document evidencing such Claim, each such holder shall tender its instrument, certificate or other physical document relating to such Claim to the Indenture Trustee. All surrendered instruments, certificates or other physical documents shall be marked as canceled and photocopies thereof shall be returned by the Indenture Trustee to Reorganized AET. The Holders of the AET Equity Interests shall be deemed to have surrendered the certificates or other documents underlying such Equity Interests and all such certificates or other documentation shall be deemed canceled as of the Effective Date.

      8.    Lost, Stolen, Mutilated or Destroyed Debt Securities

In addition to any requirements under the Senior Note Indenture or any related agreement, any Holder of a Claim or Interest evidenced by a Senior Note that has been lost, stolen, mutilated or destroyed shall, in lieu of surrendering such Senior Note, deliver to Reorganized AET: (i) evidence reasonably satisfactory to Reorganized AET of the loss, theft, mutilation or destruction; and (ii) such security or indemnity as may be required by the Reorganized Debtors to hold the Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such individual as a Holder of an Allowed Claim. Upon compliance with Article VII of the Plan by a Holder of a Senior Note Claim, such Holder shall, for all purposes under the Plan, be deemed to have surrendered such note, debenture, bond or stock certificate.

      9.    Fractional Shares of New Common Stock, Whole New Notes and Incremental New Notes

No fractional shares of New Common Stock, fractional Whole New Notes or fractional Incremental New Notes shall be distributed under the Plan. Each Person entitled to receive New Common Stock and New Notes shall receive the total number of whole shares of New Common Stock, Whole New Notes and Incremental New Notes to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of a share of New Common Stock or a fractional Whole New Note or Incremental New Note, the Senior Note Disbursing Agent shall allocate separately one whole share, Whole New Note or Incremental New Note, as the case may be, to such Person in order of the fractional portion of their entitlements, starting with the largest such fractional portion, until all remaining whole shares, Whole New Notes and Incremental New Notes have been allocated. Upon the allocation of a whole share, Whole New Note or Incremental New Note to a Person in respect of the fractional portion of its entitlement, such fractional portion shall be canceled. If two or more Persons are entitled to equal fractional entitlements and the number of Persons so entitled exceeds the number of whole shares, Whole New Notes or Incremental New Notes which remain to be allocated, the Senior Note Disbursing Agent shall allocate the remaining whole shares, Whole New Notes or Incremental New Notes by random lot or such other impartial method as the Senior Note Disbursing Agent deems fair. Upon the allocation of all of the whole shares, Whole New Notes or Incremental New Notes authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

10.     Manner of Payment Under Plan of Reorganization

At the option of the Disbursing Agent and the Senior Note Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

I.      Procedures for Treating and Resolving Disputed Claims and Equity Interests

With respect to Holders of Claims in Classes that are not impaired, their legal, equitable and contractual rights will be unaltered by the Plan. Consequently, it is anticipated that any disputes with respect to such Claims will be resolved outside of the Chapter 11 Cases. As such, all General Unsecured Claims, including claims asserted in litigation against the Debtors, will be unimpaired by the Chapter 11 Cases and will remain subject to all legal and equitable defenses of the Debtors. Nothing under the Plan will affect the Debtors' rights, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Claims, except as expressly provided in the Plan.

After the Confirmation Date, the Debtors and the Reorganized Debtors shall have the exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims, and may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; *provided*, *however*, that prior to the Effective Date, the Debtors shall first obtain the prior written consent of the Committee with respect to such settlement or compromise. All Disputed Claims shall be determined, resolved or adjudicated in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Case had not been commenced, unless the Debtors or the Reorganized Debtors, as the case may be, at its election, choose to determine, resolve or adjudicate such Disputed Claim in the Bankruptcy Court. The Debtors reserve the right to ask the Bankruptcy Court to estimate any contingent Claim regardless of whether there has been a previous objection to such Claim. The estimated amount will be either the Allowed amount or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation, the Debtors may pursue a supplemental proceeding to object to the payment of such Claim.

Unless otherwise required by the Bankruptcy Court, Holders of Claims against the Debtors shall not be required to file proofs of claim with the Bankruptcy Court. The Debtors intend to make distributions as required by the Plan and in accordance with the books and records of the Debtors as of the Distribution Record Date.

J.      Conditions to Confirmation and the Effective Date of the Plan

1.      Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that (a) the Plan shall not have been modified or amended without the consent of the Committee, the Exit Facility Agent and the Debtors, (b) all provisions, terms and conditions of the Plan shall have been approved in the Confirmation Order or waived pursuant to the provisions of Section 9.3 of the Plan and (c) the identity of the individuals proposed to serve on the boards of directors of Reorganized AET and Reorganized AET Canada shall have been disclosed to the Bankruptcy Court.

