The Reorganized Debtors shall, from and after the Effective Date, indemnify, hold harmless and reimburse (on an as incurred basis), each of the D&O Releasees, each of the members of the Committee, each Restructuring Agreement Noteholder, each Plan Funder, the Indenture Trustee, the DIP Agent, the lenders party to the DIP Credit Agreement and each of the foregoing Entities' or Persons' respective members, partners, officers, directors, employees and agents (including any attorneys, accountants, financial advisors, investment bankers and other representatives or professionals retained by such Entities or Persons), as well as each fund or account managed or advised by each of the Restructuring Agreement Noteholders (together, the foregoing Entities and Persons are the "Indemnified Parties"), from, against and for any and all losses, claims (as defined in section 101(5) of the Bankruptcy Code), damages, liabilities, costs and/or expenses (together, the "Damages") arising from, related to or that are in any manner connected with any Exculpated Act, including without limitation, any Damages arising or resulting from or that are in any manner connected with (i) any Cause of Action, suit, investigation or any other proceeding and (ii) the defense of any Indemnified Party (or the involvement or participation of any Indemnified Party) in any Cause of Action, suit, investigation or any other proceeding.

      4.      Injunction

Except as otherwise provided in the Plan or the Confirmation Order, and in addition to the injunction provided under sections 524(a) and 1141 of the Bankruptcy Code, the Confirmation Order shall provide that, on and after the Effective Date, all persons who have held, currently hold or may hold a Claim against or Equity Interest in the Debtors (whether directly or indirectly and whether as a beneficial holder of such Claim or Equity Interest or as a holder of record of such Claim or Equity Interest or otherwise) that is discharged under the Plan, including, without limitation, the Indenture Trustee, any Nominee through which a Holder of Senior Notes holds such Senior Notes, and all other third parties, are permanently enjoined, on and after the Confirmation Date and subject to the occurrence of the Effective Date, from taking any of the following actions on account of any such Claim or Equity Interest: (a) commencing or continuing in any manner (including by directly or indirectly assisting or facilitating the commencement or continuation of) any action or other proceeding of any kind with respect to any such Claim or Equity Interest, against the Debtors, the Reorganized Debtors or their respective properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors or their respective properties on account of any such Claim or Equity Interest; (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors, the Reorganized Debtors, or their respective properties or interests in their respective properties on account of any such Claim or Equity Interest; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, or against the properties or interests in property of the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest; (e) authenticating, delivering or facilitating the delivery of any certificate, including any global note or certificate or other documents evidencing a Holder's Senior Notes or interest in the Senior Notes; and (f) commencing, continuing or in any manner taking part or participating in any action, proceeding or event (whether directly or indirectly) that would be in contravention of the terms, conditions and intent of the Plan, including the releases and exculpations provided in Sections 10.2 and 10.4 of the Plan. The foregoing injunction will extend to the benefit of the successors of the Debtors (including, without limitation, the Reorganized Debtors) and the Persons and Entities entitled to the benefit of the releases and exculpations provided in Sections 10.2 and 10.4 of the Plan, and their respective properties and interests in property. Any person injured by any willful violation of such injunction may recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms, or as provided in the Bankruptcy Code.

5.      Discharge

Except as otherwise provided in the Plan or the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, (a) the rights afforded in the Plan and the treatment of all Claims and Equity Interests therein, shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred on such Claims from and after the Petition Date, against the Debtors, the Reorganized Debtors, or any of their Estates, assets or properties, (b) on the Effective Date, all such Claims against, and Equity Interests in the Debtors shall be satisfied, discharged and released in full and (c) all Persons and Entities shall be precluded from asserting against the Reorganized Debtors, their successors or their assets or properties any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

6.      Vesting of Rights

Except as otherwise provided in the Plan or any agreement, instrument or indenture relating thereto, on or after the Effective Date, all property of the Estate of AET, and any property acquired by AET or Reorganized AET under the Plan, shall vest in Reorganized AET, free and clear of all Claims, Liens, charges or other encumbrances and Interests. Except as otherwise provided in the Plan or any agreement, instrument or indenture relating thereto, on or after the Effective Date, all property of the Estate of AET Canada, and any property acquired by AET Canada or Reorganized AET Canada under the Plan, shall vest in Reorganized AET Canada, free and clear of all Claims, Liens, charges or other encumbrances but subject to the AET Canada Equity Interest which shall remain outstanding and be held by Reorganized AET. On and after the Effective Date, the Reorganized Debtors may operate their respective businesses and may use, acquire or dispose of property and compromise or settle any Claims or Equity Interests, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the generality of the foregoing, all rights, privileges, entitlements, authorizations, grants, permits, licenses, easements, franchises, and other similar items which constitute part of, or are necessary or useful in the operation of the property of the Estates or the business of the Reorganized Debtors, whether in the United States or elsewhere, shall be vested in Reorganized AET or Reorganized AET Canada, as the case may be, on the Effective Date, and shall thereafter be exercisable and usable by the Reorganized Debtors to the same and fullest extent they would have been exercisable and usable by the Debtors before the Petition Date. See Section 5.2 of the Plan.

L.      Other Provisions

1.      Executory Contracts

(a)      Under the Bankruptcy Code, the Debtors may assume or reject executory contracts and unexpired leases. As a general matter, an "executory contract" has been determined to be a contract under which material performance (other than solely the payment of money) remains to be made by each party. Immediately prior to the Effective Date, all executory contracts or unexpired leases of the Debtors will be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those executory contracts and unexpired leases that (i) have been rejected by order of the Bankruptcy Court, (ii) are the subject of a motion to reject pending on the Effective Date, (iii) are identified on a list to be filed with the Bankruptcy Court on or before the Confirmation Date as to be rejected, or (iv) are rejected pursuant to the terms of the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Article VI of the Plan shall revest in and be fully enforceable by the respective Reorganized Debtor in

accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law. See Section 6.1 of the Plan.

(b) The Debtors shall be permitted to reject any executory contract or unexpired lease if (i) the Allowed Claims with respect to such executory contract or unexpired lease are subject to a limitation under section 502(b) of the Bankruptcy Code (ii) the Claim with respect to such executory contract or unexpired lease has been reduced to an amount mutually agreed upon by the Debtors and the Committee or (iii) any other executory contract or unexpired lease that the Debtors and the Committee mutually agree to reject.

2. Modification of the Plan; Revocation or Withdrawal of the Plan

(a) Modification of Plan

The Debtors reserve the right, with the prior consent of the Committee, to alter, amend or modify the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, with the prior written consent of the Committee and upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended, modified or clarified in accordance with Article XII of the Plan, unless the proposed alteration, amendment, modification or clarification adversely changes the treatment of the Claim of such Holder.

(b) Revocation of Plan

The Debtors reserve the right, with the prior written consent of the Committee, to revoke and withdraw the Plan at any time prior to the Confirmation Date. If the Plan is so revoked or withdrawn, or if, subject to Section 9.2 of the Plan, the Effective Date does not occur, then the Plan shall be deemed null and void and of no force or effect.

3. Retention of Jurisdiction

Under the terms of the Plan, the Bankruptcy Court will retain jurisdiction in the following instances notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date. The Bankruptcy Court shall retain exclusive jurisdiction (except with respect to any release, retirement, settlement or other such agreement with any D&O Releasee) over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including, without limitation, jurisdiction to:

(a) allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b)        grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)        resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date pursuant to Article VI of the Plan to add any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be rejected;

(d)        ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including ruling on any motion filed pursuant to Article VIII of the Plan;

(e)        decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f)        enter such orders and take other actions as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order, including, but not limited to, modification or amendment thereof pursuant to Section 12.4 of the Plan, and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Solicitation and Disclosure Statement;

(g)        resolve any cases, controversies, suits or disputes that may arise in connection with the interpretation or enforcement of the Plan or any Person's or Entity's obligations incurred in connection with the Plan;

(h)        issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided therein;

(i)        resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article X of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(j)        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)        determine any other matters that may arise in connection with or relate to the Plan, the Solicitation and Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement

or document created in connection with the Plan or the Solicitation and Disclosure Statement;

(l)       enter an order or final decree concluding the Chapter 11 Cases;

(m)      resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the applicable Claims Bar Date, if any, the hearing on the approval of the Solicitation and Disclosure Statement as containing adequate information, the hearing on the Confirmation of the Plan for the purpose of determining whether a Claim or Equity Interest is discharged hereunder or for any other purpose;

(n)       recover all assets of the Debtors and property of the Estate, wherever located, including any Causes of Action under sections 554 through 550 of the Bankruptcy Code;

(o)       hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(p)       hear and resolve all matters involving the nature, existence or scope of the Debtors' discharge;

(q)       effectuate performance of or payment of all obligations under the Plan; and

(r)       modification of Plan under section 1127 of the Bankruptcy Code.

4.      Avoidance and Recovery Actions

In partial consideration for the releases and other provisions of Article X of the Plan, effective as of the Effective Date, and as to any D&O Releasee, on the later of the Effective Date and the first date after any release, retirement, settlement or other such agreement entered into by the D&O Releasee and one or more of the Debtors is no longer subject to revocation or termination by such D&O Releasee, the Debtors release and waive the right to prosecute any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other Causes of Action or rights to payments of Claims that belong to or could have been raised by the Debtors or their respective Estates, except for any such action which may be pending on the Effective Date as to which Reorganized AET's rights shall not be waived and released and Reorganized AET shall retain and may prosecute any such actions.

5.      Severability

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor (upon the prior written consent of the Committee), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and

provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

      6.     Dissolution of Committees

On the Effective Date, the Committee and all official committees shall dissolve and members shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that the Committee may evaluate, object to and appear at the hearing to consider applications for final allowances of compensation and reimbursement of expenses, including applications for compensation or reimbursement under section 503 of the Bankruptcy Code. The post-Effective Date professional fees of the Committee for services set forth in the preceding sentence shall be paid pursuant to Section 2.3 of the Plan or, if not applicable, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court.

## III.   THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS

### A.   Proposed Debtor in Possession Financing

On October 20, 2004, AET entered into the binding commitment letter with General Electric Capital Corporation ("GE Capital" or the "DIP Agent") whereby GE Capital agreed to provide debtor in possession financing (the "DIP Facility") in the amount of $125,000,000 (the "DIP Commitment" and together with the Exit Commitment (as hereinafter defined), the "Commitment Letter"). AET is currently a borrower under the Existing Credit Agreement. The proceeds from the DIP Facility will be used to repay AET's indebtedness under the Existing Credit Agreement and will be used for working capital and other general corporate purposes of AET during the pendency of the Chapter 11 Cases. It is anticipated that incremental liquidity of up to $30 million will be available to AET upon repayment of the existing credit facility under the Existing Credit Agreement.

The principal terms of the DIP Facility are summarized below. Capitalized terms used herein shall have the meaning given such term in the DIP Facility.

(a)   Borrower:  Applied Extrusion Technologies, Inc., as debtor and debtor in possession in its Chapter 11 Case.

(b)   Guarantors:  All direct and indirect wholly owned subsidiaries of Borrower except AET Limited. Collectively, Borrower, Guarantors and AET Limited are hereinafter referred to as "Credit Parties" and each individually, a "Credit Party."

(c)   Lenders:  GE Capital and other lenders acceptable to the DIP Agent.

(d)   Lead Arranger:  GECC Capital Markets Group, Inc. ("GECMG").

(e)   DIP Agent:  GE Capital.

(f)   Commitment:

    (i)    DIP Revolver:  Up to $55,000,000 (including (i) a Letter of Credit Subfacility of up to $10,000,000 and (ii) a Foreign Subfacility of up to $5,000,000) (the "DIP Revolver Commitment").

    (ii)   DIP Term Loan:  Up to $50,000,000.

    (iii)  DIP Last Out Term Loan:  Up to $20,000,000.

(g)   Availability of DIP Revolver:  Up to the sum of (i) 85% of the eligible domestic and Canadian accounts receivable of Borrower and AET Canada, and (ii) the lesser of (a) 60% of the eligible inventory of Borrower and AET Canada valued at the lower of average cost or market or (b) 85% of the appraised net orderly liquidation value of eligible inventory of Borrower and AET Canada, in each of clauses (i) and (ii) less reserves, but not to exceed the DIP Revolver Commitment.

> (i)     Foreign Subfacility Availability: Up to the lesser of (a) $5,000,000 and (b) 90% of the Borrower's eligible foreign accounts receivable, less reserves. Ninety percent (90%) of such advances shall be supported by a guarantee of the Export-Import Bank of the United States ("Ex-Im Bank") on terms and conditions acceptable to the DIP Agent.
>
> The DIP Agent will retain the right from time to time to, in its reasonable credit judgment, establish or modify advance rates, standards of eligibility and reserves against availability. Notwithstanding the foregoing, the same shall occur on terms substantially the same as existing in the Existing Credit Agreement. Outstanding letter of credit obligations under the letter of credit subfacility will be reserved in full against availability.

(h)     Term:

> (i)     Revolver: The earlier of (i) 12 months or (ii) the effective date of a plan of reorganization in any Chapter 11 Case.
>
> (ii)     DIP Term Loan: The earlier of (i) 12 months or (ii) the effective date of a plan or reorganization in any Chapter 11 Case. If the DIP Revolver is terminated prior to its scheduled maturity date, the DIP Term Loan will immediately be due and payable in full.
>
> (iii)     DIP Last Out Term Loan: The earlier of (i) 12 months or (ii) the effective date of a plan of reorganization in any Chapter 11 Case. If the DIP Revolver and the DIP Term Loan are terminated prior to their scheduled maturity dates, the DIP Last Out Term Loan will immediately be due and payable in full.

(i)     Use of Proceeds: (i) Funding the ordinary course operations of Borrower and its subsidiaries, (ii) repay the existing credit facility under the Existing Credit Agreement; (iii) paying the expenses arising in the Chapter 11 Cases (as may be approved, to the extent necessary, by the Bankruptcy Court), and (iv) such other obligations as may be agreed to by the DIP Agent and approved by the Bankruptcy Court, all subject to certain restrictions to be set forth in the final DIP Facility documents.

(j)     Interest: At Borrower's option, at either (i) absent a default, a 1, 2 or 3-month reserve-adjusted LIBOR plus the Applicable LIBOR Margin, or (ii) a floating rate equal to the Index Rate (higher of Prime or 50 basis points over the Federal Funds Rate) plus the Applicable Index Margin. Interest shall be payable monthly in arrears (except LIBOR, which shall be payable at the end of the applicable LIBOR period) and calculated on the basis of a 360-day year and actual days elapsed. LIBOR mechanics and breakage fees will be set forth in the final DIP Facility documents.

(k)    Applicable Margins:  The following applicable margins would apply until adjusted as described below.  Starting with the delivery to Agent of Borrower's consolidated quarterly financial statements for the fiscal quarter ended December 2004, the Applicable Margins shall be subject to adjustment, prospectively, based on Borrower's consolidated financial performance for the trailing four quarters most recently ended in accordance with the grid attached as Schedule II-A to the Commitment Letter.  Notwithstanding the foregoing, the Applicable DIP Last Out Term Loan Index Margin and the Applicable DIP Last Out Term Loan LIBOR Margin shall be increased by an additional 50 basis points, on the ninety-first (91st) day after the earlier to occur of (i) the DIP Facility closing date and (ii) the tenth (10th) day after the entry of the interim order by the Bankruptcy Court approving and authorizing the DIP Facility.

    (i)    Applicable DIP Revolver Index Margin:  1.75%

    (ii)    Applicable DIP Revolver LIBOR Margin:  3.25%

    (iii)    Applicable DIP Term Loan Index Margin:  2.75%

    (iv)    Applicable DIP Term Loan LIBOR Margin:  4.25%

    (v)    Applicable DIP Last Out Term Loan Index Margin:  4.25%

    (vi)    Applicable DIP Last Out Term Loan LIBOR Margin:  5.75%

    (vii)    Applicable L/C Margin:  3.25%

    (viii)    Applicable Unused Facility Fee Margin:  0.50%

(l)    Event of Default Interest:  So long as an Event of Default has occurred and is continuing, interest and the Letter of Credit Fee shall be increased 2% above the rate or Letter of Credit Fee otherwise applicable.

(m)    Mandatory Prepayments:  Borrower shall make mandatory prepayments against principal as per the Existing Credit Agreement with the exception that Borrower shall make prepayments against DIP Term Loan principal in an amount equal to 25% of consolidated Excess Cash Flow (as defined below) of the Borrower and its subsidiaries for the twelve (12) month period ending September 30, 2005; *provided* that the sum of such prepayments from Excess Cash Flow along with the scheduled DIP Term Loan amortization payments defined above shall not exceed $6,250,000 in the aggregate.  Excess cash flow shall be defined in the Financing documentation but shall generally mean EBITDA less capital expenditures, less scheduled amortization, less cash interest, less cash taxes ("Excess Cash Flow").

(n)    Fee payable to the DIP Agent for the benefit of Lenders:

(i)    Letter of Credit Fee equal to the Applicable L/C Margin (calculated on the basis of a 360-day year and actual days elapsed) on the maximum amount available to be drawn under each letter of credit, payable to the DIP Agent monthly in arrears, plus any charges assessed by the issuing bank.

(ii)    Unused Facility Fee equal to the Applicable Unused Facility Fee Margin (calculated on the basis of a 360-day year and actual days elapsed) on the average unused daily balance of the DIP Facility, payable to the DIP Agent monthly in arrears.

In addition, the Company has agreed to pay to the DIP Agent customary closing and agent's fees.

(o)    Priority: The obligations under the DIP Facility would have superpriority over any and all other administrative expenses pursuant to section 364(c)(1) of the Bankruptcy Code, subject to a reserve for certain unpaid professional fees and other administrative expenses of Borrower in the Chapter 11 Cases allowed by the Bankruptcy Court on a final basis to be set forth in the final DIP Facility documents, the amount of such reserve to be reasonably acceptable to the DIP Agent and reserved in full against availability (the "Carve-Out"). All loans and other obligations under the DIP Facility will be cross-defaulted to each other and to all other material indebtedness of each Credit Party. All loans and other obligations under the DIP Facility documents shall be cross-collateralized with each other and cross-collateralized and guaranteed by Borrower and each Guarantor.

Payment priority among DIP Revolver and DIP Term Loan Lenders would be consistent with the Existing Credit Agreement. The DIP Last Out Term Loan will have payment priority on a last-out basis.

(p)    Security: To secure all obligations of Borrower under the DIP Facility, DIP Agent, on behalf of itself and Lenders, shall receive, pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code through the final DIP Facility documents and Bankruptcy Court orders reasonably acceptable to the DIP Agent, a fully perfected first priority security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrower and Guarantors, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, supporting obligations, letter of credit rights, commercial tort claims, avoidance actions, investment property and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds (collectively the "DIP Facility Collateral"). All DIP Facility Collateral shall be free and clear of other liens, claims, and encumbrances, except for liens, claims, and encumbrances reasonably

acceptable to the DIP Agent. In the event that Borrower's property in Covington, Virginia is sold to an unrelated third party, the DIP Agent shall release *its* lien on such property, *provided* that all sale proceeds are applied in accordance with the definitive DIP Facility loan documentation.

(q)   Each Guarantor will guarantee the obligations of Borrower under the DIP Facility, and DIP Agent will receive a security interest in all of the assets of such Guarantor.

(r)   Other Terms:

    (i)   Limitations on payments in respect of prepetition obligations prior to Borrower's plan of reorganization and limitations on Borrower's ability to grant adequate protection in favor of third parties. Notwithstanding the foregoing, Borrower is permitted to make payments in respect of prepetition trade payables that are in the ordinary course of business so long as such payments are approved by the Bankruptcy Court.

    (ii)   Minimum availability at close of at least $25,000,000.

    (iii)   The inclusion of the Foreign Subfacility is expressly conditioned upon satisfactory final approval from Ex-Im Bank.

    (iv)   Monthly financial covenants to be determined but to include (i) minimum EBITDA and (ii) net cash flow covenant based upon a rolling 12-month cash flow forecast. Quarterly financial covenants to be determined but to include (i) minimum fixed charge coverage ratio.