2.      Conditions Precedent to the Occurrence of the Effective Date

It is a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 9.3 of the Plan:

(a)     the Confirmation Order shall have been approved by the Bankruptcy Court and duly entered on the docket for the Chapter 11 Cases by the Clerk of the Bankruptcy Court, shall not have been modified without the consent of the Committee, the Exit Facility Agent (as hereinafter defined) and the Debtors, shall not be subject to a pending motion pursuant to section 1144 of the Bankruptcy Code and shall have become a Final Order;

(b)     all Exit Facility Documents necessary to implement the Exit Facility shall have been duly executed and delivered;

(c)     all outstanding obligations of the Debtors under any debtor in possession financing arrangements shall have been paid in full or otherwise satisfied, and such arrangements shall have been terminated;

(d)     the New Note Indenture shall have been executed and the New Notes and Effective Date New Common Stock shall have been issued by Reorganized AET to the Indenture Trustee or the Senior Note Disbursing Agent for distribution pursuant to the terms of the Senior Note Indenture and the terms of the Plan and the New Common Stock for the New Securities Reserve shall have been authorized;

(e)     the Amended Certificate of Incorporation of AET and the Amended Certificate of Incorporation of AET Canada shall have been filed with the Secretary of State of the State of Delaware;

(f)     there shall not be in effect any order, law or regulation staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan;

(g)     all consents, approvals and actions of, filings with and notices to any governmental or regulatory authority necessary to permit the Reorganized Debtors to perform its obligations under the Plan and to permit the Reorganized Debtors to consummate the transactions contemplated hereby shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by the Plan shall have occurred;

(h)     either (x) the Estimated Plan Funding Payment (as defined in the Plan Funding Commitment) shall have been paid into an escrow account and the escrow agent shall have released such payment to the Debtors or Reorganized Debtors in accordance with the Plan Funding Commitment or (y) the New Securities Allocation shall have been reallocated in accordance with Section 3.3(d) of the Plan; and

(i)     all other actions and documents necessary to implement the provisions of the Plan on the Effective Date shall have been, respectively, effected or duly executed and delivered.

### 3. Waiver of Conditions

The Debtors, with the prior written consent of the Committee, may waive any of the conditions precedent to Confirmation of the Plan and occurrence of the Effective Date set forth in Article IX of the Plan at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than a proceeding to confirm and/or consummate the Plan.

### 4. Effect of Non-Occurrence of Effective Date Conditions

If the conditions to occurrence of the Effective Date have not been satisfied or waived in accordance with Article IX of the Plan on or before the first Business Day that is more than 120 days after the Confirmation Date or by such later date as is approved by the Bankruptcy Court after notice and a hearing, then on motion by the Debtors made, with the consent of the Committee, the DIP Agent and the Exit Facility Agent, prior to the time that all of the conditions have been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order and the Confirmation Order shall be of no force and effect. Notwithstanding the foregoing, the Confirmation Order shall not be vacated if all of the conditions to the occurrence of the Effective Date set forth in Article IX of the Plan are either satisfied or waived, in accordance with the terms thereof, prior to entry by the Bankruptcy Court of an order granting the relief requested in such motion.

If the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan or this Solicitation and Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Debtors, or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors in any respect.

### 5. Substantial Consummation of Plan

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

### K. Legal Effects of Confirmation of the Plan

### 1. Releases

In consideration of the contributions of certain parties to the Chapter 11 Cases and the waivers of claims (as defined in Section 101(5) of the Bankruptcy Code), rights and Causes of Action in Section 10.3 of the Plan, including, but not limited to, the waiver by certain parties (or their affiliates) of rights against one or more of the Debtors, the Plan provides for certain waivers, exculpations, releases and injunctions.

### (a) Releases by Debtors

For good and valuable consideration, including, but not limited to, the service of each of the following Persons or Entities to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, and, as to any D&O Releasee, on the later of the Effective Date and the first date after any release, retirement, settlement or other such agreement entered into by the D&O Releasee and one or more of the Debtors is no longer subject to revocation or termination by such D&O Releasee, the Debtors and the Reorganized Debtors hereby release:

(i) all D&O Releasees;

47

      (ii)     the Indenture Trustee, each member of the Committee, each Plan Funder, each Restructuring Agreement Noteholder and each of the foregoing Entities' or Persons' respective officers, directors, partners, members, employees, attorneys, financial advisors, accountants, investment bankers, agents, professionals and representatives, each in such capacity, as well as each fund or account managed or advised by each of the Restructuring Agreement Noteholders;

      (iii)    the DIP Agent and the lenders party to the DIP Credit Agreement and each of the foregoing Entities, or Persons' respective officers, directors, partners, members, employees, attorneys, financial advisors, accountants, investment bankers, agents, professionals and representatives, each in such capacity; and

      (iv)    the property of each of the foregoing Persons and Entities,

from any and all claims (as defined in section 101(5) of the Bankruptcy Code) and from all Causes of Action that the Debtors or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date for claims (as defined in section 101(5) of the Bankruptcy Code) or liabilities in connection with or related to AET, AET Canada, the Debtors, the Chapter 11 Cases or the Plan, including, except in the case of the D&O Releasees, without limitation, (x) in respect of any loan, advance or similar payment by the Debtors or their subsidiaries to any such Person, or (y) in respect of any contractual obligation owed by such Person to the Debtors or their subsidiaries; *provided, however*, that the foregoing provisions of Section 10.2(a) of the Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud or criminal conduct.