    (v)   Cash management system for Borrower on terms provided for in the Existing Credit Agreement. DIP Agent shall have full cash dominion by means of lock boxes and blocked account agreements.

    (vi)   Reasonably satisfactory opinions of counsel from Borrower's counsel (including local counsel as requested) reasonably acceptable to the DIP Agent.

    (vii)   Landlord/mortgagee/bailee waivers, to the extent obtainable with Borrower's commercially reasonable best efforts and consistent with the requirements of the Existing Credit Agreement; provided, however, to the extent the DIP Agent ahs not received a satisfactory landlord, mortgagee or bailee waiver, as applicable, reserves reasonably satisfactory to the DIP Agent shall have been established with respect thereto, it being agreed and understood that the non-receipt by the DIP Agent of such landlord, mortgagee or bailee waiver, as applicable, shall not constitute a Default or an Event of

Default (as such terms are defined in the final DIP Facility documentation).

(viii)    Limitations on intercompany indebtedness, investments and loans to non-debtor subsidiaries.

(ix)    The interim and final orders approving or authorizing the DIP Facility to be entered no later than 5 and 25 days, respectively, after the commencement of the Chapter 11 Cases, and to include, without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the DIP Agent's liens on the DIP Facility Collateral; (ii) providing for the vacation of such automatic stay to permit the enforcement of the DIP Agent's and Lenders' remedies under the DIP Facility, including, without limitation, the enforcement, upon 3 business days' prior written notice, of such remedies against the DIP Facility Collateral and requiring Borrower's commercially reasonable best efforts to sell the DIP Facility Collateral if reasonably requested by the DIP Agent; (iii) prohibiting the assertion of claims arising under Section 506(c) of the Bankruptcy Code against the DIP Agent or any Lender or the commencement of other actions adverse to the DIP Agent or any Lender or its respective rights and remedies under the DIP Facility or any Bankruptcy Court order; (iv) prohibiting the incurrence of debt with priority equal to or greater than the DIP Agent's and Lenders'; and (v) prohibiting any granting or imposition of liens other than purchase money and other liens reasonably acceptable to the DIP Agent.

(x)    Events of Default on terms substantially the same as in the Existing Credit Agreement and shall include, in addition, (i) the appointment of a trustee or examiner with enlarged powers to operate or manage the financial affairs of any Credit Party; or (ii) the dismissal or conversion of the Chapter 11 Case, or granting relief from the automatic stay in favor of third parties except as contemplated by the definitive DIP Facility documentation.

(xi)    As of the closing date of the DIP Facility, there will have been (i) since Borrower's last unaudited financial statements for the quarter ended June 30, 2004 except as publicly disclosed prior to the date hereof and except as occasioned by the Chapter 11 Cases, no material adverse change, individually or in the aggregate, in the business, financial or other condition of Borrower, the industry in which Borrower operates, or the collateral which will be subject to the security interest granted to the DIP Agent or Lenders or in the prospects or projections of Borrower, (ii) no litigation commenced which has not been stayed by the Bankruptcy

Court and which, if successful, would have a material adverse impact on Borrower, its business or ability to repay the loans, or which would challenge the transactions under consideration, and (iii) since the date hereof, no change in loan syndication, financial or capital market conditions generally that in GECMG's reasonable judgment would materially impair successful syndication of the DIP Facility.

(s)     Documentation:  The final DIP Facility documents will be substantially similar to the loan documents executed in connection with the Existing Credit Agreement, as modified to give effect to the terms set forth in commitment letter.

B.     First Day Orders

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, the Debtors intend to seek relief in the form of various "first day orders" from the Bankruptcy Court as to various matters, certain of which are described below. While the Debtors believe each of the requests, if granted, would facilitate the Chapter 11 Cases, there can be no assurance that the Bankruptcy Court will grant any such relief. The following "first day orders" are not exhaustive and the Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that the Debtors determine that such orders and relief are necessary or appropriate at such time that the bankruptcy proceedings are commenced.

1.     Provisions for Employees

AET believes it has a valuable asset in its workforce and that the efforts of its employees are critical to a successful reorganization. The Debtors intend to seek the approval of the Bankruptcy Court, immediately upon commencement of the Chapter 11 Cases, to honor payroll checks outstanding as of the Petition Date, to permit employees to utilize their paid vacation time which was accrued prior to the filing and to continue paying medical, severance, retirement and other employee benefits under the applicable health plans.

2.     Trade Vendors

AET believes that good relationships with its vendors are necessary to the continued viability of AET's business during the Chapter 11 Cases. The Debtors intend to seek an order from the Bankruptcy Court, immediately upon the commencement of the Chapter 11 Cases, authorizing payments as they become due in the ordinary course of business to such vendors subject to the continuation of ordinary trade terms, including amounts related to Claims arising prior to the Petition Date.

3.     Cash Management

The Debtors believe it would be disruptive to their operations if they were forced to significantly change their cash management system upon the commencement of the Chapter 11 Cases. The Debtors intend to seek relief from the Bankruptcy Court immediately upon commencement of the Chapter 11 Cases to be authorized to maintain their cash management system.

4.    Retention of Professionals

The Debtors intend to seek authority to employ MBLY as their financial advisor, Deloitte & Touche LLP as their accountants and Shearman & Sterling LLP, Young, Conaway, Stargatt & Taylor, LLP, Ropes & Gray LLP and Sutherland Asbill & Brennan LLP as their legal advisors.

5.    Customer Programs

The Debtors intend to seek authority to honor any prepetition customer programs that it determines to be essential to the operation of the business. The Debtors believe that continuing these services is essential to maintaining customer loyalty.

6.    Taxes

The Debtors intend to seek authority to pay prepetition tax claims owed to various state and local taxing authorities.

7.    Utility Service

The Debtors intend to seek an order restraining utilities from discontinuing, altering or refusing service.

8.    Scheduling Order

The Debtors intend to file a motion seeking, *inter alia*, entry of an order scheduling hearings to (i) confirm the Plan, (ii) find that the Solicitation and Disclosure Statement complied with section 1126(b)(1) of the Bankruptcy Code and section 1126(b)(2) of the Bankruptcy Code and approve the solicitation procedures and (iii) establish deadlines and procedures for filing objections to confirmation of the Plan, the Solicitation and Disclosure Statement and the solicitation procedures.

9.    DIP Motion

The Debtors intend to seek an order authorizing the Debtors to enter into the DIP Facility.

## IV.    EXIT FINANCING

On October 20, 2004, AET entered into the Commitment Letter with GE Capital (the "Exit Facility Agent") to provide a senior secured credit facility (the "Exit Facility") in the amount of $125 million following consummation of the Plan (the "Exit Commitment"). The Exit Facility will be used to repay the DIP Facility, fund certain transaction fees and expenses of the Exit Facility and for general corporate purposes. The terms of the Exit Facility are summarized below.

The principal terms of the Exit Facility are summarized below. Capitalized terms used herein shall have the meaning given such term in the Exit Facility.

(a)    Borrower: Applied Extrusion Technologies, Inc.

(b)    Guarantors: All direct and indirect wholly owned subsidiaries of Borrower except AET Limited.

(c)    Lenders: GE Capital and other lenders acceptable to Exit Facility Agent.

(d)    Lead Arranger: GECC Capital Markets Group, Inc. ("GECMG").

(e)    Exit Facility Agent: GE Capital.

(f)    Commitment:

    (i)    Exit Facility Revolver: Up to $55,000,000 (including (i) a Letter of Credit Subfacility of up to $10,000,000 and (ii) a Foreign Subfacility of up to $5,000,000);

    (ii)   Exit Facility Term Loan: Up to $50,000,000; and

    (iii)  Exit Facility Last Out Term Loan: Up to $20,000,000.

(g)    Availability of Exit Facility Revolver: Up to the sum of (i) 85% of the eligible domestic and Canadian accounts receivable of Borrower and AET Canada, and (ii) the lesser of (a) 60% of the eligible inventory of Borrower and AET Canada valued at the lower of average cost or market or (b) 85% of the appraised net orderly liquidation value of eligible inventory of Borrower and AET Canada, in each of clauses (i) and (ii) less reserves, but not to exceed the Exit Facility Revolver Commitment.

    (i)    Foreign Subfacility: Up to the lesser of (i) $5,000,000 and (ii) 90% of the Borrower's eligible foreign accounts receivable, less reserves. Ninety percent (90%) of such advances shall be supported by a guarantee of the Export-Import Bank of the United States (the "Ex-Im Bank ") on terms and conditions acceptable to the Exit Facility Agent.

        The Exit Facility Agent will retain the right from time to time to, in its reasonable credit judgment, establish or modify advance rates, standards of eligibility and reserves against availability. Notwithstanding the foregoing, the same

shall occur on terms substantially the same as existing in the Existing Credit Agreement. Outstanding letter of credit obligations under the letter of credit subfacility will be reserved in full against availability.

(h)     Term:

(i)     Exit Facility Revolver: 60 months.

(ii)    Exit Facility Term Loan: 60 Months. If the Exit Facility Revolver is terminated prior to its scheduled maturity date, the Exit Facility Term Loan will immediately be due and payable in full.

(iii)   Exit Facility Last Out Term Loan: 66 Months. If the Exit Facility Revolver and the Exit Facility Term Loan are terminated prior to their scheduled maturity dates, the Exit Facility Last Out Term Loan will immediately be due and payable in full.

(i)     Use of Proceeds: Loans made at closing (the "Exit Facility Closing Date") would be used to repay AET's senior secured DIP Facility, to pay administrative expenses and other emergence costs and to replace post-petition letters of credit, in each case in accordance with the Plan to the extent applicable, and to otherwise enable AET to consummate the Plan on the effective date thereof and to fund certain transaction fees and expenses of the Exit Facility. Loans made after the Exit Facility Closing Date shall be used for working capital needs and for other corporate purposes to be determined.

(j)     Interest: At Borrower's option, at either (i) absent a default, a 1, 2 or 3-month reserve-adjusted LIBOR plus the Applicable LIBOR Margin, or (ii) a floating rate equal to the Index Rate (higher of Prime or 50 basis points over the Federal Funds Rate) plus the Applicable Index Margin.

Interest shall be payable monthly in arrears (except LIBOR, which shall be payable at the end of the applicable LIBOR period) and calculated on the basis of a 360-day year and actual days elapsed. LIBOR mechanics and breakage fees will be set forth in the final Exit Facility documents.

(k)     Applicable Margins: The following applicable margins would apply until as adjusted as described below. Starting with the delivery to the Agent of Borrower's consolidated quarterly financial statements for the later to occur of (i) the second full fiscal quarter ending after the Exit Facility Closing Date and (ii) the fiscal quarter ending June 2005, the Applicable Margins shall be subject to adjustment, prospectively, based on Borrower's consolidated financial performance for the trailing four quarters most recently ended in accordance with the grid attached as Schedule II-A to the Exit Commitment. Notwithstanding the foregoing, the Applicable Margins for the Exit Facility Last Out Term Loan shall not be subject to adjustment.

65

(i)     Applicable Exit Facility Revolver Index Margin: 1.75%

(ii)    Applicable Exit Facility Revolver LIBOR Margin: 3.25%

(iii)   Applicable Exit Facility Term Loan Index Margin: 2.75%

(iv)    Applicable Exit Facility Term Loan LIBOR Margin: 4.25%

(v)     Applicable Exit Facility Last Out Term Loan Index Margin: 4.25%

(vi)    Applicable Exit Facility Last Out Term Loan LIBOR Margin: 5.75%

(vii)   Applicable L/C Margin: 3.25%

(viii)  Applicable Unused Facility Fee Margin: 0.50%

The definitive Exit Facility documentation will contain provisions regarding the delivery of financial statements, and the timing and mechanics of subsequent prospective adjustments in Applicable Margins. If a default is continuing at the time that a reduction in Applicable Margins is to be implemented, that reduction will be deferred until the first month commencing after the cure or waiver thereof.

(l)     Event of Default Interest: So long as an Event of Default has occurred and is continuing, interest and the Letter of Credit Fee shall be increased 2% above the rate or Letter of Credit Fee otherwise applicable.

(m)     Mandatory Prepayments: Borrower shall make mandatory prepayments against principal as per the Existing Credit Agreement with the exception that Borrower shall make prepayments against the Exit Facility Term Loan principal annually for years 1 and 2 in an amount equal to 25% of consolidated Excess Cash Flow of the Borrower and its subsidiaries for the twelve (12) month period ending fiscal years 1 and 2 following the Exit Facility Closing Date; *provided* that the sum of such prepayments from Excess Cash Flow along with the scheduled Exit Facility Term Loan amortization payments defined above shall not exceed $6,250,000 in the aggregate for any 12-month period.

Additionally, Borrower may, at its option, prepay up to $5,000,000 of the Exit Facility Last Out Term Loan in minimum increments of at least $500,000 within twelve (12) months of the Exit Facility Closing Date so long as after giving effect to such payments Borrowing Availability exceeds $30,000,000 on a pro forma basis for the 90 day period preceding such payment and for the 90 day period following such payment. After twelve (12) months after the Exit Facility Closing Date Borrower may, at its option, prepay the Exit Facility Last Out Term Loan, in whole or in part, in minimum increments of at least $500,000 so long as after giving effect to such payments Borrowing Availability exceeds $30,000,000 on a pro forma basis for the 90 day period

preceding such payment and for the 90 day period following such payment and Borrower's fixed charge coverage ratio on a last twelve-month basis is at least 1.0x, it being understood that such ratio includes scheduled amortization, Excess Cash Flow prepayments (if any), and prepayments on the Exit Facility Last Out Term Loan (if any), including the proposed prepayment but excluding up to $5,000,000 of prepayments that may be made during the first twelve (12) months after the Exit Facility Closing Date

(n)     Fees payable to Exit Facility Agent for the benefit of the Lenders:

    (i)     Letter of Credit Fee equal to the Applicable L/C Margin (calculated on the basis of a 360-day year and actual days elapsed) on the maximum amount available to be drawn under each letter of credit, payable to Exit Facility Agent monthly in arrears, plus any charges assessed by the issuing bank.

    (ii)     Unused Facility Fee equal to the Applicable Unused Facility Fee Margin (calculated on the basis of a 360-day year and actual days elapsed) on the average unused daily balance of the Exit Facility Revolver, payable to Exit Facility Agent monthly in arrears.

In addition, the Company has agreed to pay to the Exit Facility Agent customary closing and agent's fees.

(o)     Priority:  Payment priority among the Exit Facility Revolver and the Exit Facility Term Loan Lenders would be consistent with the Existing Credit Agreement.  The Exit Facility Last Out Term Loan will have payment priority on a last-out basis.

(p)     Security: To secure all obligations of Borrower under the Exit Facility, the Exit Facility Agent, on behalf of itself and Lenders, shall receive a fully perfected first priority security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrower and Guarantors, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, intellectual property, general intangibles, supporting obligations, letter of credit rights, commercial tort claims, avoidance actions, investment property and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds (collectively, the "Exit Facility Collateral").  All Exit Facility Collateral shall be free and clear of other liens, claims, and encumbrances, except for liens, claims, and encumbrances reasonably acceptable to the Exit Facility Agent.

All loans and other obligations under the Exit Facility will be cross-defaulted to each other and to all other material indebtedness of each

Credit Party. All loans and other obligations under the Exit Facility documents shall be cross-collateralized with each other and cross-collateralized and guaranteed by Borrower and each Guarantor.

(q)     Each Guarantor will guarantee the obligations of Borrower under the Exit Facility, and the Exit Facility Agent will receive a security interest in all of the assets of such Guarantor.

(r)     Other Terms:

    (i)     The terms of each of (i) the Plan and (ii) all orders of the Bankruptcy Court approving, implementing or affecting the Plan, the Exit Commitment and the Exit Facility, or affecting the rights, remedies and obligations of Exit Facility Agent and Lenders hereunder and thereunder, shall be in form and substance reasonably acceptable to the Exit Facility Agent.

    (ii)    The Plan shall have been confirmed by a final order entered by the Bankruptcy Court (the "Confirmation Order"), in form and substance reasonably acceptable to the Exit Facility Agent, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay. Without limiting the general applicability of the immediately preceding sentence, the Confirmation Order shall specifically provide that (a) the terms and conditions of this Commitment Letter with respect to the Exit Facility are approved and ratified as being entered into in good faith, providing the most favorable financing terms and being critical to the success and feasibility of the Plan, (b) on or prior to the effective date of the Plan, each Credit Party is authorized to enter into documentation evidencing the Exit Facility and to grant liens and security interests to the Exit Facility Agent in all of its assets, and such documents, liens and security interests are approved, (c) all fees, costs and expenses paid by Borrower in connection with the Commitment Letter with respect to the Exit Facility are ratified and approved, and (d) the Commitment Letter and any or all other Exit Facility documents signed by Borrower or Borrower as a debtor and debtor in possession, as the case may be, in the Chapter 11 Cases shall be binding and enforceable against the Borrower upon and after the effective date of the Plan as if executed and delivered by the Borrower notwithstanding any provision in the Plan or the Confirmation Order to the contrary. Moreover, the time to appeal the Confirmation Order or to seek review, rehearing, or certiorari with respect to the Confirmation Order must have expired, no appeal or petition for review, rehearing, or certiorari with respect to the Confirmation Order may be pending, and the Confirmation Order must otherwise be a final, non-appealable order in full force and effect. The Confirmation

Order shall have been entered upon proper notice to all parties to be bound by the Plan, all as may be required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any applicable local bankruptcy rules.

(iii)    All conditions to the effectiveness of the Plan shall have been satisfied or waived in a manner reasonably acceptable to the Exit Facility Agent.

(iv)    Terms of new $50,000,000 unsecured senior notes to be reasonably acceptable to the Exit Facility Agent, it being understood that such terms shall not be materially different from the previous descriptions provided to the Exit Facility Agent.

(v)    Minimum availability at close of at least $25,000,000.

(vi)    No default or Event of Default at close of DIP Facility.

(vii)    The inclusion of the Foreign Subfacility is expressly conditioned upon satisfactory final approval from Ex-Im Bank.

(viii)    Financial covenants to be determined but to include (i) minimum EBITDA, (ii) minimum fixed charge coverage ratio, (iii) maximum capital expenditures, and (iv) maximum total leverage covenant.

(ix)    Cash management system for Borrower on terms provided for in the Existing Credit Agreement. The Exit Facility Agent shall have full cash dominion by means of lock boxes and blocked account agreements.

(x)    Reasonably satisfactory opinions of counsel (including local counsel as requested) reasonably acceptable to the Exit Facility Agent.

(xi)    No default or Event of Default at close under DIP Facility.

(xii)    With respect to the real estate collateral in Covington, Virginia, receipt of title insurance policies in amount, form, and from an issuer satisfactory to the Exit Facility Agent, as reasonably requested by the Exit Facility Agent and consistent with the requirements of the Existing Credit Agreement, unless a binding contract of sale shall have been entered into prior to the Exit Facility Closing Date.

(xiii)    Landlord/mortgagee/bailee waivers, to the extent obtainable with Borrower's commercially reasonable best efforts and consistent with the requirements of the Existing Credit Agreement; provided, however, to the extent the Exit

Facility Agent has not received a satisfactory landlord, mortgagee or bailee waiver, as applicable, reserves reasonably satisfactory to the Exit Facility Agent shall have been established with respect thereto, it being agreed and understood that the non-receipt by the Exit Facility Agent of such landlord, mortgagee or bailee waiver, as applicable, shall not constitute a Default or an Event of Default (as such terms are defined in the final Exit Facility documentation).

(xiv) Prohibitions of a direct or indirect change in senior management or control of Borrower except as contemplated by arrangements contemplated by the Plan.