      The Debtors are not generally aware of (although they have not specifically investigated) any specific Causes of Action against any of the parties it is providing a release to under the Plan. The Debtors believe these provisions are permitted under the Bankruptcy Code but acknowledge that arguments exist that certain case law would permit a contrary conclusion. Parties with standing may object to such provisions of the Plan in the Bankruptcy Court.

      (b)     Releases by and of Holder of Claims

      On and after the Effective Date, and as to any D&O Releasee, on the later of the Effective Date and the first date after any release, retirement, settlement or other such agreement entered into by the D&O Releasee and one or more of the Debtors is no longer subject to revocation or termination by such D&O Releasee, each Holder of a Claim who has voted to accept the Plan shall be deemed to have released unconditionally the Debtors, Reorganized Debtors and their respective affiliates, the D&O Releasees, the Indenture Trustee, each Plan Funder, each member of the Committee, each Restructuring Agreement Noteholder, each account or fund managed or advised by each Restructuring Agreement Noteholder, the DIP Agent and the lenders party to the DIP Credit Agreement and each of the foregoing Entities' or Persons' respective officers, directors, employees, partners, members, attorneys, financial advisors, accountants, investment bankers, agents, representatives, professionals, each in such capacity, and the property of each of the foregoing Entities or Persons from any and all claims (as defined in section 101(5) of the Bankruptcy Code) or Causes of Action based in whole or in part upon any act or

omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date in any way relating to or pertaining to (i) AET, AET Canada, the Debtors or the Reorganized Debtors, (ii) the Chapter 11 Cases, (iii) the negotiation, formulation and preparation of the Plan, the Plan Documents, the Restructuring Agreement, the Plan Funding Commitment and the Restructuring Documents (as that term is defined in the Restructuring Agreement) and (iv) the Senior Notes, including, but not limited to, the negotiation, formulation, preparation, administration, execution and enforcement thereof; *provided, however*, that the foregoing provisions of Section 10.2(b) of the Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud or criminal conduct.

2.    Preservation of Rights of Action

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may exclusively enforce any claims (as defined in section 101(5) of the Bankruptcy Code), rights and Causes of Action that the Debtors or Estates may hold against any Person or Entity. The Reorganized Debtors may pursue such retained claims (as defined in section 101(5) of the Bankruptcy Code), rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. On the Effective Date, and as to any D&O Releasee, on the later of the Effective Date and the first date after any release, retirement, settlement or other such agreement entered into by the D&O Releasee and one or more of the Debtors is no longer subject to revocation or termination by such D&O Releasee, the Reorganized Debtors shall be deemed to waive and release any claims (as defined in section 101(5) of the Bankruptcy Code), rights or Causes of Action arising under sections 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code or otherwise arising under the Bankruptcy Code held by the Reorganized Debtors against any Person or Entity. See Section 10.3 of the Plan.

3.    Exculpation

The Debtors and the Reorganized Debtors, the D&O Releasees and each of their respective affiliates, each of the members of the Committee, each of the Restructuring Agreement Noteholder, each Plan Funder, the Indenture Trustee, the DIP Agent and the lenders party to the DIP Credit Agreement and each of the foregoing Entities' or Persons' respective members, partners, officers, directors, employees and agents (including any attorneys, accountants, financial advisors, investment bankers and other representatives or professionals retained by such Entities or Persons), as well as each fund or account managed or advised by each of the Restructuring Agreement Noteholders, and the property of each of the foregoing Entities or Persons, shall have no liability to any Person or Entity, whether arising under contract, tort, federal or state securities laws, whether known or unknown, foreseen or unforeseen, existing or arising in the future, for any pre-petition or post-petition act or omission in connection with, or arising out of the Solicitation and Disclosure Statement, the Plan, the Restructuring Agreement, the DIP Credit Agreement (and any Bankruptcy Court orders related thereto), the Exit Facility, the Commitment Letter, the Plan Funding Commitment, the Plan Documents, the solicitation of votes for and the pursuit of Confirmation of the Plan, the Effective Date of the Plan, or the administration of the Plan or the property to be distributed under the Plan and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; *provided, however*, that the foregoing provisions of Section 10.4 of the Plan shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, fraud or criminal conduct (the acts or omissions entitled to exculpation pursuant to Section 10.4 of the Plan, the "Exculpated Acts").