(xv) As of the Exit Facility Closing Date, there shall have been (i) since Borrower's last unaudited financial statements for the quarter most recently ended prior to the Exit Facility Closing Date for which public filings have been made except as publicly disclosed prior to the date hereof and except for the commencement of the Chapter 11 Cases, no material adverse change, individually or in the aggregate, in the business, financial or other condition of Borrower, the industry in which Borrower operates, or the collateral which will be subject to the security interest granted to Exit Facility Agent or Lenders or in the prospects or projections of Borrower, (ii) no litigation commenced which has not been stayed by the Bankruptcy Court and which, if successful, would have a material adverse impact on Borrower, its business or ability to repay the loans, or which would challenge the transactions under consideration, and (iii) since the date hereof, no change in loan syndication, financial or capital market conditions generally that in GECMG's reasonable judgment would materially impair successful syndication of the Exit Facility.

(s) The final Exit Facility documents will be substantially similar to the loan documents executed in connection with the Existing Credit Agreement, as modified to give effect to the terms set forth therein.

All orders of the Bankruptcy Court approving or authorizing the Exit Facility and the plan of reorganization, and all motions relating thereto, shall be in form and substance reasonably acceptable to the Exit Facility Agent.

## V.    THE BUSINESS

### A.    General

AET is one of the largest North American manufacturers and suppliers of oriented polypropylene, or OPP, films, which are used primarily in consumer product labeling, flexible packaging and overwrap applications. AET has a leading position in most of the major high-end OPP films end-use product categories in North America and has a market share of approximately 25 percent.

AET offers one of the most extensive product lines in the OPP films industry, ranging from high-margin, specialized labels and holographic films to basic heat sealable co-extruded films. With an experienced technology group and state-of-the-art production facilities, the Company works directly with its customers to develop innovative products to meet their specialized requirements. AET believes that its combination of leadership position, innovative capabilities, strong sales force and highly efficient manufacturing will allow it to achieve future growth and profitability.

End users of AET's films are consumer product companies whose labels and packages require special attributes such as vivid graphics, exceptional clarity and moisture barriers to preserve freshness. AET's OPP films product line is classified into two categories—the Core Business, which is comprised primarily of labels and packaging films, and the High Value Business, which consists of the Company's TOppCure® and Platinum films. AET's film products are utilized by end users such as Coca-Cola®, Pepsi-Cola®, Frito-Lay®, Nabisco®, Kellogg's®, Hershey Foods®, Sony® and Lipton®.

### B.    Strategy

AET's objective is to generate sustainable increasing profitability in the cyclical OPP films industry. The business strategy to achieve this objective is divided into two phases:

*Phase One*—The first phase covered 1996 - 2001 and was directed at significantly enhancing the efficiency of the asset base and creating sufficient critical mass to support future product development. The strategic elements of this first phase were as follows:

- achieve critical mass and reduce unit costs by upgrading and expanding capacity with state-of-the-art manufacturing assets;

- develop additional products to fill the new capacity; and

- Expand the reach of the sales force to sell the new capacity.

During Phase One, AET doubled its capacity without increasing headcount, thus reducing unit costs, developed over fifty new products, and greatly expanded its presence in Latin America.

*Phase Two*—The second phase covers 2002 - 2007 and is directed at driving margin expansion primarily through the development of new high-value films, including products which substitute for other materials, expanding the overall OPP market. The strategic elements of the second phase are as follows:

- develop and manufacture innovative, proprietary, high-margin products ("Platinum Products") utilizing unique new technology platforms;

- maintain leadership in its higher margin Signature Products, as described below; and

- enhance the sales mix, thereby expanding margins, through revenue growth of its Signature Products consistent with demand growth and through the substitution in its revenue mix of new higher-margin Platinum Products for lower end commodity products.

AET has developed four new technology platforms, providing a foundation on which to build innovative products that provide significant value to its customers and expanding margins for the Company. These products are referred to as AET's Platinum Products. To put the concept of these new technology platforms in context, with the exception of AET's platforms, there has not been a single new technology platform introduced into the OPP industry for over fifteen years. Examples of currently utilized technology platforms are coextrusion, voiding, out-of-line metallizing and coating, surface treatment and the use of copolymers and terpolymers.

*Innovative Products / Technology Platforms*

The four new technology platforms and certain related applications recently developed by AET include:

- The TOppCure® labeling system for applying clear, opaque or metallized plastic labels to glass or plastic containers utilizing modified cut-and-stack equipment. The highest impact application is the ability to apply transparent labels to glass or plastic containers at costs significantly less than the only alternative, which is pressure sensitive labels.

- Advanced coating and surface modification technology that enhances film surface characteristics. This technology spans a wide variety of applications from boardstock lamination and decoration to efficiently introducing special characteristics into film surfaces.

- Technology that allows the efficient processing of different polymers into complex structures. This would include applications for the graphic arts market for polyester/OPP film structures, and high barrier applications for packaging and Syn*Carta*™, the Company's synthetic media offering.

- Technology resulting in an integrated holographic film embossing and processing system that will expand the marketplace for high-impact graphic films. The applications for this technology include holographic packaging and label decorations.

*Maintain Market Leadership in Signature Products*

AET is a leading supplier to four of the five top end users and five of the top six converters of OPP films, which is the result of excellent service coupled with superior products in selected target markets. These products are referred to as AET's "Signature Products" and include the Company's roll-fed, cut-and-stack and shrink label films, cold seal release films, non-sealable metallized films, and overwrap films.

AET is continually improving and upgrading its Signature Products to ensure it maintains its strong market position by setting the standard for these value-added products. The North American market share AET enjoys in the segments in which these products participate ranges from 40 percent to 85 percent.

72

*Upgrade Sales Mix*

During Phase One of AET's Business Strategy, a period of rapid capacity expansion, the Company doubled its volume of products produced and sold. However, due to the unprecedented rate of growth in manufacturing capacity, approximately half of AET's aggregate growth in volume during this period was in lower margin films. During Phase Two of AET's Business Strategy, much of this capacity will be redirected to higher value-added opportunities. While the Company has no plans to add additional capacity in the foreseeable future, an opportunity exists as AET introduces its innovative new Platinum Products and expands its Signature Products in place of lower margin films to enhance the overall profit margins of the Company.

C.    Industry Overview

OPP films are highly engineered products developed and manufactured through a complex process of polymer design, extrusion, controlled multi-directional stretching, heating and cooling, and surface treatment. Depending on the application, finished products can then be further processed to be embossed or add high barrier or metallized coatings, and are often designed to be laminated with other films to provide highly specialized attributes required by end users.

Recent advancements in film extrusion and resin technology have produced new, sophisticated films that are thinner and stronger and have better barrier and sealant properties than other materials or predecessor films. These technological advances have allowed many traditional forms of rigid packaging to be replaced with film-based, flexible packaging that is lighter, lower in cost and has enhanced performance characteristics, such as oxygen and moisture barriers, printability and durability. In addition, flexible packaging is often recyclable.

The Company estimates that the North American OPP film market grew at an average compound annual growth rate of over 6 percent from 1980 through 2000. However, beginning in 2001 and continuing into 2002, demand growth in the OPP films industry slowed to near zero due primarily to both the recession and inventory de-stocking throughout the supply chain. Growth in OPP film demand in fiscal 2003, and as estimated in fiscal 2004, was approximately 2 percent per annum, based on Company estimates, which was also lower than the historical growth rate. This relatively sluggish demand growth resulted from the continued economic weakness coupled with lower demand for snacks and beverages. The Company anticipates growth in OPP films of approximately 3 percent or half of the historical growth rate per annum. Substitution accounted for over half of the historical growth rate in OPP films and are still a driver going forward due to their superior performance characteristics, such as improved protection against light, oxygen and moisture, good printability and durability, and exceptional clarity. In addition, due to its low density, OPP provides greater coverage at lower cost than any other plastic film material. OPP films have replaced many non-OPP plastic film materials such as polyester, nylon, cellophane and paper. Several fundamental trends continue to foster future growth in OPP films:

- the continual increase in demand for established end-market consumer products, such as snack foods, soft drinks and confectionary products, which positively impacts the demand for OPP films;

- continued substitution opportunities due to the movement away from rigid containers such as jars and boxes, towards flexible packaging such as bags and pouches that utilize OPP film;

- the continued trend from cans to plastic beverage containers that utilize OPP film labels; and

- substitution opportunities driven by AET's innovative new products such as TOppCure®, Syn*Carta*™ and HOTR™.

The OPP films industry in North America has suffered from utilization rates that approached 80 percent since the capacity in the North was increased by more than 35 percent from 1996 to 1999. This decline in capacity utilization led to sharp declines in selling prices of OPP films and severely impacted profitability in the OPP films industry. In the past eighteen months, capacity in North America has increased another 9 percent, with one production line starting up in the United States in mid 2003 and two production lines recently coming on line in Mexico. Because demand has been relatively flat over the past four years the Company believes the utilization rate is still approximately 90 percent. At this level, the industry is able to pass on some, but not all, of the raw material price increases. We believe that capacity utilization in the mid-90 percent range is required to achieve reasonable levels of price realization.

According to Chemical Data Inc. (CDI), the price of polypropylene resin has increased from an average of $0.35 per pound in fiscal 2002 to an average of $0.50 per pound in fiscal 2004, representing a 43 percent increase over the two-year period. Additionally, due to the continued high price of oil and increased demand for polypropylene resin, CDI, in their report of September 23, 2004, projected polypropylene resin prices to reach approximately $0.61 per pound in the last calendar quarter of 2004. Although capacity utilization levels remain soft, the industry has had five price increases in fiscal 2003 and 2004, but has been unable to recover all of the significant increase in raw material costs.

There are currently no announced new OPP film lines in North America. A substantial capital investment is required to build a new line and, as the industry has experienced low capacity utilization levels and poor profitability, the Company believes industry participants will be cautious about introducing new OPP film lines in the future. In addition, because at least two years are required to design and construct a new OPP film line, with a third year to fully ramp up production, no additional new OPP film lines are expected to come on stream in the United States for at least the next two to three years. With modest growth in demand forecasted over the next three years, the OPP industry utilization rate is expected to improve.

D.    Competitive Strengths

AET is well positioned to compete successfully in the OPP films market and to increase sales and profitability due to:

- *Substantial Industry Presence*—The Company is the largest manufacturer and supplier of OPP films in North America and has a leading market position in substantially all of the major high-end OPP films end-use product categories in North America.

- *Technological Leadership and Superior Product Development Capabilities*—The Company has one of the largest technology groups in the industry with more than 60 chemists, engineers and technicians, and has invested approximately $14 million in product research and development over the past two years.

- *Efficient, Low Cost Production Facilities*—AET believes that its cost to produce OPP films is one of the lowest in the North American industry and is the lowest for any manufacturer with a full line of OPP products.

- *Breadth of Product Line and Diversity of Customer Base*—With more than 80 product groups sold to over 500 customers, AET believes that it has the broadest product lines and customer base of any North American OPP films producer.

- *Experienced Management*—AET believes that its senior and operational management team is among the most experienced in the OPP films business.

E.    Products

*Core Business Products:*

- Labels—AET's OPP film labels are used on containers for soft drinks, beverages, food and other consumer products requiring a high-quality print surface for superior graphics and properties that permit high speed labeling. Examples of end uses include soft drink containers for Coca-Cola® and Pepsi-Cola®, branded water bottles for Aquafina® and Dasani®, and juice containers for Tropicana® and Dole®. In addition, the Company's films are used on products such as Folgers® and Hills Brothers® coffee cans and aerosol cans for shaving creams and air fresheners. AET's films are used on products representing over 85 percent of the North American soft drink market.

- Packaging—AET's OPP films are used in a broad range of packaging applications, principally for food products, where they provide enhanced protection against moisture, light and air. The Company's OPP films are used to make packages for products such as Frito-Lay® snacks, Nabisco®, Kellogg's®, General Foods® and Hershey Foods® products, individual size condiment pouches, and baked goods packaging. In applications where barrier is important, AET offers metallized, polyvinylidene chloride, coated and polymer modified films. High barrier metallized films provide an enhanced barrier for snacks packaged in nitrogen gas to maintain freshness and extend shelf life.

- Overwrap—The Company produces OPP films that are exceptionally clear, thin and strong and provide barriers to protect products. Examples of end uses include overwrap for boxes of Lipton® tea bags and Schrafft® candies, Sony® and TDK® compact discs and DVDs, and cigarette boxes for British American Tobacco®. End-users of these products require durable films with high barrier properties that also offer exceptional clarity and thinness to maximize visibility of their products. A significant portion of these films are sold in narrow widths, 10 to 20 inches wide, for which AET has unique slitting capabilities.

*Platinum Products:*

The Company has developed, and is currently commercializing, the first four innovative new high-margin products utilizing its new technology platforms. These products, including TOppCure®, Holographic and Syn*Carta*™ films, provide higher margins and expand the OPP market by delivering favorable costs and/or performance attributes versus existing materials. AET believes that these new proprietary technology platforms provide a strong foundation to develop additional high-margin innovative products.

F.    Marketing and Customers

AET's OPP films products are sold primarily through its direct sales organization. Its highly skilled sales force, whose principal role is to develop sales opportunities and provide customer support,

has considerable technical expertise and industry experience. Marketing activities have historically been focused primarily in North and South America, although the Company also has a sales presence in Europe and Asia. In addition, the Company's sales force and research and development scientists work directly with its customers to create new films, as well as new applications for existing OPP films.

The majority of AET's OPP films sales are to converters, who print and laminate films before selling to end-users. Two converters each will account for 15 percent of sales in fiscal 2004. The Company also sells a significant portion of OPP films directly to end-users, and considers it an important part of its marketing effort to maintain direct relations with major end-users, who generally direct packaging design efforts and provide detailed specifications to converters about the films used in their labeling and packaging applications. Sales and marketing efforts and customer relationships are enhanced by the numerous requirements of customer-specific technical qualifications that have been secured. The qualification process typically involves significant customer time and effort and results in a strong competitive position for qualified products. Once qualified, products are often referenced in end-user specifications or qualified product lists. These qualification processes also reinforce the partnership between AET and its customers and can lead to additional sales and marketing opportunities.

G.    Manufacturing and Technology

OPP films are manufactured and processed through either the tenter or the tubular process. AET is the only North American OPP films producer that has both tenter and tubular manufacturing capabilities. Additionally, OPP films can be further processed through value-adding secondary operations.

*Tenter Process*

In the tenter process, specifically formulated polypropylene resins are combined and melted, sometimes with additives, and extruded from a flat die into a thick film containing from one to five distinct layers, which are then chilled, reheated and stretched lengthwise in the machine direction and widthwise in the transverse direction while still heated. This dual stretching process is known as "biaxial orientation." The specific characteristics demanded of each film are controlled throughout this complex process by a multitude of variables, including proprietary polymer design, application of unique skin layers, timed variations of the heating, cooling and stretching processes, alteration of molecular surface characteristics through the application of flame or high-voltage electrical discharge and controlled winding tension. AET has eight tenter lines, ranging from 5.5 to 10 meters.

*Tubular Process*

In the tubular process, molten resin is extruded from a circular die to form a thick tube which is stretched lengthwise and widthwise with air pressure and gravity at controlled temperatures. Tubular processed films offer "balanced biaxial orientation," meaning that the film is stretched equally both widthwise and lengthwise. This process results in improved stability and a more uniform thickness for thinner films. The Company believes that its tubular manufacturing capacity enables it to manufacture thinner films, while preserving clarity, machinability and other performance characteristics of thicker film. These thinner films use fewer materials, thereby improving performance relative to cost. AET currently operates nine tubular lines.

*Secondary Processes*

In addition to the tenter and tubular manufacturing processes, AET also performs operations to coat, metallize, and emboss its films. In the coating process, various materials are applied in liquid form to the surface of the film, which is then dried in-line. These coatings are applied uniformly at varying thicknesses and layers to impart desired properties. In the metallization process, the film is run through a vacuum and a thin layer of aluminum is applied to the surface of the film. The embossing process uniformly modifies the surface of highly engineered films, through the application of heat and pressure, to produce films suitable for holographic applications.

    H.     Research and Development

AET believes that it has one of the largest and most experienced technology groups in the industry, with more than 60 chemists, engineers and technicians, and has invested approximately $14 million in research and development over the past two years. Utilizing extensive laboratory and film testing facilities, advanced pilot film production lines, and an array of end-use packaging and labeling equipment, the Company's technology group has introduced approximately 50 new or enhanced products in the past three fiscal years. The Company believes that this strength in innovation will continue to drive higher growth levels for differentiated, higher margin Platinum Products, and provide an advantage to customers who work with AET in the development of new labeling, packaging and overwrap products and applications. During fiscal 2002, 2003 and 2004, the Company spent approximately $6.6 million, $7.2 million and $7.2 million, respectively, on research and development.

    I.     Polypropylene and Other Raw Materials

AET manufactures its principal products primarily from polypropylene resin. The relatively low density and low cost of polypropylene resins allow OPP films to provide very cost-efficient material for packaging applications. In addition, polypropylene possesses superior clarity and natural barrier qualities, and can be modified to add other attributes or features such as metallization, which make it a higher performing and more cost-efficient material than other plastic resins.

Four suppliers provide the majority of the Company's resin supply requirements. However, these materials are generally available from a large number of suppliers in sufficient quantities to meet ongoing requirements. Historically, there have not been any significant disruptions in supply as a result of shortages in raw materials.

Historically, the price of polypropylene has fluctuated, and in recent years the price has increased significantly due to the increased price of crude oil. As a result of low capacity utilization levels, not all of the increases in costs of polypropylene resin over the past two years have been passed on to customers. According to Chemical Data Inc., polypropylene resin prices have increased from an average of $0.42 per pound in fiscal 2003 to an average of $0.50 per pound in fiscal 2004. Any major disruption in the supply of oil, including continued unrest in the Middle East, is likely to cause a significant increase in the cost of polypropylene.

    J.     Competition

AET competes with manufacturers of OPP films and other specialty films, such as cellophane and polyester, as well as with producers of traditional packaging materials, such as paper, foil, metal, glass and other containers. The flexible packaging industry is very competitive, and some competitors are subsidiaries of larger corporations that have significantly greater financial resources than the Company. There are approximately six primary manufacturers in North America producing OPP films for resale.

Out of these six manufacturers, only AET and ExxonMobil, the other broad-line producer of OPP films, have a greater than 20 percent market share. Competition in OPP films markets is based primarily on customer relationships, product performance characteristics such as machinability and quality, reliability and price. Competition also depends on developing new and enhanced products for customers. The Company also sells products in countries outside North America and, therefore, competes with local OPP manufacturers.

The Company believes that it has various competitive advantages including:

- advanced proprietary manufacturing processes and product formulations required to produce a varied range of OPP films products;

- experienced, knowledgeable sales force and technical service group;

- research and development expertise required to sustain product innovation; and

- one of the most efficient manufacturing operations in the North American OPP films market.

Although this is an asset intensive business and the cost to enter is high, it cannot be assumed that the markets into which the Company sells its products will not attract additional competitors that could have significantly greater financial, technological, manufacturing and marketing resources than AET.

K.    Patents and Trademarks

AET currently holds 43 active domestic and international patents and approximately 50 applications are in progress in the United States and various foreign countries. AET has approximately 15 domestic and international trademark registrations and applications. The termination, expiration or infringement of one or more patents or trademarks would not have a material adverse effect on the business.

L.    Government Regulation

Due to the nature of AET's business, its operations are subject to a variety of federal, state and local laws, regulations and licensing requirements. The Company believes that its operations are in substantial compliance with those laws, regulations and requirements. Compliance with federal, state and local requirements relating to the protection of the environment has not had and is not expected to have, a material effect on capital expenditures, financial condition, results of operations or competitive position.

M.    Environmental, Health and Safety Matters

AET is subject to stringent environmental, health and safety requirements, including laws and regulations relating to air emissions, wastewater management, the handling and disposal of waste, and the cleanup of properties affected by hazardous substances. The Company believes that its operations have been and are in substantial compliance with environmental, health and safety requirements, and that it has no liabilities arising under such requirements, except as could not reasonably be expected to have a material adverse effect on operations, liquidity or financial condition.

In the last five years, the Company has received no requests for information or related correspondence from the United States Environmental Protection Agency and other third parties indicating that it might be responsible under the Comprehensive Environmental Response, Compensation and Liability Act or other environmental laws for costs associated with the investigation and cleanup of

contaminated sites. The Company believes that any future involvement in matters arising under various environmental laws will not have a material adverse effect on its operations, liquidity or financial condition.

N.      Employees

The Company employs approximately 940 full-time employees. Approximately 100 production and maintenance employees at the Covington, Virginia facility are represented by the Paper Allied Industrial Chemical and Energy Workers International Union, Local 2-0884 under a collective bargaining agreement that expires in June 2005. All employee relations are considered to be satisfactory.

O.      Properties

AET has three OPP Films manufacturing facilities located in Indiana, Virginia and Quebec, Canada and a corporate research development facility located in New Castle, Delaware and pilot production lines in Virginia and Newport, Delaware. Except for the two Delaware locations which AET leases, AET owns each of the facilities. All of AET's owned real property, except for the Virginia property, is collateral under the Credit Agreement. The Company believes that its facilities are suitable for their intended purposes and adequate for their level of operations.

P.      Legal Proceedings

The Company is subject to legal proceedings and claims that have arisen in the ordinary course of its business and have not been fully adjudicated. These actions, when ultimately concluded and determined, will not, in the opinion of management, have a material adverse effect upon the financial position or results of operations of the Company.

## VI.    CAPITALIZATION

The following table sets forth the consolidated debt and capitalization of AET and its consolidated subsidiaries at December 31, 2004, and as adjusted to give effect to the Plan as though it became effective on December 31, 2004.  This table should be read in conjunction with the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in AET's Annual Report on Form 10-K for the fiscal year ended September 30, 2003 and AET's Quarterly Reports on Form 10-Q for the fiscal quarters ended December 31, 2003, March 31, 2004 and June 30, 2004, the full texts of which are incorporated herein by reference.

### DECEMBER 31, 2004
### UNAUDITED
(\$ in millions)

| Security | Projected Pre-Effective Date | Recapitalization Adjustments | Projected- Post-Effective Date |
|---|---|---|---|
| DIP Facility | \$95.0[1] | (\$95.0) | – |
| Exit Facility Revolver | – | 25.0 | 25.0[3] |
| Exit Facility Term Loan B | – | 50.0 | 50.0 |
| Exit Facility Term Loan C | – | 20.0 | 20.0 |
| **Total Secured Debt** | **\$95.0** | **–** | **\$95.0** |
| Senior Notes | \$275.0 | (\$275.0) | – |
| New Notes | – | 50.0 | 50.0 |
| **Total Unsecured Debt** | **\$275.0** | **(\$225.0)** | **\$50.0** |
| **Total Debt** | **\$370.0** | **(\$225.0)** | **\$145.0** |
| Less:  Cash and Equivalents | – | – | – |
| **Net Debt** | **\$370.0** | **(\$225.0)** | **\$145.0** |
| Common Equity Value | \$1.9[2] | \$83.1 | \$85.0 |
| **Total Capitalization** | **\$371.9** | **(\$141.9)** | **\$230.0** |

_____
(1)    Balance includes expected reorganization costs through emergence.
(2)    Current equity market capitalization of AET.
(3)    Maximum amount available under the Exit Facility Revolver is \$55 million.

## VII.    VOTING PROCEDURES AND REQUIREMENTS

The following are instructions for voting on the Plan, and together with the instructions contained in the ballot (the "Ballot") and master ballot (the "Master Ballot") to be used for voting to accept or reject the Plan, constitute the "Voting Instructions" for the Plan. To vote in favor of the Plan, you must be a beneficial holder a Class 3 Claim or Class 4 Claim as of October 8, 2004 (the "Voting Record Date"). To vote, you must fill out and sign a separate Ballot or Master Ballot enclosed herewith.

A.    Ballots

A Ballot to be used for voting to accept or reject the Plan is enclosed with all copies of this Solicitation and Disclosure Statement mailed to all Classes entitled to vote. After carefully reviewing this Solicitation and Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by completing the enclosed Ballot. All Ballots should be returned to your Nominee (as defined below) as directed below.

If you do not receive a Ballot for a certain Claim that you believe you hold and that is in a Class entitled to vote on the Plan, or if a Ballot is damaged or lost or if you have any questions regarding the procedures for voting on the Plan, you should contact:

Bankruptcy Services, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

Attn: AET Ballot Processing
Tel: 866-258-8898

All votes to accept or reject the Plan must be cast by sending the Ballot to your Nominee. In the case of a Nominee holding the Notes in its own name on behalf of a beneficial owner, the vote should be cast on the Master Ballot enclosed herein. A Nominee should transmit a Ballot with a copy of this Solicitation and Disclosure Statement and the Plan to each beneficial owner of Notes held in the name of such Nominee. Each beneficial owner should return its Ballot to its Nominee, and the Nominee should complete and submit the Master Ballot in accordance with the instructions in this Article VII.A and the Master Ballot. All Ballots should be retained by the Nominee for inspection for at least one year from the Voting Deadline.

B.    Procedures for Casting and Deadlines for Voting on the Plan

All persons entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the Ballot accompanying this Solicitation and Disclosure Statement and returning it to their Nominee. Nominees must cast votes submitted by beneficial owners on such beneficial owners' behalf on a Master Ballot prior to the Voting Deadline. Master Ballots may be returned in the enclosed return envelope, by first class mail, or they may be transmitted by courier or hand delivery to the Voting Agent at the following address:

Bankruptcy Services, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: AET Ballot Processing

**IN ORDER TO BE COUNTED, ALL MASTER BALLOTS MUST BE PROPERLY EXECUTED AND RECEIVED BY THE VOTING AGENT NO LATER THAN 5:00 P.M.,**

**EASTERN STANDARD TIME, ON NOVEMBER 24, 2004, UNLESS EXTENDED (THE "VOTING DEADLINE").**

Since mail delays may occur, and your Nominee must cast your vote on your behalf on the Master Ballot prior to the Voting Deadline, it is important that your Ballot be mailed or delivered to your Nominee well in advance of the Voting Deadline. Any Master Ballot received after the Voting Deadline will not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan. When a Ballot is returned indicating acceptance or rejection of the Plan but is unsigned, illegible or incomplete, the unsigned, illegible and incomplete Ballot will not be included in any calculation to determine whether the party is entitled to vote on the Plan. While Holders of Senior Note Claims are not required to cast a vote for or against the Plan, information from the Ballot shall be used to identify Holders as either Holders of Large Note Claims or Small Note Claims for all purposes under the Plan. Failure by a Holder to submit a Ballot, regardless of whether such Ballot reflects a vote for or against the Plan, and/or failure by a Nominee to timely transmit a Master Ballot, may result in distribution of the Small Noteholder Allocation regardless of whether such Claim is a Large Note Claim or Small Note Claim, subject to the limitations more fully described herein. See Article II.E.10. "The Plan – Means of Implementation of the Plan – Issuance and Distribution of New Common Stock and New Notes; Reserve".

With the consent of the Restructuring Agreement Noteholders, the Company reserves the right to terminate the Solicitation at any time prior to the Voting Deadline. Additionally, upon notice to the Noteholders, the Company reserves the right to amend this Solicitation at any time prior to the Voting Deadline.

With the consent of the Restructuring Agreement Noteholders, the Company reserves its right to extend the Voting Deadline. Any such extension will be followed as promptly as practicable by notice thereof by press release or other public announcement. In the event of an extension of the Voting Deadline, the Company reserves the right to establish a different Voting Record Date.

Once delivered to the Voting Agent and upon the expiration or termination of the Solicitation, Ballots or Master Ballots may not be revoked or withdrawn prior to the commencement of the Chapter 11 Cases; *provided, however*, that prior to the expiration or termination of the Solicitation, Ballots and Master Ballots may be revoked or withdrawn even if such votes have been delivered to the Voting Agent. Subsequent to the Commencement of the Chapter 11 Cases, Noteholders may, for cause, move the Bankruptcy Court to permit the revocation or withdrawal of their Ballot.

       C.      Parties Entitled to Vote on the Plan

Pursuant to section 1126 of the Bankruptcy Code, each impaired Class of Claims or Equity Interests that is not deemed to reject the Plan is entitled to vote on acceptance or rejection of the Plan. Any Holder of an Allowed Claim or Equity Interest that is in an impaired Class under the Plan, and whose Class is not deemed to reject the Plan, is entitled to vote.

A class is "impaired" unless the legal, equitable and contractual rights of the holders of claims or interests in that class left are unaltered by a plan of reorganization or if the plan reinstates the claims or interests held by members of such class by (i) curing any defaults which exist, (ii) reinstating the maturity of such claims or interests, (iii) compensating the holders of such claims or interests for damages which result from the reasonable reliance on any contractual provision or law that allows acceleration of such claims or interests and (iv) otherwise leaving unaltered any legal, equitable or contractual rights of which the claims or interests entitle the holders of such claims or interests. Because of their favorable treatment, classes that are not impaired are conclusively presumed to accept a plan pursuant to section 1126(f) of the

Bankruptcy Code. Accordingly, it is not necessary to solicit votes from the holders of claims or interests in classes that are not impaired.

Section 1126(g) of the Bankruptcy Code provides that a class of claims or equity interests is presumed to not have accepted a plan of reorganization if such plan provides that the claims or interests in such class do not entitle the holders of such claims to receive or retain any property under the plan on account of such claims or interests. In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be presumed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is presumed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule or regulation and such acceptance or rejection was solicited in accordance with section 1125(b) of the Bankruptcy Code.

The Debtors also believe that their solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that their solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If such approval is not obtained, then the Debtors may have to solicit votes to accept or reject the Plan from one or more classes of Claims or Equity Interests that were not previously solicited. There is also a risk that confirmation of the Plan would be denied by the Bankruptcy Court.

Votes to accept the Plan are being solicited only from impaired Classes that are not deemed to reject the Plan. The following Classes of Claims are impaired under the Plan and persons holding Claims therein are entitled to vote to accept or reject the Plan: Class 3 Large Note Claims and Class 4 Small Note Claims.

No other Class is entitled to vote with respect to acceptance or rejection of the Plan.

D.     Counting of Ballots and Master Ballots for Determining Acceptance of the Plan

The Debtors intend to count all Ballots and Master Ballots (unless such Ballot or Master Ballot is illegible, incomplete or unsigned) received prior to the Voting Deadline for purposes of determining whether each impaired Class that is entitled to vote has accepted or rejected the Plan. Bankruptcy Rule 3018(b) prescribes the conditions that must be satisfied in order to count the ballots solicited with respect to a plan of reorganization prior to the commencement of a chapter 11 case. The rule requires that (i) such chapter 11 plan and a related disclosure statement must be disseminated to substantially all impaired creditors and impaired equity holders, (ii) the time prescribed for voting on such a plan must not be unreasonably short and (iii) the solicitation must be conducted in compliance with all applicable non-bankruptcy laws, rules or regulations or, if there are no such applicable laws, rules or regulations, that the disclosure statement for such plan contain "adequate information." Section 1125 of the Bankruptcy Code defines "adequate information" as information of a kind and in sufficient detail as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization.

83

The Debtors believe that, with respect to the Plan, all the requirements of Bankruptcy Rule 3018(b) will be satisfied. This Solicitation and Disclosure Statement and the Plan, together with the accompanying materials, are being transmitted to the Holders of Senior Note Claims to solicit their votes to accept or reject the Plan. The solicitation period for voting on the Plan is 23 days. The Debtors believe that this Solicitation and Disclosure Statement contains sufficient information for all of the Holders of Senior Note Claims to cast informed votes to accept or reject the Plan.

Under the Bankruptcy Code, a voting class of claims is presumed to have accepted a plan if it is accepted by creditors in such class who, of those voting on the Plan, hold at least two-thirds in amount and more than one-half in number of the allowed claims in such class.

## VIII.    PROJECTIONS AND VALUATION ANALYSIS

A.    Projections

The Bankruptcy Code requires as one of the conditions to confirmation of a plan of reorganization that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, also known as the "feasibility standard". For the purposes of determining whether the Plan meets the feasibility standard, and to assist Noteholders to evaluate whether to vote to accept or reject the Plan and exchange their Claims against the Debtors for the distributions described herein, the Company's management has analyzed the ability of the Company to meet its obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business. The Company's management also has prepared certain estimates and projections of the Company's operating profit, earnings before interest, taxes, depreciation and amortization (EBITDA) and certain other items for the fiscal years 2004 through 2007 (the "Projection Period"). Such projections summarized below are based upon assumptions and have been adjusted to reflect the restructuring, including the Plan, certain subsequent events and additional assumptions, including those set forth below (as adjusted, the "Projections").

The Projections should be read in conjunction with the assumptions and qualifications set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in AET's Annual Report on Form 10-K for the fiscal year ended September 30, 2003, and AET's Quarterly Reports on Form 10-Q for the fiscal quarters ended June 30, 2003, December 31, 2003, March 31, 2004 and June 30, 2004, the full texts of which are incorporated herein by reference. The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE COMPANY'S INDEPENDENT ACCOUNTANTS, DELOITTE & TOUCHE LLP, HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE COMPANY DOES NOT, AS A MATTER OF COURSE, PUBLISH ITS PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE COMPANY DOES NOT INTEND, AND DISCLAIMS ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE TO HOLDERS OF NEW COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE. THE PROJECTIONS PROVIDED IN THE SOLICITATION AND DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE COMPANY'S MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL. THE COMPANY CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE

ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X – "RISK FACTORS."

THE FOLLOWING ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.

Although the Company believes that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no assurance can be or is given that the Projections will be realized. In deciding whether to vote to accept or reject the Plan, holders of Claims entitled to vote on the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections. See Article X. "Risk Factors."

The estimated and projected consolidated financial statements of AET and its subsidiaries set forth below were prepared based on the assumption that the Effective Date would be December 31, 2004. Although the Company would seek to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when the Effective Date actually would occur.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

(a)     Fresh Start Accounting

The Projections assume an Effective Date of December 31, 2004, and as required, the provisions of Fresh Start Accounting have been adopted for periods after December 31, 2004. These principles are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," ("SOP 90-7"). Adoption of Fresh Start Accounting requires the assets and liabilities be stated at their reorganization value, which approximates fair value at the date of emergence from Chapter 11. The Fresh Start Accounting adjustments are based upon the enterprise valuation analysis completed by MBLY and assume a reorganization value of $230 million. In applying Fresh Start Accounting, significant adjustments are expected to be recorded to write-down the Company's long-lived assets, including its property, plant and equipment, which results in a reduction in depreciation expense. The Fresh Start Accounting adjustments included in the following projections are preliminary estimates.

(b)     Revenues

The Company generates revenues from the sale of OPP films that are used primarily in consumer product labeling, flexible packaging and overwrap applications. During fiscal year 2004, the Company grew its sales volume by 10% compared to fiscal year 2003, and regained a significant amount of sales volume in its Core Business that it had lost in the prior year. In fiscal year 2005, the Projections assume a growth in volume of 4% compared to fiscal year 2004. This net increase in volume principally reflects the full year benefit of maintaining the Company's business secured in fiscal 2004, in addition to the forecasted increase in the high-value films. In fiscal years 2006 and 2007, total volume is projected to be constant. Beginning in fiscal year 2004, the Company began to increase production of its initial high-

value Platinum Products and anticipates it will begin to increase production of its TOppCure® family of films in fiscal year 2005. Platinum and TOppCure® films account for only 1% of the growth in volume in fiscal year 2005 and are projected to have similar increases in volume in fiscal years 2006 and 2007.

Revenues in fiscal year 2005 are projected to increase $53 million, or 20%, compared to fiscal year 2004. Approximately two-thirds of this increase is related to the pass-through of increased raw material costs, with the balance of the increase equally divided between additional sales volume and increased sales of higher priced Platinum and TOppCure® films. In fiscal years 2006 and 2007, revenues are projected to increase by approximately 5% in each year, primarily due to the increase in sales of high-value products and an enrichment of the product mix in the Core Business.

(c)   Cost of Sales / Gross Profit

The primary raw material utilized by the Company in manufacturing OPP film is polypropylene resin, a petroleum based product. Historically, the cost of polypropylene resin has fluctuated, primarily due to the volatility in the price of oil. In fiscal year 2004, the cost of polypropylene resin escalated at an unprecedented rate. According to Chemical Data, Inc., a recognized industry source for tracking and projecting the cost of polyolefins, the cost of polypropylene resin increased 47%, or almost $.20 per pound, during fiscal year 2004, and is expected to increase $.10 per pound in fiscal year 2005 compared to the cost per pound in fiscal year 2004. The forward cost estimates provided for polypropylene resin by Chemical Data, Inc. in their report of September 23, 2004 were utilized in the Projections. The total cost increase of $41 million in fiscal year 2005 is due to projected increases in resin costs and volumes sold. Increases in utility costs and other manufacturing expenses have been offset by the lower depreciation expenses due to the revaluation of the fixed assets. In fiscal years 2006 and 2007, costs are projected to increase with inflation.

In fiscal year 2005, gross profit is projected to increase $11.4 million over fiscal year 2004. The majority of this increase reflects price increases in fiscal year 2004, which lagged behind the increase in cost of polypropylene resin, with the balance attributable to increased sales of the high-value Platinum and TOppCure® films. In fiscal years 2006 and 2007, the projected increases in gross profit are attributable to an enriched mix of products sold in the Core Business combined with increased sales of high-value Platinum and TOppCure® films.

(d)   Operating Expenses

In addition to ongoing operating expenses, such as selling, general and administrative, and research and development costs, operating expenses include the one-time costs of restructuring and goodwill impairment. Ongoing operating expenses are projected to increase by 9% in fiscal year 2005, principally due to higher employment costs. Management bonus and retirement costs were not paid or expensed in fiscal year 2004 operating expenses, but are included in fiscal year 2005, along with increased healthcare costs and annual salary and wage increases. Research and development costs are projected to increase in order to accelerate the development of high-value films. While ongoing operating expenses are projected to increase at a modest rate in fiscal years 2006 and 2007, operating expenses, as a percentage of sales in fiscal year 2007, are projected to decrease to 9.7% compared to 10.9% in fiscal year 2004.

(e)   Interest Expense

Interest expense includes deferred interest on the New Notes, principal amount $50 million bearing interest of 12% per annum, of $4.6 million and $6.6 million in fiscal years 2005 and 2006, respectively. The projections provide for the payment in cash of current interest, in addition to the

cumulative deferred interest, on the New Notes in fiscal year 2007. Additionally, though not required under the New Note Indenture, the projections assume payment of cumulative deferred interest on the New Notes of $11.2 million in fiscal year 2007.

(f)    Taxes

The Projections assume that existing net operating losses of $220 million will be reduced at emergence by $140 million due to the cancellation of the Company's indebtedness. The use of remaining net operating losses will also be limited due to the change of control contemplated by the Plan. Exclusive of the utilization of net operating loss carryforwards, the Company's effective tax rate is expected to be 40% for the Projection Period.

(g)    Capital Expenditures

Capital expenditures are projected to be lower than historical levels as no further increase in OPP film capacity is contemplated during the Projection Periods. Maintenance capital expenditures comprise approximately one-half of the approximately $15 million per year of projected capital expenditures, with the balance primarily related to the Company's new technology platforms, which are the basis for its high-value film offerings.

(h)    Working Capital

Trade receivables, inventory and accounts payable levels are project to be consistent with historical levels. Trade payables are projected to increase after emergence from chapter 11 as the Company's vendors modify their restrictive credit terms and extend normal credit terms due to the Company's improved financial condition pursuant to the Plan.

**APPLIED EXTRUSION TECHNOLOGIES, INC.**
**PROJECTED CONSOLIDATED STATEMENTS OF OPERATIONS**
**Year ended September 30, 2004, 2005, 2006 and 2007**
**(Unaudited)**
**(In Thousands)**

|  | Estimated 2004 | Projected 2005 | Projected 2006 | Projected 2007 |
|---|---|---|---|---|
| **Net Sales** | $ 265,830 | $ 318,690 | $ 335,098 | $ 349,729 |
| **Gross Profit** | $ 32,741 | $ 44,315 | $ 57,907 | $ 64,821 |
| **Operating expenses:** |  |  |  |  |
| Selling, general, and administrative | $ 21,948 | $ 23,316 | $ 24,017 | $ 24,978 |
| Research and development | 7,106 | 8,273 | 8,521 | 8,862 |
| Restructuring expenses | 3,132 | 10,668 | - | - |
| Goodwill impairment | 9,874 | - | - | - |
| **Total operating expenses** | $ 42,060 | $ 42,257 | $ 32,538 | $ 33,840 |
| **Operating profit (loss)** | $ (9,319) | $ 2,058 | $ 25,369 | $ 30,981 |
| **Interest expense, net:** |  |  |  |  |
| Interest expense | $ 36,653 | $ 18,380 | $ 12,867 | $ 11,859 |
| **Net income (Loss)** | $ (45,973) | $ (16,322) | $ 12,502 | $ 19,122 |
| **EBITDA** | $ 29,475 | $ 30,217 | $ 40,634 | $ 47,246 |
| **Capital expenditures** | $ (6,170) | $ (15,000) | $ (15,000) | $ (15,000) |
| **Depreciation & amortization of intangibles** | $ 35,662 | $ 17,491 | $ 15,265 | $ 16,265 |
| **Debt amortization** | $ 3,226 | $ 788 | $ 380 | $ 380 |

89

**APPLIED EXTRUSION TECHNOLOGIES, INC.**

**PROJECTED CONSOLIDATED BALANCE SHEET**

Year ended September 30, 2004, 2005, 2006 and 2007

(Unaudited)

(In Thousands)

| | Estimated 2004 | Projected 2005 | Projected 2006 | Projected 2007 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash | $ 343 | $ 1,154 | $ 1,623 | $ 4,828 |
| Accounts receivable, net | 45,500 | 47,604 | 47,909 | 49,420 |
| Inventory | 59,474 | 53,072 | 49,404 | 47,216 |
| Prepaid expenses and other | 2,807 | 2,980 | 2,940 | 2,900 |
| Total current assets | 108,125 | 104,810 | 101,876 | 104,364 |
| | | | | |
| Property, plant and equipment, net | 280,038 | 149,895 | 150,030 | 149,165 |
| Intangibles and deferred finance charges, net | 10,080 | 2,179 | 1,799 | 1,419 |
| Other assets | 4,610 | 2,000 | 2,000 | 2,000 |
| Total Assets | $ 402,853 | $ 258,884 | $ 255,705 | $ 256,948 |
| | | | | |
| **Liabilities and Equity** | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 9,502 | $ 14,000 | $ 14,500 | $ 15,000 |
| Accrued expenses | 15,500 | 13,120 | 12,569 | 12,784 |
| Accrued interest | 22,909 | 3,070 | 3,133 | 2,713 |
| Total current liabilities | 47,911 | 30,190 | 30,202 | 30,497 |
| | | | | |
| Revolver | 46,837 | 19,169 | 1,169 | 0 |
| Term Loans | 43,750 | 67,375 | 63,125 | 57,313 |
| Senior Notes | 272,206 | | | |
| New Notes | - | 54,636 | 61,193 | 50,000 |
| Total Debt | 362,793 | 141,180 | 125,487 | 107,313 |
| Deferred taxes and other liabilities | 1,018 | - | - | - |
| | | | | |
| Stockholders' equity: | (8,869) | 87,514 | 100,016 | 119,139 |
| | | | | |
| **Total Liabilities and Stockholders' Equity** | $ 402,853 | $ 258,884 | $ 255,705 | $ 256,948 |

**APPLIED EXTRUSION TECHNOLOGIES, INC.**
**PROJECTED CONSOLIDATED STATEMENT OF CASH FLOWS**
**Years ended September 30, 2004, 2005, 2006 and 2007**
**(Unaudited)**
**(In Thousands)**

|  | Estimated 2004 | Projected 2005 | Projected 2006 | Projected 2007 |
|---|---|---|---|---|
| **OPERATING ACTIVITIES:** | | | | |
| Net income | $  (45,973) | $ (16,322) | $  12,502 | $  19,122 |
| Adjustments to reconcile net loss to net cash from operating activities: | | | | |
| Provision for doubtful accounts | 600 | 600 | 600 | 600 |
| Depreciation and amortization of intangibles, etc | 29,014 | 18,279 | 15,645 | 16,645 |
| Amortization of sale/leaseback transactions | (69) | - | - | - |
| Stock compensation | 113 | - | - | - |
| Gain on sale of assets | (168) | - | - | - |
| Goodwill impairment | 9,874 | - | - | - |
| Changes in assets and liabilities: | | | | |
| Accounts receivable | (12,566) | (4,704) | (904) | (2,112) |
| Inventory | (6,744) | 6,402 | 3,667 | 2,189 |
| Prepaid expenses and other assets | 9,340 | 2,437 | 40 | 40 |
| Accounts payable and accrued expenses | 12,845 | 11,843 | 12 | 295 |
| Other | (14,844) | (1,018) | - | - |
| Net cash provided by (used in) operating activities | (18,578) | 17,517 | 31,563 | 36,779 |
| **INVESTING ACTIVITIES:** | | | | |
| Additions to property, plant and equipment, net | (6,546) | (15,400) | (15,400) | (15,400) |
| Proceeds from sale of property, plant and equipment | 203 | - | - | - |
| Repurchase of leased assets | (36,961) | - | - | - |
| Net cash used in investing activities | (43,304) | (15,400) | (15,400) | (15,400) |
| **FINANCING ACTIVITIES:** | | | | |
| Borrowings (repayments) under  Revolver | 18,167 | (46,733) | | |
| Principal payment on  term loan | (6,250) | (43,750) | | |
| Proceeds from term loan | 50,000 | | | |
| Borrowings (repayments) under Exit Facility Revolver | | 19,169 | (18,000) | (1,170) |
| Principal payment on Exit Facility term loan | | (2,625) | (4,250) | (5,812) |
| Proceeds from Exit Facility term loan | | 70,000 | - | - |
| Deferred Interest (repayments) on New Notes | | 4,636 | 6,556 | (11,193) |
| Debt issuance costs | (2,549) | (2,004) | - | - |
| Net cash from financing activities | 59,368 | (1,306) | (15,694) | (18,174) |
| Effect of exchange rate changes on cash | 23 | - | - | - |
| Change in cash and cash equivalents, net | (2,492) | 811 | 469 | 3,205 |
| Cash and cash equivalents, beginning | 2,835 | 343 | 1,154 | 1,623 |
| Cash and cash equivalents, ending | $    343 | $   1,154 | $   1,623 | $   4,828 |

B.    Valuation

In conjunction with formulating the Plan, and in particular, to determine the feasibility of the Plan and to quantify the appropriate amount of cash required for the Small Noteholder Allocation, the Company determined that it was necessary to estimate a post-confirmation going-concern enterprise value for the Reorganized Company. Accordingly, the Company directed MBLY to prepare such a valuation.

1.    Valuation Overview

The estimates of enterprise value set forth herein represent an estimated reorganization enterprise value that was developed solely for the purpose of the Plan. The estimates of the reorganization value prepared by MBLY assume that the Reorganized Debtors will continue as the owner and operator of their business and assets. Such estimates reflect the computations of the estimated enterprise value of the Reorganized Company through the application of various generally accepted valuation techniques and do not reflect or constitute appraisals of assets of the Company or the actual market value of the Company. Such estimates are inherently uncertain, and neither the Company, nor MBLY, assumes any responsibility for the accuracy and completeness of such estimates.

MBLY has assumed and relied upon the accuracy and completeness of all information provided to it by the Company and has not assumed any responsibility for independent verification of such information or for any independent valuation of appraisal of any assets of the Company, nor was MBLY furnished with any such valuations or appraisals. MBLY has assumed, without independent investigation, the accuracy of all representations and statements made by management and employees of the Debtors. MBLY has assumed that the financial projections are true and that they were reasonably prepared on bases reflecting the best estimates and good faith judgment of the management of the Company as of the date of their preparation, and management has informed MBLY of all circumstances occurring since such date that could make the financial projections incomplete or misleading. The valuation was delivered by MBLY with the explicit understanding that it is based on standards of assessment, including economic, market, political, legal and other conditions, in existence as of the date hereof and that standards of assessment may change in the future. MBLY disclaims any responsibility for any impact any such change may have on the assessment of the valuation of the Reorganized Company set forth herein.

In preparing its analysis, MBLY, among other things, (i) reviewed certain financial statements of the Company for recent years and interim periods; (ii) reviewed certain internal financial and operating data prepared by the Company; (iii) discussed the current operations and prospects of the business with the management of the Company; (iv) considered the financial forecasts and reviewed the assumptions underlying the financial forecasts prepared by the management of the Company; (v) reviewed publicly available information regarding certain companies engaged in businesses deemed reasonably comparable to the Company; (vi) reviewed certain information regarding merger and acquisition transactions, to the extent publicly available, involving certain companies engaged in business deemed reasonably comparable to that of the Company; (vii) considered certain economic and industry information relevant to the business of the Company; (viii) reviewed various documents relating to the Plan; and (ix) reviewed such other information, performed such other analyses and took into account such other factors as MBLY deemed relevant, necessary or appropriate.

2.    Methodology

MBLY has employed several generally accepted valuation techniques in estimating the reorganization value of Reorganized AET. The three methodologies upon which MBLY primarily relied are: comparable public company analysis, comparable acquisition analysis and discounted cash flow

analysis. These valuation techniques reflect both the market's current view of the Debtors' business plan and operations, as well as longer term focus on the intrinsic value of the cash flow projections in the Debtors' business plan.

(a)    Comparable Public Company Analysis

In a comparable public company analysis, a subject company is valued by comparing it with publicly held companies in reasonably similar lines of business. The comparable public companies are chosen based on, among other attributes, their similarity to the subject company's size, profitability, and market presence. The price that an investor is willing to pay in the public markets for each company's publicly traded securities represents that company's current and future prospects as well as the rate of return required on the investment.

In selecting comparable public companies, MBLY considered factors such as the focus of the comparable companies' businesses as well as such companies' current and projected operating performance relative to that of the Debtors. The analytical work performed includes, among other things, a detailed financial comparison of each company's income, balance sheet and cash flow statement. Numerous financial multiples and ratios were developed to measure each company's valuation and relative performance. Some of the specific analyses entailed comparing the enterprise value (defined as market value of equity plus market value of debt, book value of preferred stock and minority interest minus excess cash) for each of the comparable public companies to their revenue and EBITDA. These multiples were then applied to AET to determine the range of enterprise value and equity value using this methodology.

(b)    Comparable Acquisition Analysis

The comparable acquisition analysis was the second valuation methodology used to determine the reorganization value for Reorganized AET and its consolidated subsidiaries. This approach entails calculating multiples of revenues and EBITDA based upon prices paid (including any debt assumed and equity purchased) in mergers and acquisitions activity for companies similar to AET. These multiples were then applied to AET to determine the implied range of enterprise values using this methodology.

(c)    Discounted Cash Flow ("DCF") Analysis

The third common valuation methodology which was used to determine the reorganization value of Reorganized AET was the discounted cash flow method. The discounted cash flow of an enterprise represents the present value of unleveraged, after-tax cash flows available to all providers of capital using an appropriate set of discount rates. The DCF approach takes into account the projected operating cash flows of the subject company by using company projections as the basis for the financial model. The underlying concept of the DCF approach is that debt-free, after-tax cash flows are estimated for a projection period and a terminal value is estimated to determine the going concern value of the subject company from the end of the projection period forward. These cash flows are then discounted at an appropriate weighted average cost of capital which is determined by referring to, among other things, the average cost of debt and equity for the other participants throughout the industry.

3.    Valuation of Reorganized Company

MBLY advised the Company that for purposes of the valuation expressed above, MBLY assumed that (i) the proposed capitalization of the Company will be as set forth in the Plan; (ii) market, business and general economic conditions will be similar to conditions observed; (iii) the financial and other information furnished to MBLY by the Company and their professionals and the publicly available

information are accurate and complete; and (iv) the Plan is confirmed without material changes. Based upon the analyses detailed above, the assumptions made, matters considered and limits of review also set forth above, MBLY estimated the total reorganization value range of the Company to be between $190 million to $270 million with a midpoint of approximately $230 million as of December 31, 2004. The range of reorganization equity value, which takes into account the total reorganization value range less estimated debt outstanding as of December 31, 2004, was estimated by MBLY to be between $45 million and $125 million, with a midpoint of approximately $85 million as of December 31, 2004. The foregoing reorganization equity value (ascribed as of the date of this Disclosure Statement) reflects, among other factors described herein, current financial and commodity market conditions and the inherent uncertainty as to the achievement of the projections.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE COMPANY AND MBLY. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. ADDITIONALLY, THE POST-REORGANIZATION VALUE ESTIMATED BY MBLY DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE DESCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH MBLY'S VALUATION ANALYSIS. INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW SECURITIES ISSUED PURSUANT TO THE PLAN OF REORGANIZATION.

## IX.    LIQUIDATION ANALYSIS

Pursuant to section 1129(a)(7) of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Article XIII.E. hereof), the Bankruptcy Code requires that each holder of an impaired Claim or impaired Equity Interest either (x) accept the Plan or (y) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Company were liquidated under chapter 7 of the Bankruptcy Code.

The first step in meeting this test is to determine the proceeds that would be generated from the hypothetical liquidation of the Company's assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash and cash equivalents ("Cash") available would be the sum of the proceeds from the disposition of Debtors' assets and the Cash held by Debtors at the time of the commencement of the chapter 7 case. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the termination of Debtors' business and the use of chapter 7 for the purposes of a hypothetical liquidation. Any remaining net Cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

The Company believes that the Holders of Claims and Equity Interests will receive not less than they would receive under a chapter 7 liquidation. The Company, with the assistance of MBLY, prepared a liquidation analysis (the "Liquidation Analysis") on behalf of the Company to assist holders of Claims to reach a determination as to whether to accept or reject the Plan. The Liquidation Analysis is based upon estimated assets and liabilities of Debtors as of September 30, 2004. This Liquidation Analysis estimates the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Company's assets on September 30, 2004.

Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Company or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. The actual amounts of claims could vary significantly from the Company's estimate, depending on the claims asserted during the chapter 7 case. This liquidation analysis does not include liabilities that may arise as a result of litigation or other potential claims or recoveries, including from avoidance actions. No value was assigned to additional proceeds that might result from the sale of certain items with intangible value. Therefore, the actual liquidation value of the Company could vary materially from the estimates provided herein.

Additional information concerning the assumptions underlying the liquidation analysis is as follows:

1.    General

This analysis (the "Liquidation Analysis") presents management's estimate of the net proceeds that would be realized if the Company's assets were liquidated under the provisions of chapter 7 of the Bankruptcy Code.

The Liquidation Analysis assumes a liquidation period of twelve months.

The Liquidation Analysis is based on the Company's estimated balance sheet as of September 30, 2004. Management of the Company does not believe that further projected information will vary significantly. However, any difference in asset values between the values used herein and actual

values on the date a liquidation process would begin would result in a variance to the estimated recovery amounts.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Company and its management, and upon assumptions with respect to liquidation decisions that could be subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized in the event of such liquidation, and actual results could vary materially from those shown here.

This analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the AICPA.

2.    Cash

The cash balance reflects actual cash held in the Company's bank accounts as of September 30, 2004.

3.    Trade Accounts Receivable

Estimated proceeds realized from accounts receivable under a liquidation are based on management's estimate of collection. The methodology for determining recovery excludes certain accounts receivable based upon their aging versus due date and/or invoice date. Foreign accounts receivable are also limited to an eligible amount of no more than $5 million. Eligible accounts receivables are further discounted by 15%.

4.    Inventories

Estimated proceeds from the sale of inventories on hand as of the liquidation date are based on management's estimate of liquidating such inventories. The methodology for determining recovery excludes classes of inventory that have minimal value in liquidation, are considered to be potentially obsolete or are excess inventory based on age. Inventory is further discounted to 85% of the estimated net.

5.    Prepaid and Other Current Assets

Prepaid and other current assets consist primarily of prepaid insurance, prepaid rents and utilities, deposits and advances and other miscellaneous current assets. Management has reviewed the individual components of the Prepaid and Other Current Assets and has estimated a liquidation recovery of approximately $0.97 million.

6.    Property, Plant and Equipment, net ("PP&E")

PP&E includes owned assets such as land, buildings, automobiles, machinery and equipment, furniture and fixtures, leasehold improvements and construction in process. For all assets, liquidation values were determined by third-party appraisals of the Company's property, plant and equipment. These appraisals were performed in August 2003 as part of the refinancing of the Company's revolving debt. These appraised values have been further discounted by 20% to compensate for the age of the appraisals as well as the reduced demand for oriented polypropylene manufacturing equipment. Additional amounts were included for additions to property, plant and equipment subsequent to the date

of the third-party appraisals. There is no recovery for leasehold improvements since such improvements will revert to the lessor upon discontinuation of the leases.

      7.      Intangibles

Due to the indeterminable value of patents and trademarks, no values have been assigned to patents and trademarks.

      8.      Other Assets

Other assets primarily consist of deposits with vendors and sales tax receivables, all of which are considered fully recoverable.

      9.      Windown Costs

It is assumed that the liquidation process would occur over a twelve-month period. Winddown costs include nearly full operating expenses, overhead and other corporate costs during the first three months, with declining amounts of costs required in the following months.

      10.      Retention

During the liquidation period, it is assumed that retention payments will be made to certain members of management and other employees of the Company in order to retain their services. Management believes that these retention payments are essential in order to maintain an appropriate workforce that will be required to assist the trustee in liquidating the estate and will ultimately result in a greater yield from the liquidation of the assets.

      11.      Other Professional Fees

During the liquidation period, it will be necessary for the Debtors' estate to engage the services of various professionals to assist in the estate's liquidation including, but not necessarily limited to, counsel, accountants, financial advisors, investment bankers and brokers.

      12.      Chapter 7 Trustee Fees

Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326 of the Bankruptcy Code. For purposes of this analysis, trustee fees in an amount of $6.445 million is based upon a reasonable assumption of a percentage of net proceeds as is customary in comparable cases.

      13.      Secured Creditors

Estimated amounts to be distributed to secured creditors reflect the balances due, including accrued interest, on the senior credit facility as of the hypothetical liquidation date.

      14.      Unsecured Creditors

Unsecured creditors include trade creditors and holders of the senior notes. Based upon the estimated recoveries under this hypothetical liquidation scenario, $56.523 million of proceeds would be available to satisfy allowed unsecured claims.

APPLIED EXTRUSION TECHNOLOGIES, INC.
LIQUIDATION ANALYSIS
(USD in 000's)

| | Note References | Estimated Book Value as of September 30, 2004 (unaudited) | Average Estimated Recovery Rate | Estimated Liquidation Value |
|---|---|---|---|---|
| Cash and cash equivalents | 2 | $ 1,332 | 100% | $ 1,332 |
| Trade accounts receivable, net | 3 | 45,500 | 61% | 27,755 |
| Inventories, net | 4 | 59,474 | 49% | 29,142 |
| Prepaid expenses and other current assets | 5 | 2,807 | 34% | 966 |
| Property, plant and equipment, net | 6 | 280,038 | 43% | 121,485 |
| Intangibles and deferred charges,net | 7 | 10,080 | 0% | - |
| Other assets | 8 | 4,610 | 100% | 4,610 |
| Total assets | | $ 403,841 | 53% | $ 185,291 |
| Net estimated proceeds available for distribution | | | | $ 185,291 |
| Less: Chapter 7 Administrative Claims | | | | |
| Winddown costs | 9 | $ 19,766 | 100% | $ 19,766 |
| Key employee retention and severance | 10 | 2,500 | 100% | 2,500 |
| Other professional fees | 11 | 10,000 | 100% | 10,000 |
| Chapter 7 trustee fees | 12 | 6,445 | 100% | 6,445 |
| Total Chapter 7 administrative claims | | $ 38,711 | 100% | $ 38,711 |
| Net estimated proceeds available after Chapter 7 administrative claims | | | | $ 146,580 |
| Less: Secured Claims | 13 | | | |
| GE Capital revolving credit line | | $ 46,307 | 100% | $ 46,307 |
| GE Capital Term Loan | | 43,750 | 100% | 43,750 |
| Total secured claims | | $ 90,057 | 100% | $ 90,057 |
| Net estimated proceeds available after Secured Claims | | | | $ 56,523 |
| Less: General unsecured claims | 14 | | | |
| 10 3/4% Senior notes due 2011 | | $ 297,437 | 18% | $ 54,773 |
| Other unsecured creditors | | 9,502 | 18% | 1,750 |
| Total general unsecured claims | | $ 306,939 | 18% | $ 56,523 |
| Net estimated proceeds available for distribution to Subordinated Claims and AET Common Stock | | | 0% | - |

## X.    RISK FACTORS

### A.    Certain Bankruptcy Law Considerations

#### 1.    Failure to Satisfy Vote Requirement

If we obtain the requisite votes from the Holders of Allowed Large Note Claims to accept the Plan in accordance with the requirements of the Bankruptcy Code, we intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received from the Holders of Allowed Large Note Claims, we may nevertheless file a petition for relief under chapter 11 of the Bankruptcy Code. In such event, we may seek to accomplish an alternative restructuring of our capitalization and its obligations to creditors and equity holders. There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to Noteholders, other creditors and equity holders as those proposed in the Plan.

#### 2.    Non-Confirmation or Delay of Confirmation of the Plan

It is possible that our Chapter 11 Cases could evolve into lengthy and contested cases, the results of which cannot be predicted.

Even if the requisite acceptances are received under the Bankruptcy Code and the Plan is uncontested in the Chapter 11 Cases, it is estimated that the Plan would take at least 6 to 8 weeks to confirm. Moreover, regardless of whether all classes of claimants accept or are presumed to have accepted the Plan, the Plan still may not be confirmed by the Bankruptcy Court, which sits as a court of equity and may exercise substantial discretion. For example, a non-accepting creditor of the Company might challenge the terms of the Plan as not being in compliance with the Bankruptcy Code and the Bankruptcy Court might rule in favor of the non-accepting creditor's objections. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan likely will not be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting impaired classes of claims and interests be not less than the value of distributions such impaired classes of claims and interests would receive if we were liquidated under chapter 7 of the Bankruptcy Code. Although we believe that the Plan will meet such tests, we cannot assure you that the Bankruptcy Court would reach the same conclusion. Additionally, even if the required acceptances of each class are received, the Bankruptcy Court may find that holders of claims have not validly accepted the Plan if the Bankruptcy Court finds that our solicitation of acceptances for the Plan did not comply with the requirements of section 1126(b) of the Bankruptcy Code. In such event, we may seek to resolicit acceptances. Nonetheless, confirmation of the Plan could be delayed and possibly jeopardized. Additionally, we cannot assure you that the Plan will not require significant modifications for confirmation, or that such modifications would not require a resolicitation of acceptances.

#### 3.    Non-Consensual Confirmation

We have been informed by Ingalls & Snyder that it intends to recommend to the beneficial owners of its Notes to vote to reject the Plan because Ingalls & Snyder does not support the non-reporting, private company status of Reorganized AET. We believe that the beneficial owners of Ingalls & Snyder's Notes are Holders of Allowed Small Note Claims. Counsel to Ingalls & Snyder has contended that the Plan violates sections 1122 and 1129, among others, of the Bankrupty Code and that the Plan is therefore unconfirmable. Accordingly, the Company expects that Ingalls & Snyder would object to Confirmation of the Plan. In the event a Class of Claims, such as the Small Note Claims, does

not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Company's request if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such non-accepting impaired class of Claims. Although we believe that the Plan will meet such tests, we cannot assure you that the Bankruptcy Court would reach the same conclusion. Under section 1129(b)(2)(C) of the Bankruptcy Code, the condition that the Plan be "fair and equitable" with respect to a class of interests includes the requirement that the holder of any Claims that is junior to the Claims of such class will not receive or retain under the Plan on account of such junior interest any property. If however, the Bankrupcty Court does not confirm the Plan, the Company may pursue one of the following alternatives: (i) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code and (iii) dismissal of the Chapter 11 Cases. See Article XIII.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

4.     Risk of Non-Occurrence of the Effective Date

Although the Company believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

5.     Effect of the Chapter 11 Cases on Relations with Trade Vendors, Customers and our Employees

Following our announcement on June 30, 2004 that we are engaging in discussions with the Committee to recapitalize the Senior Notes, certain of our vendors constricted their trade terms with us. In the period since, all of our key vendors have continued to supply the Company with materials and or services. It is expected that the vendors will expand their trade terms to pre-announcement levels upon confirmation of the recapitalization plan. Whilst our trade terms are not as favorable in this period as the period pending the announcement, taken as a whole, the constriction of terms has not had a material effect on our operations.

Customer responses to the Company's announcement of the recapitalization plan have been generally favorable with respect to the eventual strengthened financial position, which the plan provides. However, certain customers have expressed concerns with respect to the Company's ability to ensure continuity of supply and to develop and supply new higher value film products. While the Company believes it has addressed these concerns there can be no assurance that certain customers, or end users will not seek alternative sources of supply.

The Company implemented an employee communication program immediately following the announcement of the Plan to recapitalize the Senior Notes. This communication program has been effective in addressing employee questions and concerns and, to date the Company has not realized a material change in employee turnover.

In addition, because of the traditional stigma associated with any bankruptcy, regardless of whether it may improve our financial condition, our commencement of the Chapter 11 Cases may adversely affect our ability to retain and attract customers and/or highly-skilled personnel, which could harm our business. Although we intend to seek authority from the Bankruptcy Court to pay, among other things, all prepetition wages, salaries, commissions and employee benefits, we cannot assure you that our highly-skilled personnel will continue their employment with us, and their failure to do so could harm our business.

B.     Factors Affecting the Value of the Securities to Be Issued Under the Plan of
       Reorganization

       1.     Capital Requirements

The business of the Reorganized Debtors is expected to have substantial capital expenditure
needs. Although (i) Reorganized AET intends to enter into the Exit Facility, which will provide the
Reorganized Debtors with approximately $30 million of liquidity and (ii) the Plan significantly decreases
Reorganized AET's debt obligations, Reorganized AET's ability to gain access to additional capital, if
needed, cannot be assured, particularly in view of competitive factors and industry conditions.

       2.     Variances from Projections

The fundamental premise of the Plan is the deleveraging of the Company and the implementation
and realization of the Company's business plan, as reflected in the Projections contained in this
Solicitation and Disclosure Statement. The Projections reflect numerous assumptions concerning the
anticipated future performance of the Reorganized Debtors and its subsidiaries, some of which may not
materialize. Such assumptions include, among other items, assumptions concerning the general economy,
the ability to make necessary capital expenditures, the ability to establish market strength, consumer
purchasing trends and preferences, and the ability to stabilize and grow the Company's sales base and
control future operating expenses. The Company believes that the assumptions underlying the
Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the
preparation of the Projections may affect the actual financial results of the Reorganized Debtors.
Therefore, the actual results achieved throughout the Projection Period necessarily will vary from the
projected results, and such variations may be material and adverse. Accordingly, holders of Claims and
Interests and other interested parties are cautioned not to place undue reliance on the Projections.

Moreover, the estimated percentage recovery by Holders of the Senior Notes is based upon
estimated values of the New Notes and New Common Stock. Because the market and economic
conditions upon which such values are based are beyond the control of AET, the actual results achieved
necessarily will vary from the estimate. Such variations may be material and adverse.

       3.     Disruption of Operations

The commencement and pendency of the Chapter 11 Cases could adversely affect AET's
relationships with its customers and suppliers, as well as AET's ability to retain or attract high-quality
employees. In such event, weakened operating results may occur that could give rise to variances from
AET's projections.

       4.     Lack of Trading Market and Restrictions on Transfer

The New Notes and the New Common Stock are new issues of securities with no established
trading market or prior trading history. There can be no assurance regarding the future development of a
market for the New Notes and the New Common Stock, the ability of holders thereof to sell their New
Notes or New Common Stock or the price for which such holders may be able to sell their New Notes and
New Common Stock. If a market were to develop, the New Notes and the New Common Stock could
trade at prices lower than their initial values. The trading prices of such securities will depend on many
factors, including factors beyond the Company's control. Furthermore, the liquidity of, and trading
market for, the New Notes and the New Common Stock may be adversely affected by price declines and
volatility in the market for similar securities, as well as by any changes in the Company's financial
condition or results of operations.

The New Notes and the New Common Stock will be subject to substantial restrictions on transfer contained in the Amended AET Certificate of Incorporation, the Amended AET By-Laws, the New Note Indenture and the Stockholders' Agreement. Consequently, any holder of New Notes or New Common Stock may have to bear the economic risk of its investment for an indefinite period of time.

Reorganized AET will not be subject to the reporting requirements under the Exchange Act, and does not intend to register any such securities under the Securities Act or list shares of the New Common Stock or New Notes on any national securities exchange or on the Nasdaq National Market. Holders of these securities will not receive reports or financial statements from Reorganized AET except to the extent required by the Stockholders' Agreement and the New Note Indenture.

> 5.    Dividend Policies

AET does not anticipate that any dividends will be paid on the New Common Stock in the foreseeable future. In addition, the covenants in the Exit Facility and the New Note Indenture may limit the ability of Reorganized AET to pay dividends. Certain institutional investors may only invest in dividend-paying equity securities or may operate under other restrictions that may prohibit their ability to invest in the New Common Stock.

> 6.    Interest on Notes May Be Deferred

In the event that the Company does not achieve certain financial thresholds, the New Note Indenture will allow the Company to defer interest payments in full in lieu of making such interest payments on the New Notes provided, however, that if the Company elects to defer any interest payment on the New Notes in accordance with the New Note Indenture, then the amount of interest so deferred, together with all prior amounts of interest that have previously been deferred shall constitute the "Cumulative Deferred Amount". Interest on the Cumulative Deferred Amount will accrue at the rate of 12.0% per annum, and (unless the Company defers the payment of interest as described above, in which event such interest will be added to the Cumulative Deferred Amount) such interest on the Cumulative Deferred Amount will be payable on each interest payment date and will be equal in right of payment to all interest due and payable on the New Notes on such interest payment date.

> C.    Risks Relating to the Company

> 1.    Leverage and Debt Service

After giving effect to the reorganization contemplated under the Plan, the Company will have a manageable amount of debt obligations. As of December 31, 2004, on a pro forma basis after giving effect to the Reorganization, the Company would have had an aggregate net indebtedness of $145 million including amounts funded under the Exit Facility and the New Notes.

The Company's capitalization could have important consequences to the holders of the New Common Stock, including: (i) the Company's ability to obtain additional financing for working capital, capital expenditures, acquisitions or general corporate purposes may be impaired in the future and (ii) a substantial portion of the Company's cash flow from operations must be dedicated to the payment of principal and interest on its indebtedness, thereby reducing the funds available to the Company for other purposes.

2.      Existing Credit Agreement and Liquidity

Due to the impact of adverse economic conditions facing the Company's industry, the Existing Credit Agreement was amended on June 30, 2004, to among other things, restate the Company's minimum EBITDA covenant for the third fiscal quarter 2004 from approximately $35,000,000 to $30,000,000. The Existing Credit Agreement was subsequently amended on October 1, 2004, to among other things, restate the Company's minimum EBITDA covenant for the fourth fiscal quarter 2004 from approximately $43,000,000 to $28,500,000. Additionally, the Existing Credit Agreement has been amended to the effect that the lenders waived any event of default with respect to non-payment of interest on the Notes through December 15, 2004, which date may be extended by the lenders. There can be no assurance that the lenders will extend this date.

The Company's liquidity generally depends on cash provided by operating activities and the Existing Credit Agreement. The ability of the Company to continue as a going concern depends, among other things, on (i) the Company's ability to maintain adequate cash on hand; (ii) the Company's ability to generate cash from operations; (iii) the duration and outcome of the Solicitation; and (iv) the Company's ability to achieve profitability following the reorganization process. The Company, in conjunction with its advisors, is working to design and implement strategies to provide adequate liquidity for the Company. However, there can be no assurance as to the success of such efforts.

3.      Competition

The markets in which we operate are highly competitive. Competition in the OPP films market is based primarily on customer relationships, product performance characteristics, such as machinability, quality, reliability and price. Our ability to be an effective competitor will depend on our ability to compete on the basis of these characteristics. It will also depend on our success in developing new and enhanced products for our customers. Although we have broad product lines and are continually developing new and enhanced products, our current customers may not continue to purchase our products, we may not be successful in avoiding product obsolescence, and we may not be able to compete effectively with these companies.

4.      Rise in Costs of Raw Materials

AET is heavily dependent on petroleum and associated products such as propylene and polypropylene resin, our primary raw materials. The costs of such materials escalated sharply in fiscal year 2004, an unforeseen development that affected our economic performance. If the costs of these raw materials continue to rise, we may not be able to absorb the cost increases or pass along a portion of the increase to our customers, further negatively impacting our financial condition.

5.      Industry Overcapacity

Production capacity in the OPP films industry increased significantly in the late 1990's. This decline in capacity utilization led to sharp declines in selling prices of OPP films. Although capacity utilization levels have improved since 1999, continued depressed growth in demand has prevented any sustained, significant price increases. In the past eighteen months capacity in North America was increased another 9 percent, with one production line starting up in the United States in mid 2003 and two production lines recently coming on line in Mexico. Since demand has been relatively flat over the past four years, the Company believes the utilization rate is still approximately 90 percent. At this level the industry is able to pass on some, but not all, of the raw material price increases. We believe that capacity utilization in the mid-90 percent range is required to achieve reasonable levels of price realization.

Profitability may be negatively affected by increased raw material costs should capacity utilization remain at the current level, or worsen.

6.    New Product Development

AET is developing new high-value products, some of which have recently been introduced commercially into the market, others of which are in various stages of development. It is anticipated that theses new products will contribute significantly to the profitability of AET in two to three years; however there can be no assurance that the balance of these products will be successfully commercialized and if commercialized, there is no assurance that competing products of greater value will be introduced into the marketplace.

7.    Other Risks Relating to AET

For risks related to our company in general, you should read the "Risk Factors" section in AET's annual report on Form 10-K for the fiscal year ended September 30, 2003, as filed with the SEC. This filing is incorporated by reference into this Solicitation and Disclosure Statement and is deemed to be a part of this Solicitation and Disclosure Statement. See "Documents Incorporated by Reference."

D.    Risks of Voluntary Bankruptcy Filing

1.    General

The filing of a bankruptcy petition by the Company and the publicity attendant thereto may adversely affect the business of the Company. The Company believes that any such adverse effects may worsen during the pendency of a protracted bankruptcy case if the Plan is not confirmed as expected.

2.    Failure to File Chapter 11 Petition

If the requisite votes for acceptance of the Plan are obtained from the Holders of Large Note Claims, the Company intends to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly thereafter as is practicable, confirmation by the Bankruptcy Court of the Plan. In the event that the requisite accepting votes are not obtained from the Holders of Large Note Claims, or the Company otherwise determines not to file a chapter 11 petition, AET may with the consent of the Restructuring Agreement Noteholders seek to accomplish an alternative restructuring of their obligations and obtain consent to any such restructuring plan by means of another out-of-court solicitation for acceptance of a Company plan of reorganization, or otherwise. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable as those proposed in the Plan.

3.    Risk of Failure to Obtain Authority to Pay Prepetition Unsecured Claims in the Ordinary Course of Business

Under the Plan, General Unsecured Claims are unimpaired. In order to effectuate this treatment, the Debtors intend to seek authority from the Bankruptcy Court pursuant to its "first day orders" to continue to satisfy their obligations to unsecured creditors in the ordinary course of business, including obligations which arise prior to the filing of the Debtors' Chapter 11 Cases. If the Debtors are unable to obtain such authority, the Plan may have to be amended to provide different treatment for the Holders of General Unsecured Claims. See Article XIII.F. herein.

4.    Methods of Solicitation

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code. This Solicitation and Disclosure Statement is being presented to all Holders of Claims in impaired Classes in order to satisfy the requirements of section 1126(b) of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule or regulation, and such acceptance or rejection was solicited in accordance with section 1125(b) of the Bankruptcy Code.

The Debtors believe that their solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that their solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If such approval is not obtained, then the Debtors may have to solicit votes to accept or reject the Plan from one or more Classes of Claims or Equity Interests that were not previously solicited. There is also a risk that confirmation of the Plan would be denied by the Bankruptcy Court.

The Debtors believe that the use of the Solicitation and Disclosure Statement and of Ballots and Master Ballots for the purpose of obtaining acceptances of the Plan and the Solicitation is in compliance with the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will decide that the Solicitation meets the requirements of section 1126(b) of the Bankruptcy Code. If the Bankruptcy Court determines that the Solicitation does not comply with the requirements of section 1126(b) of the Bankruptcy Code, the Company may seek to resolicit acceptances, and, in such event, Confirmation of the Plan could be delayed and possibly jeopardized.

5.    Classification and Treatment of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Equity Interests in, the Company. The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. The Debtors believe that all Claims and Equity Interests have been appropriately classified in the Plan. The Debtors have elected to separately classify General Unsecured Claims because this Class is composed largely of trade creditors. Many of these creditors are key suppliers of products and services used by the Debtors. Accordingly, any impairment of these Claims could be detrimental to the ability of the Debtors to obtain essential trade credit and could substantially impair the ability of the Debtors to do business with trade creditors whose goods and services are essential for the Debtors. In addition, the

105

Debtors have separately classified the Holders of Allowed Small Note Claims because of the potentially large number of Holders of Senior Note Claims. In order to be responsive to the concerns of Ingalls & Snyder and to achieve and maintain the non-reporting status of Reorganized AET on and after the Effective Date, the Debtors have chosen to distribute the Small Noteholder Allocation to the Holders of Small Note Claims. Counsel to Ingalls & Snyder has contended that the Plan violates sections 1122 and 1129 among others, of the Bankruptcy Code and that the Plan is therefore unconfirmable. Accordingly, the Company expects that Ingalls & Snyder would object to Confirmation of the Plan. The Debtors believe that there is a valid business purpose for the difference in treatment of Large Note Claims and Small Note Claims, that the treatment of the Holders of Small Note Claims is not less favorable than the treatment of Holders of Large Note Claims and that the Plan does not unfairly discriminate against the Holders of the Small Note Claims. However, an objection to the Classification Claims would be subject to a final determination of the issue by the Bankruptcy Court before the Plan could be confirmed.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors currently anticipate that they would seek (i) to modify the Plan to provide for whatever reasonable classification might be required for Confirmation, with the consent of the Committee, and (ii) to use the acceptances received from any creditor pursuant to this Solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this Solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Company believes that under the Federal Rules of Bankruptcy Procedure, the Company would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the claim of any creditor or equity security holder. See Article II.L.2. "THE PLAN—Other Provisions—Modification of the Plan; Revocation or Withdrawal of the Plan."

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. The Debtors believe that they have complied with the requirement of equal treatment, in particular in ensuring that the Small Noteholder Allocation is equivalent in value to the New Securities Allocation. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

6.    Nonacceptance of the Plan—Confirmation by "Cramdown"

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request pursuant to the "cramdown" provisions of the Bankruptcy Code if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not

discriminate unfairly" and is "fair and equitable" with respect to such impaired Class. See "RISK FACTORS— Certain Bankruptcy Law Considerations - Non-Consensual Confirmation" and Article XIII.D. "CONFIRMATION—Cramdown."

The Debtors also reserve the right, with the consent of the Committee, to modify the terms of the Plan as necessary for the Confirmation of the Plan without the acceptance of other impaired Classes of Claims. Such modification could result in a less favorable treatment to any nonaccepting Class or Classes, as well as any Classes junior to such nonaccepting Classes, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution to the affected Class of property of less value than that currently provided in the Plan or, in certain cases, no distribution of property under the Plan, as modified. Any such modification may require resolicitation of one or more impaired Classes of Claims and could result in a delay of the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated. See Article II.L.2. "THE PLAN—Other Provisions—Modification of the Plan; Revocation or Withdrawal of the Plan" and Article X.A.3. "RISK FACTORS— Certain Bankruptcy Law Considerations - Non-Consensual Confirmation." However, except as described above, the Debtors may choose not to seek Confirmation of the Plan in the event one or more Classes of Claims do not accept the Plan, but may choose instead to pursue an alternative means to restructure the Debtors.

7.    Certain Risks of Non-Confirmation

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A nonaccepting creditor of the Debtors might challenge the adequacy of the disclosure, the solicitation procedures and results, or the terms of the Plan as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court were to determine that the disclosure and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met, including that the terms of the Plan are fair and equitable to nonaccepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any nonaccepting Classes and that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to nonaccepting impaired Classes of Claims and Equity Interests will not be less than the value of distributions such impaired Classes of Claims and Equity Interests would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code. See Article XIII.E.1. "CONFIRMATION—Plan Meets Requirements for Confirmation—Best Interests of Creditors—Liquidation Analysis." While there can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a liquidation or the need for further financial reorganization and that nonaccepting Holders of Claims and Equity Interests in impaired Classes will receive distributions at least as great as would be received following a liquidation pursuant to chapter 7 of the Bankruptcy Code. The Debtors believe that Holders of Equity Interests would receive no distribution under a liquidation pursuant to either chapter 7 or chapter 11. See Article XIII.E. "CONFIRMATION— Plan Meets Requirements for Confirmation."

The Plan provides for releases by the Debtors of the D& O Releases, the Indenture Trustee, each member of the Committee, each Plan Funder, each Restructuring Agreement Noteholder, the DIP Agent and others. The Plan also provides for releases of certain parties by and of each Holder of Claims that has voted to accept the Plan, as well as exculpation provisions, indemnifications related thereto and injunction provisions. See Article II.K. "THE PLAN – Legal Effects of Confirmation of the Plan." While the Debtors believe that these provisions in the Plan are permissible under the Bankruptcy Code, arguments

exist that certain case law would permit a contrary conclusion which, if accepted by the Bankruptcy Court, may result in the Plan not being confirmed.

The confirmation and consummation of the Plan are also subject to certain other conditions. See Article II.J. "THE PLAN—Conditions to Confirmation and the Effective Date of the Plan." No assurance can be given that these conditions will be satisfied or if not satisfied that the Debtors could or would waive such conditions.

If the Plan, or a plan determined not to require re-solicitation of any Classes by the Bankruptcy Court, were not to be confirmed in a timely manner, it is unclear whether the restructuring could be implemented and what Holders of Claims and Equity Interests would ultimately receive with respect to their Claims and Equity Interests. If an alternative reorganization could not be agreed to in a timely manner, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that Holders of Claims and Equity Interests would receive less than they would have received pursuant to the Plan. See Article XIII.F.1. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan—Liquidation Under Chapter 7 or Chapter 11."

        8.      Alternatives to Confirmation and Consummation of the Plan

If the Debtors commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code and (iii) dismissal of the Chapter 11 Cases. The Debtors believe the Plan is significantly more attractive than these alternatives because it could, among other things, minimize disputes during such proceeding concerning the reorganization of the Debtors, significantly shorten the time required to accomplish the reorganization, reduce the expenses of a case under chapter 11 of the Bankruptcy Code, minimize the disruption to the Debtors' business that would result from a protracted and contested bankruptcy case and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 of the Bankruptcy Code. One of the conditions to consummation of the Plan is the availability to the Debtors of the Exit Facility in an amount not less than $125 million. If the Debtors are unable to obtain such a credit facility, the Debtors would probably not have sufficient financing for their operations and would be unable to consummate the Plan. See Article XIII.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

## XI.    CERTAIN OTHER LEGAL CONSIDERATIONS

### A.    Section 3(a)(9) of the Securities Act

AET is relying on section 3(a)(9) of the Securities Act to exempt from the registration requirements of the Securities Act the offer to Noteholders of New Notes and New Common Stock which may be deemed to be made by AET pursuant to the solicitation of votes on the Plan. Section 3(a)(9) provides an exemption from the registration requirements of the Securities Act for any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange.

AET has no contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchanges of Notes or Common Stock. AET has received assurances that no person will provide any information to Noteholders relating to the Solicitation or the Plan other than to refer the Noteholders to the information contained in this Solicitation and Disclosure Statement and in the Ballots delivered with it. In addition, none of the financial advisors to AET or the Committee, the Voting Agent or any the trustee for the Notes or registrar and transfer agent for the Common Stock, and no broker, dealer, salesperson, agent or any other person, has been engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the solicitation, the value and terms of the New Notes and New Common Stock or the Plan (and the transactions contemplated thereby).

### B.    Section 1145 of the Bankruptcy Code

#### 1.    Initial Offer and Sale of Securities

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization, and be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claims against or interests in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property. The Debtors believe that the offer and sale of the New Common Stock and New Notes under the Plan satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

#### 2.    Subsequent Transfers of Securities

All New Common Stock and New Notes issued under the Plan and covered by section 1145(a)(1) of the Bankruptcy Code may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities, as such term is defined in Section 1145(b)(1) of the Bankruptcy Code. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is:  (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of

securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. "Control" (as such item is defined in Rule 405 of the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise. To the extent that Persons who receive New Common Stock and New Notes pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. However, for any "affiliate" of an issuer deemed to be an "underwriter", Rule 144 under the Securities Act provides an exemption from registration under the Securities Act for certain public resales of unrestricted securities by "affiliates" of the issuer of such securities. Specifically, Rule 144 allows a holder of unrestricted securities that is an "affiliate" of the "issuer" of such securities to sell, without registration, within any three month period a number of shares of such unrestricted securities that does not exceed the greater of 1% of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer. In addition, any person who is an "underwriter" but not an "issuer" with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or New Notes to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving New Common Stock or New Notes under the Plan would be an "underwriter" with respect to such New Common Stock or New Notes.

**Given the complex and subjective nature of the question of whether a particular holder may be an "underwriter", the Debtors make no representation concerning the right of any Person to trade in the New Common Stock or New Notes. The Debtors recommend that potential recipients of the New Common Stock or New Notes consult their own counsel concerning whether they may freely trade New Common Stock or New Notes without compliance with the Securities Act, the Securities Exchange Act or similar state and federal laws.**

3. Subsequent Transfers Under State Law

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New Common Stock and the New Notes.

**AET is not making any representation to any offeree of the securities issued under the Plan regarding the legality of any investment therein by such offeree under appropriate legal investment or similar laws or regulations.**

## XII.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The following is a discussion of certain significant federal income tax considerations of the Plan under the Internal Revenue Code of 1986, as amended (the "Code"). This general description does not discuss all aspects of federal income taxation that may be relevant to a Holder of Allowed Small Note Claims ("Small Noteholder") or a Holder of Allowed Large Note Claims ("Large Noteholder")(collectively "Noteholders") in light of such person's personal investment circumstances, or to certain types of Noteholders subject to special treatment under the federal income tax laws (for example, life insurance companies, banks, dealers in securities, tax-exempt organizations, foreign corporations and individuals who are not citizens or residents of the United States) and does not discuss any aspect of state, local or foreign taxation. This discussion is limited to Noteholders who hold such interests as "capital assets" and Large Noteholders who will hold Effective Date New Common Stock and New Notes as capital assets (generally property held for investment) within the meaning of section 1221 of the Code. This discussion is based upon laws, regulations, rulings and decisions now in effect and upon proposed regulations all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, substantial uncertainties, resulting from the lack of a definitive judicial or administrative authority and interpretation, apply to various tax aspects of the transactions discussed herein. EACH NOTEHOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE TAX CONSEQUENCES PARTICULAR TO IT FROM THE IMPLEMENTATION OF THE PLAN.

A Holder of an Effective Date Unidentified Claim that receives solely New Notes and Effective Date New Common Stock in exchange for Senior Notes will be subject to the treatment described in Section XII.B below. A Holder of an Effective Date Unidentified Claim that receives cash or a combination of cash, New Notes and Effective Date New Common Stock in exchange for Senior Notes will be subject to the treatment described in Section XII.C below.

A.    Tax Consequences to the Company

The Company expects to report a net operating loss ("NOL") carryforward for federal income tax purposes of approximately $163 million for its taxable year ended September 30, 2003. The Company also anticipates incurring additional NOLs for the taxable year ending September 30, 2004. A portion of such NOL carryforwards is subject to prior limitations, and the amount of such NOL carryforwards and other losses remain subject to adjustment by the IRS. Moreover, as discussed below, such NOL carryforwards and certain other tax attributes of the Company may be reduced and/or subjected to limitation upon the implementation of the Plan.

1.    Cancellation of Debt Income

As a result of the anticipated exchange of the Senior Notes for Effective Date New Common Stock, New Notes and cash pursuant to the Plan, the amount of the Company's aggregate outstanding indebtedness will be reduced. In general, for federal income tax purposes, a debtor will realize cancellation of debt ("COD") income when a creditor accepts less than full payment in satisfaction of its debt. Under certain provisions of section 108 of the Code, if a debtor corporation transfers stock to a creditor in satisfaction of its indebtedness, such corporation shall be treated as having satisfied the indebtedness with an amount of money equal to the fair market value of the stock. Furthermore, when a corporation uses one debt instrument to retire another, it is treated as having satisfied its prior indebtedness for an amount equal to the "issue price" of the new debt instrument as determined under the OID rules (see below). Absent an exception, the amount of COD income realized must be included in taxable income. Section 108 of the Code provides in part that gross income does not include COD income if the discharge occurs in a title 11 case. Instead, the taxpayer applies the COD income that

would otherwise be included in gross income to reduce the following tax attributes in the following order: net operating losses or net operating loss carryovers, carryovers of the general business credit, carryovers of the minimum tax credit, net capital losses or capital loss carryovers, basis of the taxpayer's depreciable and nondepreciable property, passive activity loss and credit carryovers and carryovers of foreign tax credit. The taxpayer may elect to first reduce the basis of depreciable property.

The Company expects that it will realize significant COD income upon the exchange of the Senior Notes for New Notes, Effective Date New Common Stock and cash pursuant to the Plan. Based on the estimated reorganization value of the Company, the amount of COD income is estimated to be approximately $140 million. Because the realization of COD income will occur in a title 11 case, the Company will not recognize such COD income, but will instead reduce tax attributes after the end of the tax year in which the COD income is recognized. The Company expects to reduce its NOLs, rather than electing to first reduce the basis of some or all of its depreciable property.

2.    High Yield Discount Obligations – Limitation on Interest Deductions

Under section 163 of the Code, a corporation that issues a "high yield discount obligation" will be limited in its ability to take a deduction for interest attributable to original issue discount ("OID"). A "high yield discount obligation" is a debt instrument which has a term of more than 5 years and a yield 5 points or more in excess of the applicable federal rate ("AFR") in effect when the debt instrument was issued, and having "significant original issue discount". A debt instrument has "significant original issue discount" if for periods before the close of any accrual period ending after the date 5 years after the date of issue, the aggregate interest and OID accrued on the debt instrument exceeds the aggregate amount of interest and OID required to be paid on the debt instrument by more than the product of the issue price and the yield to maturity of the debt instrument. If the yield on the debt instrument does not exceed the AFR by more than 6 percentage points the issuer will be denied a deduction for the original issue discount on the debt instrument until the interest is paid. If the yield on the debt instrument does exceed the AFR by more than 6 percentage points a portion of the total return on the debt instrument is not deductible at all by the issuer and is treated when accrued as a distribution with respect to the issuer's common stock which may be treated as a dividend eligible for the dividends received deduction for corporate holders of the debt instrument.

The Company may be subject to the rules governing high yield discount obligations, because the New Notes will have a term of greater than 5 years, and may have a yield of greater than 6 percentage points over the AFR, and may have significant original issue discount depending on whether it makes interest payments in cash or elects to defer the interest payments.

3.    Section 382 Limitation

Under section 382 of the Code, if a loss corporation undergoes an ownership change, the amount of its pre-change losses that may be utilized to offset future taxable income generally will be subject to an "annual limitation." Such limitation may also apply to subsequently recognized "built-in" losses, i.e., losses economically accrued but unrecognized as of the date of the ownership change. In general, the annual limitation for a corporation that undergoes an ownership change pursuant to a plan of reorganization in a title 11 case would be equal to the product of (i) the value of the loss corporation's outstanding stock immediately after the ownership change (with certain adjustments) and (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (which is, for example, 4.64% for October 2004). Any unused portion of the annual limitation would be available in subsequent years. However, if the loss corporation does not continue its historic business or use a

significant portion of its business assets in a new business for two years after the ownership change, the annual limitation would be zero.

In general, an ownership change occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect 5% shareholders (as specially defined for purposes of Section 382 of the Code) has increased by more than fifty (50) percentage points over the lowest percentage of that value owned by such 5% shareholders at any time during a three-year testing period. It is anticipated that the issuance of Effective Date New Common Stock pursuant to the Plan will constitute an ownership change of the Company.

As stated above, section 382 also can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and all items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Based on the estimated reorganization value of the Company, the Company currently anticipates that it will be in a net unrealized built-in loss position on the Effective Date.

An exception to the foregoing annual limitation (and built-in gain and loss) rules generally applies where shareholders and qualified (so-called "old and cold") creditors of the debtor receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization and, during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

An old and cold creditor includes a creditor who has held its debt continuously beginning at least 18 months prior to the filing of the chapter 11 case. In addition, any stock received by a creditor who does not become a direct or indirect 5% shareholder of the reorganized debtor generally will be treated as received by an old and cold creditor, other than in the case of any creditor whose participation in the plan makes evident to the debtor that the creditor has not owned the debt for the requisite period. The Company anticipates that even if it would qualify for this exception, it will elect not to apply this exception and instead remain subject to the annual limitation and built-in gain and loss rules described above.

4.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL

carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as recomputed for AMT purposes).

In addition, if a corporation undergoes an "ownership change" within the meaning of section 382 of the Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

      B.      Tax Consequences to the Large Noteholders who receive New Notes and Effective Date New Common Stock in Exchange for the Senior Notes

             1.      Exchange of the Senior Notes for New Notes and Effective Date New Common Stock

For Large Noteholders that exchange the Senior Notes for New Notes and Effective Date New Common Stock pursuant to the Plan, the U.S. federal income tax consequences will depend on whether or not such exchange qualifies as a "recapitalization" under the Code. In general, the Code requirements for recapitalization treatment will be met so long as the Senior Notes are considered securities for U.S. federal income tax purposes. Furthermore, the receipt of the New Notes will constitute boot to the Large Noteholders in the recapitalization (potentially resulting in recognition of gain by the Large Noteholders) if the New Notes are not considered securities for U.S. federal income tax purposes. In this regard, the term "securities" is not clearly defined under current U.S. federal income tax law; instead, the status of a debt instrument as a security typically is determined based upon an overall evaluation of the nature of the debt instrument, the term to maturity of the debt instrument, the extent of the investor's proprietary interest in the issuer of the debt instrument and certain other factors. While the matter is not free from doubt, the Company believes that both the Senior Notes and the New Notes should be considered securities for U. S. federal income tax purposes, and, thus, that the exchange of the Senior Notes for the New Notes and Effective Date New Common Stock pursuant to the Plan should qualify as a recapitalization under the Code, and the receipt of the New Notes should not constitute boot to the Large Noteholders in the recapitalization.

Assuming that the Senior Notes and New Notes are securities, a Large Noteholder will not generally recognize gain or loss on the exchange of such Senior Notes for Effective Date New Common Stock and New Notes, except as discussed in Section 3 below. A Large Noteholder will, however, be treated as receiving an interest payment to the extent that a portion of the New Notes and Effective Date New Common Stock received is allocable to accrued interest that accrued during the Large Noteholder's holding period for the Senior Notes exchanged therefore. Accordingly, a Large Noteholder who had not previously included such accrued interest in income will recognize ordinary taxable income with respect to such interest payment, and a Large Noteholder who had previously included such accrued interest in income will recognize ordinary income or loss equal to the difference between the Large Noteholder's basis in such interest (i.e., the amount of such accrued interest recognized as income by such Large Noteholder) and the amount of the payment. Any distributions received by a Large Noteholder of the New Notes and Effective Date New Common Stock shall be allocated first to the principal portion of the Senior Notes to the extent thereof and thereafter to any accrued interest on the Senior Notes. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. Each Noteholder is urged to consult its tax advisor regarding the allocation of consideration.

The tax basis of the Effective Date New Common Stock and New Notes received in the exchange will be equal to the portion of adjusted tax basis of the Senior Notes surrendered in the exchange allocable to the Effective Date New Common Stock and New Notes, respectively, increased by any gain recognized on the receipt of the boot described in Section 3 below, and increased, for a cash method

Large Noteholder, by the amount of income recognized with respect to accrued interest and decreased by any deduction or loss claimed in respect of any previously accrued interest. It is unclear how the amounts treated as interest payments and how such income, deduction or loss would be allocated as between the New Notes and Effective Date New Common Stock, and each Large Noteholder is urged to consult its tax advisor regarding such allocation. The adjusted tax basis of the Senior Notes is allocated between the Effective Date New Common Stock and New Notes based on their relative fair market values. The holding period of the New Notes and Effective Date New Common Stock received in the exchange will include the holding period of the Senior Notes surrendered in the exchange (provided such Senior Notes were held as a capital asset at the time of the exchange), except that the portion of Effective Date New Common Stock and New Notes treated as interest payments will have a new holding period beginning the day after the exchange.

2.    Consequences of Distribution of the Noteholder Cash to Holders of AET Common Stock

Pursuant to the Plan, a series of transfers of the Noteholder Cash will be deemed to occur. The Company intends to take the position that because the Large Noteholders will have no dominion or control over the Noteholder Cash, and there will be no accretion of wealth to the Large Noteholders as a result of the deemed distribution of this amount to the Indenture Trustee (regardless of whether the Equity Committee Appointment occurs), such deemed distributions will not have any federal income tax consequences to the Large Noteholders. However, there is no assurance that such a position would be accepted by the IRS for federal income tax purposes. In the event the deemed transfer of the Noteholder Cash to the Indenture Trustee, on behalf of the Large Noteholders is treated as a distribution for federal income tax purposes from Reorganized AET to the Large Noteholders (and assuming the exchange of Senior Notes for New Notes and Effective Date New Common Stock qualifies as a recapitalization), such deemed distribution should constitute "boot" in the recapitalization. The consequences of such deemed distribution would vary depending on the particular circumstances of each Large Noteholder and may result in the recognition of gain by such Large Noteholder. However, such deemed distribution should not result in federal income tax to a Noteholder that did not realize gain in the exchange of such Noteholder's Senior Notes for New Notes and Effective Date New Common Stock and such deemed distribution. Each Large Noteholder is urged to consult its tax advisor regarding the treatment of such deemed distributions.

3.    High Yield Discount Obligations

As described above, the New Notes may be subject to the provisions governing "high yield discount obligations." In this event, a portion of the total return on the debt instrument would not be deductible by the Company and could be treated, when accrued, as a distribution eligible for the dividends received deduction for Large Noteholders that are corporations. Such Noteholders are urged to consult their tax advisors regarding the application of these rules.

4.    Subsequent Sale of Effective Date New Common Stock or New Notes

(a)    Sale of Effective Date New Common Stock

Upon the sale, exchange, redemption or other taxable disposition of Effective Date New Common Stock (collectively, a "disposition"), a Large Noteholder will generally recognize capital gain or loss equal to the difference between (1) the amount of cash and the fair market value of any property received with respect to such disposition and (2) the Large Noteholder's adjusted tax basis in the Effective Date New Common Stock. Such capital gain or loss will be long-term capital gain or loss if the Large

Noteholder's holding period for such Effective Date New Common Stock exceeds one year on the date of disposition.

> (b)    Sale, Exchange, Redemption or other Taxable Disposition of the New Notes

Upon the sale, exchange, redemption or other taxable disposition of a New Note (collectively, a "disposition"), a Large Noteholder will generally recognize capital gain or loss equal to the difference between (1) the amount of cash and the fair market value of any property received with respect to such disposition, and (2) the Large Noteholder's adjusted tax basis in the New Note. A Large Noteholder's adjusted tax basis in a note generally will equal either the portion of the adjusted tax basis of the Senior Note allocable to the New Note or the portion of the cash paid for the New Note allocable to the New Note, and increased by the amount of OID previously included in income and decreased by the amount of any cash payment received with respect to the New Note. Such capital gain or loss will be long-term capital gain or loss if the Large Noteholder's holding period for such New Note exceeds one year on the date of disposition.

> (c)    Accrued Market Discount

Any accrued "market discount" not treated as ordinary income upon a tax-free exchange of market discount bonds carries over to nonrecognition property received in the exchange. Large Noteholders that have accrued market discount would carry over the portion of accrued market discount allocable to the Effective Date New Common Stock and New Notes received pursuant to the Plan such that any gain recognized by the Large Noteholder upon a subsequent disposition of such Effective Date New Common Stock and New Notes would be treated as ordinary income to the extent of any accrued market discount not previously included in income (unless the amount of such market discount was a de minimis amount, in which case market discount is disregarded). In general, a Senior Note will have accrued "market discount" if such Senior Note was acquired after its original issuance at a discount to its adjusted issue price.

> 5.    Original Issue Discount

Large Noteholders should be aware that the New Notes will be issued with original issue discount ("OID"). The total amount of OID on the New Notes will be the excess of the stated redemption price at maturity over the issue price of the New Notes. The Large Noteholders generally must include OID in gross income in advance of the receipt of cash attributable to that income (but will not be taxed again when such cash is received). The amount of OID includible in income each year is determined using a constant yield to maturity.

The issue price of the New Notes depends on (i) whether a substantial amount of such New Notes will be issued for money and (ii) whether a substantial amount of such New Notes or Senior Notes are considered to be "traded on an established market" within the meaning of applicable U.S. Treasury Regulations. Under applicable U.S. Treasury Regulations, if a substantial amount of the New Notes is issued for money, then the issue price of each of the New Notes will be the first price at which a substantial amount of the debt instruments is sold for money. The Company intends to take the position that, while certain of the Large Noteholders will receive a portion of the New Notes in exchange for cash, such portion will not be a substantial amount of the New Notes. The Company expects that the New Notes will not be considered to be traded on an established market. As a result, if the Senior Notes are considered to be traded on an established market, as the Company expects, the issue price of the New Notes will be determined by reference to the trading price of such Senior Notes, as discussed in the next sentence. In determining the issue price of the New Notes, the Effective Date New Common Stock and

New Notes will be treated as an "investment unit" that has an issue price equal to the fair market value of the Senior Notes on the issue date of the investment unit. Assuming, as is expected, that neither the Effective Date New Common Stock nor the New Notes will be traded on an established market, the issue price of the unit will then be allocated between the Effective Date New Common Stock and New Notes based on their relative fair market values.

The "stated redemption price at maturity" of a debt instrument is the aggregate of all payments due to the holder under such debt instrument at or before its maturity date, other than interest that is actually and unconditionally payable in cash or property (other than debt instruments of the issuer) at fixed intervals of one year or less during the entire term of the instrument at certain specified rates ("qualified stated interest"). Under this definition, no interest payable with respect to the New Notes will be treated as qualified stated interest, since the Company has the option to defer the interest payments in lieu of paying cash interest (the "Deferred Interest Payments") under certain circumstances. Instead, the Deferred Interest Payments and any interest that would accrue thereon (assuming deferral until the New Note matures) will be aggregated with the New Notes, and such Deferred Interest Payments and accrued interest will be taken into account in determining the stated redemption price at maturity of the New Notes.

The amount of OID includible in income for a taxable year by a Large Noteholder will generally equal the sum of the "daily portions" of the total OID on the New Notes for each day during the taxable year on which such Large Noteholder held the New Notes. Generally, the daily portion of the OID is determined by allocating to each day in any accrual period a ratable portion of the OID allocable to such accrual period. The amount of OID allocable to an accrual period will generally be the product of the "adjusted issue price" of a note at the beginning of such accrual period and its "yield to maturity", less the amount of any qualified stated interest allocable to such period. The "adjusted issue price" of a note at the beginning of an accrual period will equal the issue price plus the amount of OID previously includible in the gross income of any Large Noteholder, less any payments made on such note on or before the first day of the accrual period. The "yield to maturity" of a note will be computed on the basis of a constant interest rate and compounded at the end of each accrual period. An accrual period may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day or the first day of an accrual period.

If a note is subject to a call option by the issuer and the exercise of the call option would result in a payment schedule that would reduce the yield to maturity, the issuer will be deemed to exercise the call option. The result would be to treat the first such call date as the maturity date of the note and to compute the stated redemption price at maturity and yield to maturity accordingly. The Company's option to call the New Notes (the "Call Option") should not result in a lower yield to maturity if the Call Option is exercised, and, therefore, should not be deemed exercised.

In the event the Company makes an interest payment in cash rather than deferring the payment, such payment will be treated as a pro-rata prepayment. As a result, the Large Noteholder will be treated as if a portion of the New Notes were retired (the "Retired Notes") and the stated redemption price at maturity will be reduced by the amount of the pre-payment. The adjusted issue price, Large Noteholder's adjusted basis, and accrued but unpaid OID determined immediately before the prepayment will be allocated between the Retired Notes and the remaining portion of the New Notes based on the relative amounts of the Retired Notes and the remaining outstanding New Notes. The pre-payment received by the Large Noteholder will be considered to be received from the sale or exchange of the Retired Notes.

If a Large Noteholder's adjusted tax basis in the New Note immediately after the exchange of the Senior Notes for the New Notes (i) is less than or equal to the sum of all amounts payable on the New

Notes, but (ii) exceeds the adjusted issue price of such New Notes, such excess will be considered "acquisition premium." In such case, the daily portion of OID for any day that the Large Noteholder holds the New Note is reduced by a fraction, the numerator of which is the amount of acquisition premium and the denominator of which is the excess of the sum of all amounts payable on the New Notes after the date of exchange over the adjusted issue price of the New Notes. Alternatively, a Large Noteholder may elect to amortize acquisition premium on a constant-yield basis.

If the Large Noteholder's adjusted tax basis in the New Notes immediately after the exchange exceeds the amount that is the stated redemption at maturity, the Large Noteholder will be considered to have amortizable bond premium equal to such excess and will not be required to accrue any OID income. In addition, the Large Noteholder may elect to amortize this premium using a constant yield method, over the remaining term of the New Notes. A Large Noteholder who elects to amortize bond premium may offset each interest payment on such New Notes by the portion of the bond premium allocable to such payment and must reduce its tax basis in the New Notes by the amount of the premium amortized in any year.

C.      Tax Consequences to Small Noteholders on the Redemption of the Senior Notes by the Company for Cash

The receipt of solely cash by the Small Noteholders in exchange for the Senior Notes will be a taxable transaction for federal income tax purposes. Accordingly, a Small Noteholder that receives solely cash will generally recognize gain or loss for such purposes in an amount equal to the difference between the amount of cash received and the Small Noteholder's adjusted tax basis in its Senior Notes. Subject to the discussion below, any such gain or loss recognized will be a capital gain or loss for such purposes, assuming that the Small Noteholder has held his or her Senior Note as a capital asset. Any such capital gain or loss will be long-term capital gain or loss for such purposes if the Small Noteholder has held his or her Senior Notes for more than one year. In the event, however, that the Company distributes New Notes, Effective Date New Common Stock, and possibly cash to the Small Noteholders in exchange for their Senior Notes, pursuant to Section 5.9 of the Plan, then assuming, as discussed in Section XII.B.1 above, that the Senior Notes are securities, such exchange should constitute a recapitalization for U.S. federal income tax purposes as described in such Section XII.B.1. If the exchange is treated as a recapitalization for U.S. federal income tax purposes, a Small Noteholder would recognize gain, if any, to the extent of any "boot" received in the recapitalization (which will include any cash received and will include New Notes received if such New Notes are not treated as securities) and would not recognize a loss in the exchange. Each Small Noteholder is urged to consult its own tax advisor regarding the U.S. federal income tax consequences of a recapitalization.

In the case of a Small Noteholder who acquired the Notes at a market discount (unless the amount of such market discount was a de minimis amount, in which case market discount is disregarded), any gain recognized upon the sale of the Senior Notes will represent ordinary income to the extent of the market discount that accrued during the period such Small Noteholder held such Senior Note, unless the Small Noteholder previously had elected to include such accrued market discount in the Small Noteholder's income on a current basis. In general, a Senior Note will have accrued market discount if such Senior Note was acquired after its original issuance at a discount to its adjusted issue price.

Furthermore, a Small Noteholder will recognize ordinary income to the extent a portion of the cash received by the Small Noteholder is allocable to accrued but unpaid interest on the Senior Notes. A Small Noteholder who had not previously included such accrued interest in income will recognize ordinary taxable income with respect to such interest payment, and a Small Noteholder who had previously included such accrued interest in income will recognize ordinary income or loss equal to the

difference between the Small Noteholder's basis in such interest (i.e., the amount of such accrued interest recognized as income by such Small Noteholder) and the amount of the payment.

Pursuant to the Plan, a series of transfers of the Noteholder Cash will be deemed to occur. The Company intends to take the position that because the Small Noteholders will have no dominion or control over the Noteholder Cash, and there will be no accretion of wealth to the Small Noteholders as a result of the deemed distribution of this amount to the Indenture Trustee (regardless of whether the Equity Committee Appointment occurs), such deemed distributions will not have any federal income tax consequences to the Small Noteholders. However, there is no assurance that such a position would be accepted by the IRS for federal income tax purposes. In the event the deemed transfer of the Noteholder Cash to the Indenture Trustee, on behalf of the Small Noteholders is treated as a distribution for federal income tax purposes from Reorganized AET to the Small Noteholders, such deemed distribution should constitute additional consideration received by the Small Noteholders in the exchange for the Senior Notes. Each Small Noteholder is urged to consult its tax advisor regarding the treatment of such deemed distributions.

D.    Backup Withholding

Under certain circumstances a Noteholder may be subject to backup withholding at the rate of 28% with respect to "reportable payments." The Company will be required to deduct and withhold the prescribed amount if (a) the Noteholder fails to furnish a taxpayer identification number ("TIN") to the Company in the manner required, (b) the IRS notifies the Company that the TIN furnished by the Noteholder is incorrect, (c) there has been a failure of the Noteholder to certify under penalty of perjury that the Noteholder is not subject to withholding or (d) the Noteholder is notified by the IRS that he or she failed to report properly payments of interest and dividends and the IRS has notified the Company that he or she is subject to backup withholding.

Backup withholding is not an additional tax. Any amount withheld from a payment to a Noteholder under the backup withholding rules is allowable as a credit against such holder's U.S. federal income tax liability (and may entitle such holder to a refund), provided that the required information is furnished to the IRS. Certain persons are exempt from backup withholding, including corporations and financial institutions. Noteholders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such exemption.

## XIII.  CONFIRMATION

The Debtors intend to seek a "first day order" scheduling the Confirmation Hearing, at which the Debtors will seek approval of this Solicitation and Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code.

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Should the Company file a petition for relief under chapter 11 of the Bankruptcy Code and seek confirmation of the Plan, the Bankruptcy Court will schedule a Confirmation Hearing to consider whether the Plan satisfies the various requirements of the Bankruptcy Code. At that time, the Debtors will submit a report to the Bankruptcy Court concerning the vote for acceptance or rejection of the Plan by the parties entitled to vote thereon. The Debtors intend to seek a "first day order" scheduling the Confirmation Hearing, at which the Debtors will seek approval of this Solicitation and Disclosure Statement and Confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. The Confirmation Hearing Notice will be provided to all Holders of Claims and Equity Interests or their representatives are required by rule 2002 of the Bankruptcy Rules and the Bankruptcy Court. Objections to confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Bankruptcy Rules 3020(b) and 9014, and local rules of the Bankruptcy Court. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.    Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of section 1129 of the Bankruptcy Code have been satisfied. If all of the provisions of section 1129 of the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan. The Debtors believe that all the requirements of section 1129 of the Bankruptcy Code will be satisfied.

### C.    Class Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or interests accept a plan, subject to the exceptions described in the section entitled "Cramdown of the Plan" below. At least one impaired class of claims must accept a plan in order for the plan to be confirmed.

For a class of claims to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by creditors that hold at least two-thirds in dollar amount and a majority in number of allowed claims of such class, in both cases counting only those claim actually voting to accept or reject the plan. The holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

For a class of interests to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting

120

only those interests actually voting to accept or reject the plan. The holders of interests who fail to vote are not counted as either accepting or rejecting a plan.

If the Plan is confirmed, the Plan will be binding with respect to all Holders of Claims and Equity Interests of each Class, including Classes and members of such Classes that did not vote or that voted to reject the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that they have complied or will have complied with all of the requirements of chapter 11, and that the Plans have been proposed and are made in good faith.

      D.      Cramdown

A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does not "discriminate unfairly" with respect to each nonaccepting impaired class of claims or interests. With respect to a dissenting class of claims, the "fair and equitable" standard requires, among other things, that the plan contain one of two elements. It must provide either that each holder of a claim in such class receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or that no holder of allowed claims or interests in any junior class receive or retain any property on account of such claims or interests. With respect to a dissenting class of interests, the "fair and equitable" standard requires that the plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

In the event that any impaired Class shall fail to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or modify the Plan in accordance with the terms thereof. See Article X.D. "RISK FACTORS — Risks of Voluntary Bankruptcy Filing."

      E.      Plan Meets Requirements for Confirmation

           1.      Best Interests of Creditors—Liquidation Analysis

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, that is, that the Plan is in the best interests of each Holder of a Claim or Equity Interest in an impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each Holder in such impaired class a recovery on account of the Holder's Claim or Equity Interest that has a value at least equal to the value of the distribution that each such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

In the opinion of the Company, confirmation of the Plan is in the best interests of the Holders of Claims and Equity Interests because they provide to Holders of impaired Claims and Equity Interests

distributions having a present value as of the Effective Date of not less than the value such Holders would likely receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Article VIII "PROJECTIONS AND VALUATION ANALYSIS" and Article IX. "LIQUIDATION ANALYSIS."

To estimate what members of each impaired Class of Claims or Equity Interests would receive if the Debtors were liquidated pursuant to chapter 7 of the Bankruptcy Code, the Debtors must first determine the aggregate dollar amount that would be available if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtors would consist of the net proceeds from the disposition of assets of the Debtors, augmented by any Cash held by the Debtors.

In summary, the Debtors believe that chapter 7 liquidation would result in a diminution in the value to be realized by Holders of Claims and Equity Interests due to, among other factors, (i) the failure to realize the maximum going-concern value of the Debtors' assets, (ii) the incurrence of additional tax liabilities in the event of a liquidation, (iii) additional costs and expenses involved in the appointment of a chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee in the chapter 7 case, (iv) additional expenses and Claims, some of which would be entitled to priority in payment, which would arise by reason of the liquidation, including Claims resulting from the rejection of unexpired real estate leases and other leases and executory contracts in connection with a cessation of the Debtors' real estate operations, and (v) the substantial time that would elapse before creditors would receive any distribution in respect of their Claims. Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' business, will provide a greater ultimate return to Holders of Claims and Equity Interest than would a chapter 7 liquidation.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Holders of Claims and Equity Interests in impaired Classes would receive a distribution under the Plan that is at least as great as the distribution that such Holders would receive upon a liquidation of the Debtors pursuant to chapter 7 of the Bankruptcy Code.

       2.       Feasibility of the Plan

On the Effective Date, based upon the Debtors' current cash balance and access to the Exit Facility, the Debtors believe that there will be Cash sufficient to satisfy all Allowed and Disputed Claims (to the extent that such Claims are allowed subsequent to the Effective Date).

The Debtors also believe that confirmation of the Plan is not likely to be followed by a liquidation of Reorganized AET or a need for a further financial reorganization of Reorganized AET. Upon consummation of the Exit Facility in the amount of $125 million, Reorganized AET will have sufficient Cash to support and meet the ongoing financial needs of Reorganized AET. The Projections indicate that the Plan as proposed by the Debtors is feasible and that Reorganized AET will be financially viable after confirmation of the Plan.

       F.       Alternatives to Confirmation and Consummation of the Plan

If the Debtors commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include (i) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code or (iii) an out of court restructuring which would result in a dismissal of the proceedings. One of the conditions to consummation of the Plan is the availability to the Debtors of an Exit Facility in an amount of up to $125 million on terms and conditions satisfactory to the Debtors.

If the Plan is not confirmed, the Debtors will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Debtors, their creditors and other parties in interest.

        1.       Liquidation Under Chapter 7 or Chapter 11

If no plan of reorganization is confirmed (and in certain other circumstances), the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the potential effects that a chapter 7 liquidation would have on the recovery of Holders of Claims and Equity Interests is set forth under Article IX. "LIQUIDATION ANALYSIS." In a liquidation, the assets of the Debtors would be sold in exchange for cash, securities or other property, which would then be distributed to creditors. In contrast to the Plan (or an alternative reorganization under chapter 11 of the Bankruptcy Code), in which certain creditors would receive debt or equity securities of the Reorganized Debtors and would be subject to the risks associated with holding such securities, in a liquidation creditors might receive cash or other assets which are not subject to those risks. See Article X.D. "RISK FACTORS—Risks of Voluntary Bankruptcy Filing." However, the Debtors believe that liquidation under chapter 7 would result in smaller distributions (and, as to certain Classes, no distributions) as compared to those provided for in the Plan because of, among other things, (i) failure to realize the greater going-concern value of the Debtors' assets and the erosion in value of assets in a chapter 7 case due to the expeditious liquidation required and the "forced sale" atmosphere that would prevail, (ii) additional administrative expenses involved in the appointment of a trustee and professional advisors to such trustee and (iii) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations of the Debtors. In addition, a chapter 7 liquidation is likely to result in substantial litigation and delays in ultimate distributions to creditors. In the event of a chapter 7 liquidation, the Debtors believe that there would not be sufficient assets to make any distribution to any unsecured creditors.

In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, potentially resulting in somewhat greater (but indeterminate) recoveries. Although preferable to a chapter 7 liquidation, the Company believes that a liquidation under chapter 11 would still not realize the full going-concern value of the Debtors' assets or the value of any accumulated net operating losses. First, the going-concern value is predicated upon the Debtors continuing in operation. In contrast, liquidation value assumes that the Debtors would be unable to continue functioning as a going concern and their assets would be sold separately. Second, due to certain provisions of the Tax Code, it is unlikely that the Debtors could take advantage of the Debtors' accumulated NOLs following a liquidation or a sale of the Debtors' assets to an unaffiliated third party. Consequently, the Debtors believe that a liquidation under chapter 11 is a less attractive alternative to creditors than the Plan because of the likelihood of a greater recovery provided for by the Plan. See Article II. "THE PLAN" and Article IX. "LIQUIDATION ANALYSIS."

        2.       Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors (or, if the exclusive period in which to file a plan of reorganization has expired or is terminated by the Bankruptcy Court, any other party in interest) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets.

The Debtors believe that the Plan is a significantly more attractive alternative than these alternatives, because it could, among other things, maximize the value of the Debtors' NOLs, minimize

disputes during such proceeding concerning the reorganization of the Debtors, significantly shorten the time required to accomplish the reorganization, reduce the expenses of cases under chapter 11 of the Bankruptcy Code, minimize the disruption of the Debtors' business that would result from a protracted and contested bankruptcy case and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 or chapter 11 of the Bankruptcy Code.

## RECOMMENDATION AND CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of creditors and that the Plan should be confirmed. The Debtors recommend that all Holders of Claims that are entitled to vote on the Plan vote to accept the Plan.

Respectfully Submitted,

APPLIED EXTRUSION TECHNOLOGIES, INC.

By:

Name:  David N. Terhune
Title:  President


APPLIED EXTRUSION TECHNOLOGY
(CANADA), INC.

By:

Name:  David N. Terhune
Title:  President